**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| GRANITE BROADCASTING | : | Case No. 06-12984 (ALG) |
| CORPORATION, <u>et al.</u>, | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |

-----------------------------------------------------------------

**DISCLOSURE STATEMENT**
**PURSUANT TO SECTION 1125 OF THE BANKRUPTCY**
**CODE FOR DEBTORS' FIRST AMENDED JOINT PLAN OF**
**REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022
(212) 872-1000

Attorneys for Debtors
and Debtors in Possession

Dated:  March 2, 2007

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................................1

II. SUMMARY OF THE TREATMENT OF CREDITORS AND STOCKHOLDERS
    UNDER THE PLAN...........................................................................................................9

    A.       Summary of Voting Procedures. ...............................................................18
    B.       Recommendation. .....................................................................................19

III. OVERVIEW OF CHAPTER 11 PROCESS .........................................................................19

IV. BUSINESS DESCRIPTION AND REASONS FOR CHAPTER 11 .....................................20

    A.       Corporate Structure...................................................................................20
    B.       Background................................................................................................20

            1.       Overview. ......................................................................................20

            2.       History...........................................................................................22

            3.       Industry Overview..........................................................................23

            4.       Broadcast Licenses and the Granite Entities' Relationship with the
                      FCC. ..............................................................................................23

            5.       Sources of Revenue and Operating Expenses...........................................24

            6.       Competitive Market. ......................................................................24

            7.       Properties. .....................................................................................25

            8.       Legal Proceedings. ........................................................................25

    C.       Prepetition Capital Structure......................................................................29

            1.       Secured Notes. ...............................................................................29

            2.       Prepetition Credit Agreement. ........................................................30

            3.       Interests.........................................................................................31

            4.       The Malara Agreements. .................................................................32

V. EVENTS LEADING TO THE COMMENCEMENT OF THE REORGANIZATION
    CASES ............................................................................................................................33

    A.       The Programming Contracts.......................................................................33
    B.       Efforts to Sell the San Francisco and Detroit Stations..................................34
    C.       The Granite Entities' Inability to Make Payments Under  the Secured
            Notes Indenture and Entry into the Prepetition Credit Agreement. ......................35
    D.       The Granite Entities' Business Plan.............................................................35

i

E.      Prepetition Restructuring Efforts. ...........................................................37

VI. SIGNIFICANT EVENTS DURING THE REORGANIZATION CASES ............................40

A.      First Day Orders.......................................................................................40
B.      Debtor in Possession Financing. ..............................................................41
C.      The WB Settlement...................................................................................41
D.      The Schedules and Bar Date. ...................................................................42
E.      Creditors Committee.................................................................................42
F.      Requests for the Appointment of an Equity Committee. ..........................43
G.      The Examiner Motion. ..............................................................................43
H.      The Fox Motion to Allow Claims and the Fox Stipulation......................44
I.       The Beck Stipulation.................................................................................45
J.      The Debtors' Exclusive Right to File and Solicit Acceptances of a Plan. .............46
K.      Approval of the Rights Offering. ..............................................................46
L.      Assumption and Rejection of Executory Contracts and Unexpired Leases. .........46

VII. THE PLAN OF REORGANIZATION.......................................................................47

A.      Introduction..............................................................................................47
B.      Summary of the Structure of the Reorganized Debtors On and After the
         Effective Date. .........................................................................................47
C.      Classification and Treatment of  Claims and Interests Under the Plan...................47

         1.      Unclassified....................................................................................50

         2.      Classified........................................................................................53

D.      Means of Implementation. ........................................................................65

         1.      Non-Substantive Consolidation. ....................................................65

         2.      Intercompany Claims and Subsidiary Interests..............................66

         3.      New Corporate Structure for Reorganized Granite.......................66

         4.      Authorization of Plan Securities. ...................................................66

         5.      Incurrence of New Indebtedness – the Exit Facility. ....................67

         6.      Cancellation of Existing Securities and Agreement and Related
                 Indentures/Discharge of Indenture Trustee. .................................67

         7.      Reorganized Granite Board of Directors. .....................................68

         8.      Reorganized Subsidiaries Board of Directors................................69

         9.      Officers of Reorganized Debtors. ..................................................69

         10.     Management Incentive Plan..........................................................69

         11.     New Employment Agreements. ......................................................69

         12.     Corporate Action. ..........................................................................69

         13.     By-Laws and Certificates of Incorporation...................................70

E.      Securities to Be Issued Under the Plan. ....................................................70

    1.      The New Common Stock. ......................................................................70

    2.      The New Warrants Series A and the New Warrants Series B. .................70

    3.      The Rights. ...........................................................................................71

F.      Securities Law Matters. ............................................................................71

    1.      Issuance and Resale of New Securities Under the Plan...........................71

G.      The Rights Offering. ..................................................................................73

    1.      Issuance of Rights. ...............................................................................73

    2.      Exercise of Rights. ...............................................................................74

    3.      Transfer and Revocation of the Rights. .................................................75

    4.      Use of Proceeds from the Rights Offering...............................................75

    5.      Private Placement Exemption. ..............................................................75

    6.      1145 Exemption. ..................................................................................75

H.      Plan Provisions Governing Distributions...................................................76

    1.      Record Date for Distributions. ..............................................................76

    2.      Date of Distributions............................................................................76

    3.      Subsequent Distributions. ....................................................................76

    4.      Surrender of Instruments......................................................................77

    5.      Setoffs. ................................................................................................77

    6.      Delivery of Distributions. .....................................................................77

    7.      Manner of Payment Under the Plan.......................................................78

    8.      No Fractional Distributions...................................................................78

    9.      Withholding and Reporting Requirements. ............................................78

    10.     Time Bar to Cash Payments..................................................................78

    11.     Transactions on Business Days..............................................................79

    12.     Allocation of Distributions. ..................................................................79

    13.     Disbursing Agent. ................................................................................79

    14.     Rights and Powers of Disbursing Agent. ...............................................79

    15.     Distributions to Preferred Interests and Common Interests......................80

I.      Procedures for Treating Disputed Claims. .................................................80

    1.      No Distribution Pending Allowance. ......................................................80

    2.      Resolution of Disputed Claims. .............................................................80

    3.      Estimation of Claims.............................................................................80

4.     Allowance of Disputed Claims. ................................................................81

J.     Provisions Governing Executory Contracts and Unexpired Leases. ....................81

1.     General Treatment..................................................................................81

2.     Cure of Defaults....................................................................................82

3.     Rejection Claims. ..................................................................................83

K.     Conditions Precedent to Occurrence of Effective Date. ........................................83

1.     Conditions Precedent to Confirmation....................................................83

2.     Conditions Precedent to the Occurrence of the Effective Date. ................83

3.     Waiver of Conditions. ...........................................................................84

4.     Effect of Failure of Conditions. .............................................................84

L.     Effect of Confirmation. ........................................................................................85

1.     Vesting of Assets. .................................................................................85

2.     Binding Effect. .....................................................................................85

3.     Discharge of Claims and Termination of Interests....................................85

4.     Release and Discharge of Debtors. .........................................................85

5.     Release and Discharge of Non-Debtor Subsidiaries. ................................86

6.     Terms of Injunctions or Stays. ...............................................................86

7.     Indemnification Obligations. ..................................................................86

8.     D&O Tail Coverage Policies...................................................................86

9.     Injunction Against Interference with the Plan. .........................................86

10.    Exculpation. .........................................................................................87

11.    Limited Releases....................................................................................87

12.    Avoidance Actions. ...............................................................................88

13.    Injunctions Regarding Worthless Stock Deduction. ..................................89

M.     Retention of Jurisdiction. .....................................................................................89
N.     Miscellaneous Provisions......................................................................................91

VIII. PROJECTIONS AND VALUATION ANALYSIS ...............................................................91

A.     Projected Financial Statements. ............................................................................91
B.     Valuation. ...........................................................................................................93

1.     Valuation Methodology..........................................................................97

IX. CERTAIN FACTORS TO BE CONSIDERED ......................................................................100

A.     Certain Reorganization Considerations. ..............................................................100

B.    Risks Relating to the Plan Securities. ...............................................................101

1.    Variances from Projected Financial Information. ...................................101

2.    Lack of Trading Market. .......................................................................102

3.    Restrictions on Transfer. ......................................................................102

C.    Competition in the Broadcasting Industry. .........................................................102
D.    Government Regulation. .....................................................................................103
E.    Reliance on Key Personnel. ................................................................................103
F.    Liquidity and Capital Resources. ........................................................................103
G.    Additional Factors to Be Considered. .................................................................104

1.    The Debtors Have No Duty to Update. ..................................................104

2.    No Representations Outside This Disclosure Statement Are
Authorized. ...........................................................................................104

3.    Projections and Other Forward Looking Statements Are Not
Assured, and Actual Results Will Vary. ..................................................104

4.    Claims Could Be More Than Projected. .................................................104

5.    No Legal or Tax Advise Is Provided to You By This Disclosure
Statement. .............................................................................................104

6.    No Admission Made. .............................................................................105

X.  VOTING PROCEDURES AND REQUIREMENTS .............................................................105

A.    Vote Required for Acceptance by a Class. ...........................................................105
B.    Classes Not Entitled to Vote. ..............................................................................105
C.    Voting. ...............................................................................................................106

XI.  CONFIRMATION OF THE PLAN OF REORGANIZATION. ...........................................108

A.    Confirmation Hearing. ........................................................................................108
B.    Requirements for Confirmation of the Plan of Reorganization. ...........................108

1.    Requirements of Section 1129(a) of the Bankruptcy Code. ....................108

2.    Requirements of Section 1129(b) of the Bankruptcy Code. ....................111

XII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN
OF REORGANIZATION .....................................................................................112

A.    Liquidation Under Chapter 7. .............................................................................112
B.    Alternative Plan of Reorganization. ....................................................................113

XIII.  CERTAIN US FEDERAL INCOME TAX CONSIDERATIONS ......................................113

A.    Tax Treatment of Implementing the Plan. ............................................................115

      1.      Certain U.S. Federal Income Tax Consequences to Reorganized Debtors .................................................................................................115

      2.      Tax Treatment of US Holders of Secured Claims....................................116

      3.      Tax Treatment of Amounts Received for Accrued Interest......................118

B.     Tax Consequences of Owning the Exit Secured Term Loan ..............................118

      1.      The Exit Secured Term Loan ...................................................................119

      2.      Acquisition Premium, Market Discount and Bond  Premium With Respect to the Exit Secured Term Loan....................................................119

C.     Limitation on Use of Capital Losses..................................................................120

D.     Information Reporting and Backup Withholding ...............................................121

XIV. CONCLUSION ...............................................................................................................122

# I.

# INTRODUCTION

Granite Broadcasting Corporation ("*Granite*") and certain of its direct and indirect subsidiaries (the "*Debtor Subsidiaries*" and, collectively with Granite, the "*Debtors*"),[1] each a Delaware corporation, as debtors and debtors in possession in the reorganization cases (the "*Reorganization Cases*") under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), jointly submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against the Debtors in connection with the solicitation of acceptances of the Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated March 2, 2007, as the same may be modified and/or amended from time to time (the "*Plan*"), filed contemporaneously herewith by the Debtors with the Bankruptcy Court. Unless otherwise defined herein, all capitalized terms used herein have the meanings ascribed to such terms in the Plan.

Attached as Exhibits to this Disclosure Statement are copies of the following documents:

- The Plan (Exhibit 1);

- Restructuring Support Agreement (Exhibit 2);

- Projections (Exhibit 3);

- Historical Financial Information (Exhibit 4);

- Liquidation Analysis (Exhibit 5);

- Order of the Bankruptcy Court approving this Disclosure Statement and establishing procedures with respect to the solicitation of votes on the Plan (the "*Disclosure Statement Order*") (Exhibit 6);

- Granite's Quarterly Report on Form 10-Q for the period ended September 30, 2006 (attached without exhibits) (Exhibit 7);

- Granite's Annual Report on Form 10-K for the fiscal year ended December 31, 2005 (attached without exhibits) (Exhibit 8);

---

[1] The Debtor Subsidiaries are WXON, Inc. ("*WXON*"), WXON License, Inc. ("*WXON License*"), WEEK-TV License, Inc. ("*WEEK-TV License*"), KBWB, Inc. ("*KBWB*"), and KBWB License, Inc. ("*KBWB License*"). WXON is the legal entity for the former WDWB-TV, which is now WMYD-TV. The Non-Debtor Subsidiaries are Granite Response Television, Inc., KBJR, Inc., Channel 11 License, Inc., KBJR License, Inc., Queen City Broadcasting of New York, Inc., WKBW-TV License, Inc., KSEE Television, Inc., KSEE License, Inc., WTVH, LLC, WTVH License, Inc., WISE-TV, Inc., WISE-TV License, LLC, WBNG, Inc. ("*WBNG*"), and WBNG License, Inc. ("*WBNG License*") The Debtor Subsidiaries and the Non-Debtor Subsidiaries are hereinafter collectively referred to as the "*Granite Subsidiaries*."

- Corporate structure of the Debtors and Non-Debtor Subsidiaries (Exhibit 9);

- Biographical information regarding the management of the Reorganized Debtors (Exhibit 10);

- The Fox Stipulation (as defined below and in the Plan) (Exhibit 11); and

- The Beck Stipulation (as defined below and in the Plan) (Exhibit 12).

The purpose of the Disclosure Statement is to provide sufficient information to enable the creditors of the Debtors who are entitled to vote on the Plan to make an informed decision on whether to accept or reject the Plan.  This Disclosure Statement describes, among other things:

- the Debtors' business (*Section IV*);

- the reasons the Debtors commenced their Reorganization Cases (*Section V*);

- significant events during the Reorganization Cases (*Section VI*);

- the Plan, including, among other things, the classification and treatment of Claims and Interests under the Plan, means of implementing the Plan, the terms of the securities to be issued under the Plan, how distributions under the Plan will be made and the manner in which Disputed Claims are resolved, and securities law issues (*Section VII*);

- certain factors affecting the Debtors (*Section IX*);

- voting procedures and requirements (*Section X*);

- the procedure for confirming the Plan (*Section XI*);

- alternatives to confirmation of the Plan (*Section XII*); and

- certain tax law issues (*Section XIII*).

Additional copies of this Disclosure Statement are available upon request made to the Debtors' Voting Agent, at the following address:

| Granite Broadcasting Corporation c/o The Trumbull Group, LLC d/b/a Wells Fargo Trumbull | |
| --- | --- |
| If by regular mail: Attention: Granite Broadcasting Corporation Balloting Center, P.O. Box 721, Windsor, CT 06095 | If by overnight or hand delivery: Attention: Granite Broadcasting Corporation Balloting Center, 4 Griffin Road North, Windsor, CT 06095 |
| Tel.:  (860) 687-3951 | |

A Ballot to accept or reject the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims that are entitled to vote to accept or reject the Plan, as explained below.

After notice and a hearing, the Bankruptcy Court approved the Disclosure Statement on February 14, 2007 and entered the Disclosure Statement Order on March 2, 2007 approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Plan.  **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order, a copy of which is attached as Exhibit 6 to this Disclosure Statement, sets forth in detail the deadlines, procedures, and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots.  Detailed voting instructions are also set forth on each Ballot.  Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order, and the instructions accompanying the Ballot in their entirety before voting on the Plan.  These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.  No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

WHO IS ENTITLED TO VOTE:  Pursuant to the Disclosure Statement Order, the Bankruptcy Court has established March 2, 2007 (the "***Voting Record Date***") as the record date for determining the holders of Claims entitled to vote to accept or reject the Plan.  Accordingly, the holders of Secured Claims (Classes 1A-1F), Granite General Unsecured Claims (Class 4A), KBWB General Unsecured Claims (Class 5), KBWB License General Unsecured Claims (Class 6), WEEK-TV License General Unsecured Claims (Class 7), WXON General Unsecured Claims

(Class 8), and WXON License General Unsecured Claims (Class 9) as of the Voting Record Date are entitled to vote on the Plan and a Ballot for acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims in these classes that are entitled to vote.  Holders of Secured Tax Claims (Class 2), and Priority Non-Tax Claims (Class 3) are conclusively presumed to accept the Plan and are not entitled to vote.  Holders of Malara Guaranty Claims (Class 4B), Preferred Interests (Class 10), Class A Interests (Class 11), Class B Interests (Class 12), Securities Claims (Class 13), and Subordinated Claims (Class 14) are deemed to reject the Plan and are not entitled to vote.

The Debtors are commencing this solicitation after extensive negotiations with Silver Point Finance, LLC and its Affiliates (collectively, "***Silver Point***").  Silver Point has been represented by Milbank, Tweed, Hadley & M$^c$Cloy LLP, as legal advisor.  Silver Point holds a majority of the Debtors' Secured Notes, is the Administrative Agent under the Prepetition Credit Agreement (as defined below), and is a holder of the Debtors' Preferred Interests.  As a result of these negotiations, prior to the commencement of the Reorganization Cases, the Debtors entered into the Restructuring Support Agreement, dated as of the Petition Date (and as amended on December 15, 2006 and January 10, 2007, and as may be further amended from time to time), with Silver Point and the Other Secured Claimholders (as defined in the Restructuring Support Agreement).[2]  Silver Point and the Other Secured Claimholders are, in the aggregate, the beneficial owners of more than 66 2/3% of the principal amount of the Debtors' Secured Notes and 100% of the principal amount of the claims pursuant to the Prepetition Credit Agreement.  Pursuant to the terms of the Restructuring Support Agreement, a copy of which is annexed hereto as Exhibit 2 to this Disclosure Statement, including the amendments thereto, and subject to the approval of the Disclosure Statement by the Bankruptcy Court, Silver Point and the Other Secured Claimholders have agreed to vote to accept the Plan.  The performance of Silver Point and the Other Secured Claimholders under the Restructuring Support Agreement is subject to numerous conditions contained therein.

In addition, holders of an additional approximate 17% of the principal amount of the Debtors' Secured Notes have indicated that they intend to vote to support the Plan, subject to definitive documentation of a shareholders' agreement (the "***Shareholders' Agreement***") and related documentation, the principal terms of which have been negotiated and a copy of which will be included in the Plan Supplement.  Thus, in the aggregate, with the parties to the Restructuring Support Agreement, the holders of approximately 90% of the Secured Claims have agreed to, or indicated that they intend to, support the Plan.

The Debtors' financial advisor, Houlihan Lokey, has conducted a valuation of the Debtors and their subsidiaries using widely-accepted valuation methodologies (as more fully set forth in *Section VIII*).  This valuation has produced a range of value for the Debtors and their subsidiaries, including the Non-Debtor Subsidiaries and Malara, between $463 million and $523 million, which, after deducting the outstanding Malara debt, is less than the total aggregate

---

[2] The signatories to the Restructuring Support Agreement are:  (i) Field Point I, Ltd.; (ii) Field Point III, Ltd.; (iii) Grand Central Asset Trust, SIL Series; (iv) Grand Central Asset Trust, SPF Series; (v) the Granite Entities; (vi) Sea Pines Funding, LLC; (vii) Silver Point Capital Fund LP; (viii) Silver Point Capital Offshore Fund, Ltd.; (ix) Silver Point Finance, LLC; (x) SPCP Group III LLC; (xi) SPCP Group LLC; and (xii) SPF CDO I LLC.

amount of the Secured Notes Claims, the Term Loan A Claims, and the Term Loan B Claims (collectively, the "**Secured Claims**"), which are secured by substantially all of the assets of all of the Granite Entities (comprising Granite and all of its subsidiaries), and which must be satisfied in full before any distribution may be made to the Debtors' unsecured creditors or Granite's preferred stockholders or common stockholders.  Based on the Debtors' estimate, the valuation required to provide a distribution to holders of Preferred Interests according to the absolute priority rule would need to be in excess of approximately $573.6 million, including postpetition interest on the Secured Claims and amounts projected under the Exit Secured Revolver assuming an Effective Date of March 31, 2007, and potentially $613.1 million, including the application of any potential prepayment premium, if any, due under the Secured Notes, which is estimated to be approximately $39.5 million.  For each month beyond March 31, 2007 until the actual Effective Date, the valuation level required to provide a distribution to holders of Preferred Interests (mentioned above) increases by approximately $4.5 million due to the accrual of postpetition interest on the Secured Claims at the default rate.

Based on the midpoint of the Houlihan Lokey valuation, the value of the collateral securing the Term Loan A Claims and the Term Loan B Claims exceeds such claims.  The aggregate amount of such claims is approximately $73.3 million, assuming approximately $3.0 million of accrued postpetition interest at the default rate through an assumed effective date of March 31, 2007.[3]  The holders of such claims hold (i) the sole first lien against the assets and stock of WBNG (which stock is an asset of Granite), which were acquired in August 2006 for approximately $45 million and (ii) a lien against all other assets of the Granite Entities, which is shared with the holders of the Secured Notes.  Therefore, the claims of the holders of Term Loan A Claims and Term Loan B Claims are oversecured.  Oversecurity is determined based on the midpoint of the Houlihan Lokey valuation ($493 million) after accounting for (i) the Malara Guaranty Claims (to represent the value provided by Malara within the Houlihan Lokey valuation) (approximately $29.3 million); and (ii) the first lien granted to the Term Loan A and Term Loan B on WBNG, assuming its recent acquisition price of approximately $45 million.  The remaining value is then allocated pro rata to (i) the aggregate Term Loan A Claims and Term Loan B Claims (approximately $73.3 million); and (ii) the Secured Note Claims (approximately $425.9 million).  This pro rata calculation, plus the value ascribed to WBNG, due to the first lien granted to the Term Loan A Claims and Term Loan B Claims results in total value allocated to the Term Loan A Claims and Term Loan B Claims of approximately $106.5 million.  Under the Bankruptcy Code, oversecured creditors are entitled to receive postpetition interest or postpetition charges, while undersecured creditors are not entitled to any such postpetition interest or charges.

Because the holders of the Secured Claims have liens against substantially all of the assets of the Granite Entities and such assets are worth less than the aggregate amount of the Secured Claims, the holders of the Secured Claims are entitled to receive the entire economic value of the Granite Entities.  Despite the fact that the holders of Secured Claims in the aggregate are undersecured and entitled to the entire economic value of the Granite Entities, however, the Debtors and the holders of more than 66 2/3 % of the Secured Claims have agreed in the

---

[3] Provided the Plan is confirmed and consummated, holders of the Term Loan A Claims and Term Loan B Claims have agreed to waive the payment in Cash by the Debtors of the postpetition interest.

Restructuring Support Agreement to support the Plan, which provides a full recovery to unsecured creditors (based on the face amount of such Allowed Claims and the treatment of Fox and Beck in accordance with the Fox Stipulation and the Beck Stipulation, respectively) and a partial recovery to Granite's preferred and common stockholders.  In the aggregate, approximately 90% of the holders of the Secured Claims have agreed to, or indicated that they intend to, support the Plan.  Specifically the holders of Secured Claims will transfer a portion of their recoveries to holders of General Unsecured Claims (and, in fact, pay the face amount of such Allowed Claims in full, subject to the Fox Stipulation and the Beck Stipulation, unless otherwise agreed with the holders thereof), Preferred Interests, Class A Interests, and Class B Interests.  Moreover, the holders of the Term Loan A Claims and Term Loan B Claims have specifically agreed to forego payment in Cash by the Debtors of postpetition interest subject to the Plan being confirmed and consummated.

If the Bankruptcy Court were to determine that the holders of the Secured Claims are oversecured, then the excess value over and above the Allowed amount of such Secured Claims would be used to pay to the holders of such Claims postpetition interest at the default rate provided in the DIP Order and the repayment premiums, if any, owing under the Secured Notes Indenture (as defined below).  These Claims could exceed $56 million (assuming an Effective Date of March 31, 2007).  Therefore, the Bankruptcy Court would have to conclude that the Houlihan Lokey valuation materially understates the value of the Granite Entities (as defined below) for unsecured creditors and holders of preferred and common stock of Granite to have an entitlement to a distribution from the Debtors pursuant to the Bankruptcy Code.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN, PLEASE SEE <u>SECTION VII.C.</u> OF THE DISCLOSURE STATEMENT, ENTITLED "Classification and Treatment of Claims and Interests Under the Plan," AND <u>SECTION IX</u> OF THE DISCLOSURE STATEMENT, ENTITLED "CERTAIN FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS EXPECTED TO OCCUR IN THE REORGANIZATION CASES, AND CERTAIN FINANCIAL INFORMATION.  ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES OF THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.

**ALL HISTORICAL FINANCIAL INFORMATION CONTAINED HEREIN HAS BEEN AUDITED OR REVIEWED BY THE DEBTORS' CERTIFIED PUBLIC ACCOUNTANTS AND HAS BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.  NONE OF THE PROJECTIONS CONTAINED HEREIN, HOWEVER, WERE AUDITED OR REVIEWED BY THE DEBTORS' CERTIFIED PUBLIC ACCOUNTANTS OR**

**PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.**

**IT IS EXPECTED THAT THERE WILL BE FEWER THAN 300 RECORD HOLDERS OF NEW COMMON STOCK AND NEW WARRANTS AFTER THE ISSUANCE OF NEW COMMON STOCK, THE NEW WARRANTS, AND THE NEW COMMON STOCK ISSUED PURSUANT TO THE NEW WARRANTS UNDER THE PLAN.  THE DEBTORS CANNOT ENSURE THAT A LIQUID MARKET WILL DEVELOP FOR THE NEW COMMON STOCK OR NEW WARRANTS OR THAT HOLDERS OF NEW COMMON STOCK AND NEW WARRANTS WILL BE ABLE TO SELL AT ANY PARTICULAR TIME AND RECEIVE A FAVORABLE PRICE PURSUANT TO SUCH SALE.  THERE WILL BE NO PUBLIC MARKET FOR THE NEW COMMON STOCK OR NEW WARRANTS AND THERE IS NO ASSURANCE AS TO WHEN OR IF REORGANIZED GRANITE WILL COMPLETE AN INITIAL PUBLIC OFFERING FOR THE NEW COMMON STOCK OR NEW WARRANTS.**

**GRANITE HAS FILED A FORM 15 UNDER THE SECURITIES AND EXCHANGE ACT OF 1934 (THE "*EXCHANGE ACT*") TO DEREGISTER THE SHARES OF GRANITE'S COMMON STOCK, WHICH ARE REGISTERED UNDER THE EXCHANGE ACT. UPON THE EFFECTIVENESS OF THE FORM 15, WHICH IS EXPECTED TO OCCUR IN MARCH 2007, GRANITE WILL NO LONGER BE REQUIRED TO FILE REPORTS AND OTHER INFORMATION WITH THE SEC UNDER THE EXCHANGE ACT AND WILL CEASE TO BE A PUBLIC REPORTING COMPANY.  FOLLOWING THE EFFECTIVE DATE OF THE PLAN, REORGANIZED GRANITE WILL NOT BE A PUBLIC REPORTING COMPANY AND THE ORGANIZATIONAL DOCUMENTS OF REORGANIZED GRANITE WILL PROHIBIT TRANSFERS OF SECURITIES IF THE TRANSFERS COULD REQUIRE REORGANIZED GRANITE TO BECOME A PUBLIC REPORTING COMPANY.  AS A RESULT, FOLLOWING THE EFFECTIVE DATE OF THE PLAN, THERE WILL NOT BE PUBLICLY AVAILABLE CURRENT INFORMATION REGARDING REORGANIZED GRANITE AND ITS FINANCIAL RESULTS.**

**NEITHER THE SHARES OF NEW COMMON STOCK NOR THE NEW WARRANTS WILL BE LISTED OR QUOTED ON ANY SECURITIES EXCHANGE.  AS A RESULT OF THESE FACTORS AND THE TRANSFER RESTRICTIONS DESCRIBED HEREIN, THERE WILL NOT BE ANY LIQUID MARKET FOR THE NEW COMMON STOCK OR THE NEW WARRANTS AND THERE CAN BE NO ASSURANCE THAT ANY MARKET WILL EVER DEVELOP.  REORGANIZED GRANITE WILL NOT BE OBLIGATED TO COMPLETE ANY PUBLIC OFFERING FOLLOWING THE EFFECTIVE DATE OF THE PLAN OTHER THAN AS REQUIRED UNDER THE REGISTRATION RIGHTS AGREEMENT BETWEEN REORGANIZED GRANITE AND SILVER POINT OR AS DETERMINED BY THE BOARD OF DIRECTORS.**

**THE SHARES OF NEW COMMON STOCK AND NEW WARRANTS ISSUED PURSUANT TO THE PLAN WILL BE SUBJECT TO CERTAIN TRANSFER AND OTHER RESTRICTIONS SET FORTH IN THE NEW CERTIFICATE OF INCORPORATION, AND THE NEW WARRANT AGREEMENTS.  SUCH TRANSFER**

**RESTRICTIONS IN THE NEW CERTIFICATE OF INCORPORATION, AND THE NEW WARRANT AGREEMENTS WILL PROHIBIT A HOLDER OF NEW COMMON STOCK AND NEW WARRANTS, AS APPLICABLE, FROM TRANSFERRING ANY SHARES TO ANY PERSON NOT ALREADY HOLDING SHARES OF THE SAME CLASS AS THOSE PROPOSED TO BE TRANSFERRED AFTER SUCH CLASS HAS RECORD HOLDERS OF 300 OR MORE PERSONS AS DETERMINED BY REORGANIZED GRANITE.**

The summaries of the Plan and other documents related to the restructuring of the Debtors are qualified in their entirety by the Plan, its exhibits, and the documents and exhibits contained in the Plan Supplement(s).  If there is any inconsistency between the Plan and the descriptions in the Disclosure Statement, the terms of the Plan will govern.  The Plan Supplement(s) will be filed with the Bankruptcy Court prior to the Voting Deadline (as defined below).  Documents to be included in the Plan Supplement(s) will also be available on the official website of the Bankruptcy Court at http://www.nysb.uscourts.gov as they become available, but no later than March 30, 2007.  The financial and other information included in this Disclosure Statement are for purposes of soliciting acceptances of the Plan and are being communicated for settlement purposes only.

The Debtors' legal advisor is Akin Gump Strauss Hauer & Feld LLP; their financial advisor is Houlihan Lokey Howard & Zukin Capital, Inc.  They can be contacted at:

| Akin Gump Strauss Hauer & Feld LLP<br>590 Madison Avenue<br>New York, New York 10022<br>(212) 872-1000<br>Attention:  Ira Dizengoff, Esq.<br>            Philip Abelson, Esq. | Houlihan Lokey Howard & Zukin Capital, Inc.<br>245 Park Avenue<br>New York, New York 10167<br>(212) 497-4100<br>Attention:  David Hilty<br>            J.P. Hanson |
|---|---|

**Because the Bankruptcy Court ordered the appointment of an Examiner (as defined and discussed herein in *Section VI.G*) parties in interest are advised to closely monitor the docket in these jointly-administered chapter 11 cases.  In addition, any report filed by the Examiner will be posted on the Voting Agent's website (www.trumbullgroup.com) and available upon written request to the Voting Agent.**

**On February 23, 2007, the Bankruptcy Court entered an Order approving the appointment of Mr. Andrew Hruska, Esq. of the law firm of King & Spalding LLC as the Examiner.**

The following table summarizes the treatment of Claims and Interests under the Plan.  This table identifies the Claims against and Interests in the Debtors in their respective Classes and summarizes the treatment for each Class under the Plan.  The table also identifies which Classes are entitled to vote on the Plan, based on rules set forth in the Bankruptcy Code.  Finally, the table provides an estimated recovery for each Class.  For a complete explanation, please refer to the discussion in *Section VII* below, entitled "THE PLAN OF REORGANIZATION," and to the Plan itself.

***IRS CIRCULAR NOTICE***:  TO INSURE COMPLIANCE WITH <u>IRS CIRCULAR 230</u>, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT:  (I) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (II) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (III) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## II.

## SUMMARY OF THE TREATMENT OF
## CREDITORS AND STOCKHOLDERS UNDER THE PLAN

| Class(es) | Description | Treatment of Allowed Claim or Allowed Interest | Estimated Allowed Amount[4] | Estimated Recovery | Entitled to Vote |
|---|---|---|---|---|---|
| -- | DIP Claims | Paid in full, in Cash, on the Effective Date in accordance with the terms of the DIP Order and the DIP Credit Agreement. | Undetermined | 100% | n/a |
| -- | Administrative Expenses | On the Effective Date or as soon thereafter as is practicable, except to the extent that a holder of an Allowed Administrative Expense agrees to different treatment, paid in full, in Cash, subject to the terms of the DIP Order; *provided, however*, Allowed Administrative Expenses incurred in the ordinary course of business shall be paid in the ordinary course of business. | $2,530,105 | 100% | n/a |
| -- | Compensation and Reimbursement Claims of Professionals | Paid in full, in Cash, in accordance with the Order allowing such Claim, except with respect to Claims asserted pursuant to section 503(b)(3)(D) as set forth in section 2.3 of the | $6,460,000 | 100% | n/a |

---

[4] The Estimated Allowed Amounts set forth in this Disclosure Statement are only approximate amounts and, thus, are subject to change.  Moreover, all such amounts exclude postpetition interest, if any.

| Class(es) | Description | Treatment of Allowed Claim or Allowed Interest | Estimated Allowed Amount[4] | Estimated Recovery | Entitled to Vote |
|---|---|---|---|---|---|
| | | Plan. | | | |
| -- | Priority Tax Claims | Paid in full, in Cash, at the option of the Debtors, subject to Silver Point Consent, either (i) on the Effective Date; (ii) in equal annual installments commencing on the first anniversary of the Effective Date and continuing on each anniversary thereafter over a period not exceeding five (5) years after the Petition Date, together with interest thereon at the applicable rate under non-bankruptcy law, subject to the option of the Debtors, subject to Silver Point Consent, to prepay the entire remaining amount of the Allowed Priority Tax Claim at any time; or (iii) upon such other terms determined by the Bankruptcy Court. | $0 | 100% | n/a |
| 1A-1F | Secured Claims | Impaired; on the Effective Date, each holder of a Secured Claim shall receive its Ratable Proportion of (i) the Exit Secured Term Loan; (ii) 10 million shares of the New Common Stock, (iii) the Rights, (iv) the New Warrants Series A, and (v) the New Warrants Series B, and in each case of (ii) through (v) above, subject to reduction, if applicable by the following distributions made pursuant to and in accordance with sections 3.11, 3.12, 3.13, and 5.15 of the Plan: (a) up to 300,000 shares of the New Common Stock provided to holders of Preferred Interests in Class 10 and Common Interests in Classes 11 and 12; (b) the Rights offered to holders of the Preferred Interests in Class 10 and Class B Interests in Class 12; and (c) the New Warrants provided to holders of the Preferred Interests in Class 10 | $496,172,870 | 90.9% | Yes, as to each specific subclass of Classes 1A-1F. |

| Class(es) | Description | Treatment of Allowed Claim or Allowed Interest | Estimated Allowed Amount[4] | Estimated Recovery | Entitled to Vote |
|---|---|---|---|---|---|
| | | and Common Interests in Classes 11 and 12. Any Rights which revert to the holders of Secured Claims shall be extinguished. | | | |
| 2 | Secured Tax Claims | Unimpaired; except to the extent that a holder of an Allowed Secured Tax Claim agrees to a different treatment, each holder of an Allowed Secured Tax Claim against any of the Debtors shall receive, at the option of the Debtors, with Silver Point Consent, either: (i) the Collateral securing such Allowed Secured Tax Claim; (ii) Cash in the amount equal to the face amount of such Allowed Secured Tax Claim; (iii) Cash payments in equal annual installments commencing on the first anniversary of the Effective Date and continuing on each anniversary thereafter over a period not exceeding five (5) years after the Petition Date in the aggregate amount of such Allowed Secured Tax Claim, together with interest thereon at the applicable rate under non-bankruptcy law; or (iv) deferred Cash payments having a value, as of the Effective Date and as determined by the Bankruptcy Court, equal to such Allowed Secured Tax Claim. | $0 | 100% | No (deemed to accept) |
| 3 | Priority Non-Tax Claims | Unimpaired; on the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, each holder of an Allowed Priority Non-Tax Claim shall receive Cash, in an amount equal to the Allowed portion of such Claim. | $0 | 100% | No (deemed to accept) |

| Class(es) | Description | Treatment of Allowed Claim or Allowed Interest | Estimated Allowed Amount[4] | Estimated Recovery | Entitled to Vote |
|---|---|---|---|---|---|
| 4A | Granite General Unsecured Claims | Impaired; on the Effective Date, each holder of an Allowed Granite General Unsecured Claim shall receive Cash in an amount equal to the face amount of such Allowed Claim; *provided, however*, that (i) the Fox Claims shall receive the treatment provided in the Fox Stipulation and (ii) the Beck Claims shall receive the treatment provided in the Beck Stipulation;[5] *provided, further however*, that holders of Deficiency Claims shall receive no distributions on account of such Deficiency Claims.[6]  In no event, however, shall (a) the holder of an Allowed General Unsecured Claim against Granite receive more than the face amount of its Allowed Claim or (b) the holder of an Allowed General Unsecured Claim against Granite that receives a distribution in any other Class on account of such Claim receive a distribution on account of such Claim in this Class. | $2,086,899 | 100% | Yes |

---

[5] Pursuant to the Beck Stipulation (as defined and discussed in *Section VI.I.* below), Beck is entitled to a distribution of $2 million in Cash on account of the Beck Claim.  Pursuant to the Beck Stipulation, such payment to Beck shall be deemed payment in full of all Claims of Beck against the Debtors.  In addition, in accordance with and subject to the Fox Stipulation (also as defined and discussed in *Section VI.H.* below) for purposes of the Plan, the Fox Claims will be included solely in Class 5 and shall not be included in Class 4A and Fox is entitled to a distribution of $8 million in Cash on the Effective Date on account of its Allowed KBWB General Unsecured Claim.  Pursuant to the Fox Stipulation, while the amount of the Fox Claims, the treatment of the Fox Claims, and the Debtors against whom the Fox Claims may be asserted remains disputed and subject to the reservation of certain rights of the parties as set forth in the Fox Stipulation, for purposes of the Plan, such payment to Fox shall be deemed payment in full of all Claims of Fox against the Debtors.

[6] For the sole purposes of the Plan (and subject to the Effective Date of such Plan occurring) and in accordance with the settlement among the Debtors and the holders of Secured Claims embodied therein, the holders of Allowed Deficiency Claims have agreed to neither receive a distribution of property on account of such Claims nor vote to accept or reject the Plan with respect to such Deficiency Claims.

| Class(es) | Description | Treatment of Allowed Claim or Allowed Interest | Estimated Allowed Amount[4] | Estimated Recovery | Entitled to Vote |
|---|---|---|---|---|---|
| 4B | Malara Guaranty Claims | Impaired; no distribution. The Malara Guaranty shall be cancelled and replaced by the New Malara Guaranty. | up to $29,281,000 | 0% | No (deemed to reject) |
| 5 | KBWB General Unsecured Claims | Impaired; on the Effective Date, each holder of an Allowed KBWB General Unsecured Claim shall receive Cash in an amount equal to the face amount of such Allowed Claim; *provided, however*, the Fox Claims shall receive the treatment provided in the Fox Stipulation;[7] *provided, further however*, that holders of Deficiency Claims shall receive no distributions on account of such Deficiency Claims.[8] In no event, however, shall (a) the holder of an Allowed General Unsecured Claim against KBWB receive more than the face amount of its Allowed Claim or (b) the holder of an Allowed General Unsecured Claim against KBWB that receives a distribution in any other Class on account of such Claim receive a distribution on account of such Claim in this Class. | $8,056,750 | 100% | Yes |

---

[7] In accordance with and subject to the Fox Stipulation (as defined and discussed in *Section VI.H.* below) for purposes of the Plan, the Fox Claims will be included solely in Class 5 and shall not be included in Class 4A and Fox is entitled to a distribution of $8 million in Cash on the Effective Date on account of its Allowed KBWB General Unsecured Claim. Pursuant to the Fox Stipulation, while the amount of the Fox Claims, the treatment of the Fox Claims, and the Debtors against whom the Fox Claims may be asserted remains disputed and subject to the reservation of certain rights of the parties as set forth in the Fox Stipulation, for purposes of the Plan, such payment to Fox shall be deemed payment in full of all Claims of Fox against the Debtors.

[8] For the sole purposes of the Plan (and subject to the Effective Date of such Plan occurring) and in accordance with the settlement among the Debtors and the holders of Secured Claims embodied therein, the holders of Allowed Deficiency Claims have agreed to neither receive a distribution of property on account of such Claims nor vote to accept or reject the Plan with respect to such Deficiency Claims.

| Class(es) | Description | Treatment of Allowed Claim or Allowed Interest | Estimated Allowed Amount[4] | Estimated Recovery | Entitled to Vote |
|---|---|---|---|---|---|
| 6 | KBWB License General Unsecured Claims | Impaired; on the Effective Date, each holder of an Allowed KBWB License General Unsecured Claim shall receive Cash in an amount equal to the face amount of such Allowed Claim; *provided, however*, that holders of Deficiency Claims shall receive no distributions on account of such Deficiency Claims.[9] In no event, however, shall (a) the holder of an Allowed General Unsecured Claim against KBWB License receive more than the face amount of its Allowed Claim or (b) the holder of an Allowed General Unsecured Claim against KBWB License that receives a distribution in any other Class on account of such Claim receive a distribution on account of such Claim in this Class. | $0 | 100% | Yes |
| 7 | WEEK-TV License General Unsecured Claims | Impaired; on the Effective Date, each holder of an Allowed WEEK-TV License General Unsecured Claim shall receive Cash in an amount equal to the face amount of such Allowed Claim; *provided, however*, that holders of Deficiency Claims shall receive no distributions on account of such Deficiency Claims.[10] In no event, however, shall (a) the holder of an Allowed General Unsecured Claim against WEEK-TV License receive more than the | $0 | 100% | Yes |

---

[9] For the sole purposes of the Plan (and subject to the Effective Date of such Plan occurring) and in accordance with the settlement among the Debtors and the holders of Secured Claims embodied therein, the holders of Allowed Deficiency Claims have agreed to neither receive a distribution of property on account of such Claims nor vote to accept or reject the Plan with respect to such Deficiency Claims.

[10] For the sole purposes of the Plan (and subject to the Effective Date of such Plan occurring) and in accordance with the settlement among the Debtors and the holders of Secured Claims embodied therein, the holders of Allowed Deficiency Claims have agreed to neither receive a distribution of property on account of such Claims nor vote to accept or reject the Plan with respect to such Deficiency Claims.

| Class(es) | Description | Treatment of Allowed Claim or Allowed Interest | Estimated Allowed Amount[4] | Estimated Recovery | Entitled to Vote |
|---|---|---|---|---|---|
| | | face amount of its Allowed Claim or (b) the holder of an Allowed General Unsecured Claim against WEEK-TV License that receives a distribution in any other Class on account of such Claim receive a distribution on account of such Claim in this Class. | | | |
| 8 | WXON General Unsecured Claims | Impaired; on the Effective Date, each holder of an Allowed WXON General Unsecured Claim shall receive Cash in an amount equal to the face amount of such Allowed Claim; *provided, however*, that holders of Deficiency Claims shall receive no distributions on account of such Deficiency Claims.[11] In no event, however, shall (a) the holder of an Allowed General Unsecured Claim against WXON receive more than the face amount of its Allowed Claim or (b) the holder of an Allowed General Unsecured Claim against WXON that receives a distribution in any other Class on account of such Claim receive a distribution on account of such Claim in this Class. | $129,817 | 100% | Yes |

---

[11] For the sole purposes of the Plan (and subject to the Effective Date of such Plan occurring) and in accordance with the settlement among the Debtors and the holders of Secured Claims embodied therein, the holders of Allowed Deficiency Claims have agreed to neither receive a distribution of property on account of such Claims nor vote to accept or reject the Plan with respect to such Deficiency Claims.

| Class(es) | Description | Treatment of Allowed Claim or Allowed Interest | Estimated Allowed Amount[4] | Estimated Recovery | Entitled to Vote |
|---|---|---|---|---|---|
| 9 | WXON License General Unsecured Claims | Impaired; on the Effective Date, each holder of an Allowed WXON License General Unsecured Claim shall receive Cash in an amount equal to the face amount of such Allowed Claim; *provided, however,* that holders of Deficiency Claims shall receive no distributions on account of such Deficiency Claims.[12] In no event, however, shall (a) the holder of an Allowed General Unsecured Claim against WXON License receive more than the face amount of its Allowed Claim or (b) the holder of an Allowed General Unsecured Claim against WXON License that receives a distribution in any other Class on account of such Claim receive a distribution on account of such Claim in this Class. | $0 | 100% | Yes |
| 10 | Preferred Interests | Impaired; extinguished, no distribution.<br><br>Each holder of an Allowed Preferred Interest will receive, in accordance with and subject to sections 3.11 and 5.15 of the Plan, its Ratable Proportion of (i) 200,000 shares of New Common Stock on the Effective Date and (ii) the right to purchase up to 500,000 shares of the New Common Stock pursuant to the New Warrants Series A. In addition, certain "accredited investors" who are holders of Allowed Preferred Interests will receive Rights to purchase up to 1 million shares of New Common Stock at the | n/a | 0% | No (deemed to reject) |

[12] For the sole purposes of the Plan (and subject to the Effective Date of such Plan occurring) and in accordance with the settlement among the Debtors and the holders of Secured Claims embodied therein, the holders of Allowed Deficiency Claims have agreed to neither receive a distribution of property on account of such Claims nor vote to accept or reject the Plan with respect to such Deficiency Claims.

| Class(es) | Description | Treatment of Allowed Claim or Allowed Interest | Estimated Allowed Amount[4] | Estimated Recovery | Entitled to Vote |
|---|---|---|---|---|---|
| | | Implied Equity Value. | | | |
| 11 | Class A Interests | Impaired; extinguished, no distribution.<br><br>Each holder of an Allowed Class A Interest, will receive, jointly and equally with the Class B Interests, in accordance with and subject to sections 3.12 and 5.15 of the Plan, its Ratable Proportion of (i) 100,000 shares of New Common Stock on the Effective Date; (ii) the right to purchase up to 250,000 shares of the New Common Stock pursuant to the New Warrants Series A; and (iii) the right to purchase up to 250,000 shares of the New Common Stock pursuant to the New Warrants Series B. | n/a | 0% | No (deemed to reject) |
| 12 | Class B Interests | Impaired; extinguished, no distribution.<br><br>Each holder of an Allowed Class B Interest, will receive, jointly and equally with the Class A Interests, in accordance with and subject to sections 3.13 and 5.15 of the Plan, its Ratable Proportion of (i) 100,000 shares of New Common Stock on the Effective Date; (ii) the right to purchase up to 250,000 shares of the New Common Stock pursuant to the New Warrants Series A; (iii) the right to purchase up to 250,000 shares of the New Common Stock pursuant to the New Warrants Series B; and (iv) any Rights not exercised by the holders of the Allowed Preferred Interests to which Rights were offered. | n/a | 0% | No (deemed to reject) |
| 13 | Securities Claims | Impaired; extinguished, no distribution. | $0 | 0% | No (deemed to reject) |

| Class(es) | Description | Treatment of Allowed Claim or Allowed Interest | Estimated Allowed Amount[4] | Estimated Recovery | Entitled to Vote |
|---|---|---|---|---|---|
| 14 | Subordinated Claims | Impaired; extinguished, no distribution. | $0 | 0% | No (deemed to reject) |

## A.    Summary of Voting Procedures.

This Disclosure Statement and the Plan are the only materials creditors should use to determine whether to vote to accept or reject the Plan.

**The *last day* to vote to accept or reject the Plan is April 6, 2007.**

**To be counted, your Ballot must be properly completed in accordance with the instructions on the Ballot and actually received by the Voting Agent, The Trumbull Group, LLC d/b/a Wells Fargo Trumbull, (i) if sent via regular mail at The Trumbull Group, Attention: Granite Broadcasting Corporation Balloting Center, P.O. Box 721, Windsor, CT 06095 or, (ii) if sent by overnight courier or by hand delivery, at The Trumbull Group, Attention: Granite Broadcasting Corporation Balloting Center, 4 Griffin Road North, Windsor, CT 06095, by 4:00 p.m. Eastern Time on April 6, 2007 (the "*Voting Deadline*").  Ballots received after that time will NOT be counted.**

**Any properly executed, timely received Ballot that does not indicate either an acceptance or rejection of the Plan will NOT be counted.  Any properly executed, timely received Ballot that indicates both acceptance and rejection of the Plan will NOT be counted.  BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE DEBTORS, THE COURT, OR COUNSEL TO THE DEBTORS.**

**The *Voting Record Date* for determining which creditors may vote on the Plan is March 2, 2007.**

The Bankruptcy Code provides that only creditors who vote on the Plan will be counted for purposes of determining whether the requisite acceptances have been attained.  Failure to timely deliver a properly completed Ballot by the Voting Deadline will constitute an abstention and, thus, will not be counted as either an acceptance or a rejection.  Unless otherwise noted herein, any improperly completed or late Ballot will not be counted.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for voting purposes.  Please vote and return your Ballot(s) in accordance with the instructions set forth herein and in the Ballots.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning

the procedures for voting on the Plan, please call the Voting Agent, The Trumbull Group, LLC, d/b/a Wells Fargo Trumbull, at (860) 687-3951.

Any voter that has delivered a valid Ballot may withdraw its vote by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline.

Any holder that has delivered a valid Ballot may change its vote by delivering to the Voting Agent a properly completed subsequent Ballot so as to be received before the Voting Deadline.

For detailed voting instructions, see the instructions on your Ballot. For a further discussion of voting on the Plan, see *Section X* below, entitled "VOTING PROCEDURES AND REQUIREMENTS."

**B.      Recommendation.**

The Plan was developed over several months and through extensive negotiations among the Debtors, the Non-Debtor Subsidiaries, and Silver Point. The Debtors believe that approval of the Plan is the Debtors' best chance to successfully reorganize, emerge from chapter 11, and return the Debtors and Non-Debtor Subsidiaries to profitability and provides the best recoveries possible for holders of Claims against and Interests in the Debtors.

---

**RECOMMENDATION:** The Debtors urge creditors to vote to accept the Plan.

---

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. NOR HAS THE COMMISSION PASSED ON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREWITH. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

## III.

## OVERVIEW OF CHAPTER 11 PROCESS

Chapter 11 is the primary business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself and all economic parties in interest. While permitting rehabilitation of a debtor, chapter 11 also promotes equality of treatment of similarly situated claims and similarly situated equity interests with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or holder of an equity interest in, a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

In order to solicit acceptances of a proposed plan, however, section 1126 of the Bankruptcy Code requires a debtor and any other plan proponents to conduct such solicitation, pursuant to a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement in accordance with the Disclosure Statement Order and the requirements of section 1126 of the Bankruptcy Code.

## IV.

## BUSINESS DESCRIPTION AND REASONS FOR CHAPTER 11

### A.    Corporate Structure.

Granite is a publicly-held corporation that owns 100% of the issued and outstanding shares of its direct, first-tier subsidiaries: (i) three Debtors – KBWB; WXON; and WEEK-TV License and (ii) seven Non-Debtor Subsidiaries – (a) KBJR, Inc.; (b) Queen City Broadcasting of New York, Inc.; (c) Granite Response Television, Inc.; (d) KSEE Television, Inc.; (e) WISE-TV, Inc.; (f) WTVH, LLC; and (g) WBNG (collectively, the "***First-Tier Subsidiaries***"). With the exception of Granite Response Television, Inc. and WEEK-TV License, each First-Tier Subsidiary, in turn, has a wholly-owned second-tier subsidiary (collectively, the "***Second-Tier Subsidiaries***"). Granite, together with its First-Tier Subsidiaries and Second-Tier Subsidiaries are hereinafter collectively referred to as the "***Granite Entities***." KBWB License and WXON License are the only Second-Tier Subsidiaries that are Debtors in these Reorganization Cases. Each Second-Tier Subsidiary and WEEK-TV License hold, as its sole asset, the Federal Communications Commission (the "***FCC***") broadcast license for the operation of its respective Station (as defined below). The corporate structure of the Granite Entities, as of the Petition Date, is set forth on Exhibit 9 hereto.

### B.    Background.

#### 1.    *Overview.*

Together, the Granite Entities form one of the largest minority-controlled television broadcasting companies in the United States. Their businesses primarily focus on developing and operating small- to middle-market television broadcasting stations along with two large-market stations in Detroit and San Francisco. The Granite Entities own and operate one full-power independent and eight full-power network-affiliated television stations (each, a "***Station***"). With the exception of WEEK-TV, the Stations are owned and operated through the

First-Tier Subsidiaries.[13]  The Granite Entities' network consists of four NBC-affiliated Stations, one ABC-affiliated Station, two CBS-affiliated Stations, one MyNetworkTV-affiliated Station, and one independent Station.  In addition, WBNG is providing CW Network programming using excess capacity on its digital channel.  The Granite Entities' Stations are located in geographically diverse markets in New York, California, Michigan, Indiana, Illinois, and Minnesota, reaching over 6% of American television households.  Each of the Granite Entities' ABC, NBC, and CBS affiliates are leading providers of local news, weather, and sports in their respective markets.  The following chart illustrates each Station's network affiliation and corresponding broadcast market, with the Stations operated directly by the Debtors shaded accordingly:

| Station | Network Affiliation | Location |
| --- | --- | --- |
| KSEE-TV | NBC | Fresno-Visalia, California |
| WEEK-TV | NBC | Peoria-Bloomington, Illinois |
| KBJR-TV[14] | NBC | Duluth, Minnesota – Superior, Wisconsin |
| WISE-TV | NBC | Fort Wayne, Indiana |
| WKBW-TV | ABC | Buffalo, New York |
| WTVH-TV | CBS | Syracuse, New York |
| KBWB-TV | Independent[15] | San Francisco, California |
| WMYD-TV (formerly WDWB-TV) | MyNetworkTV[16] | Detroit, Michigan |
| WBNG-TV | CBS | Binghamton/Elmira, New York |

Granite and certain of its Non-Debtor Subsidiaries also are parties to certain agreements (the "*Agreements*") pursuant to which Granite and/or such Non-Debtor Subsidiaries provide advertising, sales, promotion services, administrative services, and selected

---

[13] WEEK-TV is owned and operated directly by Granite.

[14] The Granite Entities also own the KRII-TV television station in Chisholm, Minnesota ("*KRII*").  KRII is a satellite station that transmits the signal of KBJR-TV ("*KBJR*") into the northern section of the Duluth/Superior television market.  Although KRII predominantly rebroadcasts the KBJR signal, KRII also: (i) broadcasts unique news and weather content, as well as certain commercials, separately to this region; (ii) multicasts weather content originated by KBJR and carried over one of KBJR's digital steams; and (iii) broadcasts MyNetworkTV programming on one of its digital streams, which programming is also carried in an analog format by certain of the cable systems in the Duluth/Superior market.

[15] Prior to the Fall of 2006, KBWB-TV was affiliated with the WB Network.

[16] Prior to the Fall of 2006, WMYD-TV was also affiliated with the WB Network

programming to two stations owned by Malara Broadcast Group ("***Malara***") (see discussion in *Section IV.C.4* below) and one Station owned by Four Seasons Broadcast Company ("***Four Seasons***").  Granite and WKBW, Inc. are also parties to an Agreement pursuant to which they are the advertising representative through April 15, 2007 for one station owned by Equity Broadcasting Corporation ("***EBC***").  The two Malara stations to which Granite, WISE, Inc., and KBJR, Inc. provide services and selected programming are WPTA-TV (an ABC affiliate serving Fort Wayne, Indiana) and KDLH-TV (a CBS affiliate serving Duluth, Minnesota - Superior, Wisconsin). In addition, WPTA-TV and KDLH-TV are providing CW Network programming using excess capacity on their digital channels.  The Four Seasons station to which Granite provides services is WAOE-TV (a MyNetworkTV affiliate serving Peoria-Bloomington, Illinois). The EBC Station to which Granite and WKBW, Inc. serve as advertising representatives is WNGS-TV (a Retro Television Network affiliate serving Buffalo, New York).

Both the Stations that the Granite Entities own and those to which the Granite Entities provide services under the Agreements operate in geographically diverse markets, which minimizes the impact of regional economic downturns.

In general, each Granite-owned Station operates autonomously.  Additionally, each Granite-owned Station employs its own team of sales personnel and is responsible for selling its own advertising time.  At the corporate office level, Granite, among other things, (i) performs the primary strategic functions of developing long-term business relationships (for example, through the Agreements), (ii) negotiates group-wide contracts and large-scale transactions such as organizational acquisitions and dispositions, and (iii) organizes sales programs and other revenue-generating initiatives for all of the Granite Entities.  Granite also controls the Granite Entities' cash flow through a centralized cash management system and administers many of their employee benefits programs.  As of December 1, 2006, the Granite Entities had 786 employees with approximately 207 of such employees employed by the Debtors.

As of September 30, 2006, the Granite Entities' unaudited, consolidated balance sheets reflected total assets of approximately $443.5 million and total liabilities of approximately $644.1 million.

2.    *History.*

Granite was founded in 1988 by W. Don Cornwell and Stuart J. Beck to acquire and manage network-affiliated television stations and other media and communications-related properties.  At the time of inception, Granite acquired two stations, WEEK-TV, serving Peoria-Bloomington, Illinois and KBJR-TV, serving Duluth, Minnesota.  Granite qualified as a "minority controlled" entity pursuant to FCC regulations, and today is one of the largest minority controlled television broadcasters in the United States.  Since its inception, Granite has acquired and sold many television station properties, and, as stated above, currently owns nine full-power television stations.

3.      *Industry Overview.*

Commercial television broadcasting began in the United States on a regular basis in the 1940s. Currently, there are a limited number of channels available for broadcasting in any particular geographic area and the license to operate a broadcast station must be obtained from the FCC.

Television stations can be distinguished by the frequency on which they broadcast. Television stations which broadcast over the very high frequency, or "VHF," band of the spectrum generally have some competitive advantage over television stations that broadcast over the ultra-high frequency, or "UHF," band of the spectrum because VHF stations typically have better signal coverage and operate at a lower transmission cost. In television markets in which all local stations are UHF stations, such as Fort Wayne, Indiana, Peoria-Bloomington, Illinois, and Fresno-Visalia, California, there is no competitive disadvantage to broadcasting over a UHF band.

4.      *Broadcast Licenses and the Granite Entities' Relationship with the FCC.*

Television broadcasting is subject to the jurisdiction of the FCC under the Communications Act of 1934, as amended (the "***Communications Act***"). The Communications Act prohibits the operation of television broadcasting stations except under a license issued by the FCC. The Communications Act also empowers the FCC to issue, revoke, and modify broadcasting licenses, determine the locations of stations, regulate the equipment used by stations, adopt regulations to carry out the provisions of the Communications Act, and impose penalties for violation of such regulations. The Telecommunications Act of 1996 was enacted on February 8, 1996 and amends major provisions of the Communications Act.

Television broadcasting licenses are typically granted and renewed for a period of eight years, but may be renewed for a shorter period upon a finding by the FCC that the "public interest, convenience and necessity" would be served by a license for a shorter period. When a station applies for renewal of its television license, parties in interest as well as members of the public may apprise the FCC of the service the station has provided during the preceding license term and urge the grant or denial of the renewal application. Upon the timely filing of a renewal application, the existing license shall continue in effect until such time as the FCC acts on the renewal application.

The criteria used by the FCC in considering whether to grant or deny a renewal application include whether the licensee: (i) has served the public interest, convenience, and necessity; (ii) has committed serious violations of the Communications Act or the FCC's rules; and (iii) has committed other violations of the Communications Act or the FCC's rules which would constitute a pattern of abuse.

In the vast majority of cases, the FCC renews broadcast licenses even when petitions to deny are filed against broadcast license renewal applications. The licenses of WBNG-TV, WTVH-TV, and WKBW-TV will expire on June 1, 2007, and such Stations filed renewal applications on January 31, 2007. WMYD-TV has previously sought, and received, a renewal of its license. All of the other Stations have renewal applications pending with the FCC.

The Communications Act also prohibits the assignment of a license or the transfer of control of a licensee without prior approval of the FCC.  In its review process, the FCC considers financial and legal qualifications of the prospective assignee or transferee and also determines whether the proposed transaction complies with rules limiting the common ownership of certain attributable interests in broadcast, cable, and newspaper media on a local and national level.  The FCC's restrictions on multiple ownership could limit the acquisitions and investments the Granite Entities make or the investments other parties make in the Granite Entities.  However, none of Granite's officers, directors, or holder of voting common stock (Class A Interests) currently has attributable or non-attributable interests that violate the FCC ownership rules now in effect.

5.      *Sources of Revenue and Operating Expenses.*

The Granite Entities derive their revenues primarily from local, regional, and national advertising on their Stations and, to a lesser extent, from network compensation and revenues from studio rental and commercial production activities.  The advertising rates charged by the Stations for advertising during a particular program depend upon: (i) a program's popularity with viewers that advertisers wish to reach; (ii) the number of advertisers competing for the available time; (iii) the size and demographic make-up of the market served by the station; and (iv) the availability of alternative advertising media in the market area.  Because of the dependence on advertising revenue, declines in advertising budgets, particularly in recessionary periods, can dramatically impact the Granite Entities' businesses.

The nature of a Station's revenues, expenses, and operations is largely dependent on whether or not a station is affiliated with one of the major networks.  Affiliates of the major networks, which include NBC, ABC, CBS, and Fox, receive a significant portion of their programming each day from the network.  These major networks provide programming, and in some cases, cash payments, to their affiliated Stations in exchange for a significant portion of the affiliates' advertising inventory during the network-provided programs.  These networks then sell this advertising time and retain the revenue.

The primary operating expenses involved in owning and operating the Stations are employee salaries, depreciation and amortization, programming, advertising, production, and promotion.

6.      *Competitive Market.*

The financial success of the Stations depends on audience ratings and advertising revenues within each Station's geographic market.  The Stations compete for revenues with other television stations in their respective markets, as well as with other advertising media, such as newspapers, radio, magazines, outdoor advertising, transit advertising, yellow page directories, the Internet, direct mail, and local cable systems.  Some competitors are part of larger companies with substantially greater financial resources than the Granite Entities.

The broadcasting industry faces continual technological change and innovation, the rise in popularity of competing entertainment and communications media, and changes in labor conditions.  Alternate programming, entertainment, and video distribution systems can

increase competition for a broadcasting station by bringing distant broadcasting signals into its market which are not otherwise available to the station's audience and also by serving as distribution systems for non-broadcast programming. Programming is now being distributed to cable television systems by both terrestrial microwave systems and by satellite.

A television station's ability to successfully compete in a given market depends upon several factors, including: (i) management experience; (ii) signal coverage; (iii) local program acceptance; (iv) network affiliation; (v) audience characteristics; (vi) assigned frequency; and (vii) strength of local competition.

Competition in the broadcasting industry occurs primarily in individual markets. Generally, a television broadcasting station in one market does not compete with stations in other market areas. The Granite Entities' Stations are located in highly competitive markets.

The Stations also compete with home entertainment systems, including video cassette recorders and playback systems, video discs and television game devices, the Internet, multi-point distribution systems, multi-channel multi-point distribution systems, video programming services available through the Internet, and other video delivery systems. The Granite Entities' Stations also face competition from direct-broadcast satellite services and wireless cable systems.

In addition, actions by the FCC, Congress, and the courts all suggest an increased future involvement in the provision of video services by telephone companies. The Telecommunications Act of 1996 lifted the prohibition on the provision of cable television services by telephone companies in their own telephone areas subject to regulatory safeguards and permits telephone companies to own cable systems under certain circumstances. SBC Communications Inc. and Verizon Communications Inc. have recently begun to expand their respective fiber-optic networks in order to offer Internet Protocol-based video services to their customers. The entry into the video programming distribution market by these entities and other telephone companies could increase the competition the Stations face from other distributors of video programming.

7.    *Properties.*

Granite's corporate headquarters is located in New York City at 767 Third Avenue, New York, New York, 10017 and each of the Stations is located in the geographic area it serves. The types of properties required to support each of the Stations include offices, studios, transmitter sites, and antenna sites. A Station's studios are generally housed with its offices in downtown or business districts. The transmitter sites and antenna sites are generally located so as to provide maximum market coverage. As of the Petition Date, the Debtors own 1 property and lease 6 properties in connection with their operations.

8.    *Legal Proceedings.*

As of the Petition Date, the Debtors were parties to a number of legal proceedings, including those listed below (collectively, the "***Prepetition Litigation***"). Due to the commencement of the Reorganization Cases, prepetition litigation against the Debtors is subject to the automatic stay pursuant to section 362 of the Bankruptcy Code. Although the Debtors

dispute the validity of the allegations asserted in the Prepetition Litigation described below, and have, and will continue to, vigorously defend each such suit, an adverse decision in the Prepetition Litigation could potentially have a material effect on the pro rata amounts of Cash to be distributed to holders of Allowed Granite General Unsecured Claims but will not have a material effect on the Reorganized Debtors' businesses:

- **Harbinger Litigation I**.  On June 7, 2006, Harbinger Capital Partners Master Fund I, Ltd. ("**Harbinger**"), a holder of Preferred Interests, commenced a lawsuit in the Court of Chancery of the State of Delaware in and for New Castle County (the "**Chancery Court**") against Granite, DS Audible San Francisco, LLC ("**DS San Francisco**") and DS Audible Detroit, LLC ("**DS Detroit**," and together with DS San Francisco, "**DS Audible**") alleging that the proposed DS Sale (as defined and discussed below) constituted a fraudulent conveyance under the New York Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act as adopted in California and Michigan.  Harbinger sought damages and to enjoin the DS Sale, or if the DS Sale occurred, to rescind the DS Sale. Granite responded by filing a motion to dismiss in the Chancery Court and, on June 29, 2006, the Chancery Court granted the motion to dismiss. On or about June 30, 2006, Harbinger filed a notice of appeal of such dismissal.  Harbinger has since voluntarily dismissed the appeal.

- **Harbinger Litigation II**.  Also on June 7, 2006, Harbinger filed a petition requesting that the FCC not consent to the assignment of the television broadcasting licenses relating to KBWB-TV and WDWB-TV pending resolution of the Harbinger Litigation I.  The FCC denied the petition and granted the assignment application in June 2006.  On July 24, 2006, Harbinger filed a petition seeking reconsideration of the FCC's decision. Granite notified the FCC that it had decided not to consummate the assignment of such Stations and that Granite did not intend to respond to the petition for reconsideration because it was mooted by the decision not to consummate the assignment applications (as discussed in *Section V.B.* below).

- **The WB Litigation**.  On May 17, 2006, Granite and certain of the Debtor Subsidiaries and Non-Debtor Subsidiaries filed a lawsuit in the Chancery Court regarding the termination by The WB Television Network Partners, L.P. ("**The WB**") of Granite's WB affiliation agreements for its San Francisco and Detroit television stations.  The lawsuit follows a January 24, 2006 announcement of the merging of the UPN and WB television networks and was filed against The WB, WB Communications, a division of Time Warner Entertainment Company, L.P. ("**WB Communications**"), CBS Corporation ("**CBS**"), and Warner Brothers Entertainment, Inc. ("**Warner Brothers**").  The lawsuit alleges, among other things, that The WB's premature termination of Granite's San Francisco and Detroit network affiliation agreements, and The WB's repudiation of agreements to extend the terms of Granite's San Francisco and Detroit network

affiliation agreements, damaged Granite and its subsidiaries and led to the termination of their then-existing agreements to sell those Stations to wholly-owned subsidiaries of AM Media Holdings, LLC. The suit further alleges that Warner Brothers and CBS tortiously interfered with Granite's San Francisco and Detroit network affiliation agreements and the agreements to extend the terms of such agreements. The WB has asserted a counterclaim against Granite alleging that Granite breached the San Francisco and Detroit network affiliation agreements by failing to make certain required payments and that, as of July 14, 2006, Granite owed The WB $2,523,428, plus interest, under such agreements. As discussed below, the Debtors have entered into the WB Settlement, which was approved by the Bankruptcy Court on February 6, 2007.

- *The Warner Brothers Litigation*. On August 9, 2006, Granite was served with a complaint in a law suit filed by Warner Brothers Television Distribution, Inc. ("*WB Distribution*" and, together with The WB, WB Communications, CBS, the "*WB/CBS Entities*") against Granite and WXON License, KBWB and Does 1-10, inclusive in the Superior Court of the State of California, County of Los Angeles (the "*Warner Brothers Litigation*"). The Warner Brothers Litigation alleges breach of several syndication license agreements for non-payment of license fees and seeks monetary damages in excess of $7.5 million. On or about October 6, 2006, the Debtors answered the complaint and asserted affirmative defenses in the Warner Brothers Litigation. As discussed below, the Debtors have entered into the WB Settlement, which was approved by the Bankruptcy Court on February 6, 2007.

- *The Shareholder Litigation*. On August 21, 2006, Harbinger and GoldenTree Master Fund High Yield II, Ltd. ("*GoldenTree*") filed a shareholder derivative lawsuit in the Chancery Court naming the Debtors as nominal defendants and naming all of the Debtors' current directors and certain officers as defendants (other than two directors appointed by Harbinger) and certain others in their capacity as holders of a majority of Preferred Interests. The Shareholder Litigation alleges breach of fiduciary duty in connection with financing and restructuring proposals made in June 2006 by Harbinger and GoldenTree and entry into the Prepetition Credit Agreement (as defined and discussed in more detail below). Specifically, the Shareholder Litigation alleges, among other things, that the Debtors' Chief Executive Officer attempted to extract certain personal benefits in exchange for the resignation of the Debtors' management in connection with the Harbinger Proposal (as defined below).[17] The

---

[17] At their request, Mr. Cornwell engaged in negotiations with Harbinger and GoldenTree in response to a litany of demands contained in the Harbinger Proposal regarding the terms and conditions of a change in the Debtors' management and termination of Mr. Cornwell's employment. In the Shareholder Litigation, however, Harbinger and GoldenTree allege that such negotiations took place at the direction of the board of directors.

Debtors deny these allegations. The plaintiffs have since amended the complaint. On September 25, 2006, Granite filed a motion to dismiss the Shareholder Litigation.

▪ ***The Fox Litigation***. On or about September 6, 2006, Granite was served with a complaint in a law suit filed by Twentieth Television and Twentieth Century Fox Film Corporation (together "***Fox***") against Granite and KBWB, two of the Debtors in these Reorganization Cases, in the Superior Court of the State of California, County of Los Angeles (the "***Fox Litigation***"). The complaint alleges breach of three television syndication license agreements for non-payment of license fees and seeks monetary damages in excess of $22.9 million.[18] On or about October 4, 2006, the plaintiffs filed a motion seeking an order of attachment against any assets of the defendants located in California in the amounts of $4,292,699.85 and $647,883.48 related to the contracts at issue (the "***Attachment Motion***"). On November 1, 2006, the court granted the Attachment Motion. Pursuant to section 493.030 of the California Code of Civil Procedure, the commencement of the Reorganization Cases terminated any liens or attachments that were granted to Fox on November 1, 2006. On November 6, 2006, the defendants answered the complaint. The Debtors have entered into the Fox Stipulation (as described in *Section VI.H.* below) to, among other things, resolve the claims asserted in the Fox Litigation, provided the Plan is consummated.

▪ ***The June Foster Litigation.*** On November 21, 2001, June Foster, a former news writer for KNTV Television, Inc. ("***KNTV***") (an entity owned by Granite at the time of such employment), filed a lawsuit in California entitled *June Foster v. KNTV Television, Inc. and Granite Broadcasting Corporation* in the Santa Clara County Superior Court alleging discrimination, harassment, and retaliation arising out of her employment at KNTV and the termination of that employment. After a number of causes of action were dismissed on summary judgment, on December 1, 2003, the case was tried to a jury on the issue of retaliation over a five-week period and resulted in a unanimous verdict in favor of Granite and KNTV. Foster's post-trial motions for new trial and judgment notwithstanding the verdict were denied. On March 22, 2004, Foster appealed the judgment. On May 25, 2004, the California Court of Appeal for the Sixth District unanimously affirmed judgment in favor of Granite and KNTV. On June 9, 2006, Foster sought rehearing by the Court of Appeal. On June 22, 2006, that request for rehearing was denied. On July 3, 2006, Foster filed a Request for Review with the California Supreme Court, which was denied on August 18, 2006. On September 15, 2006,

---

[18] While Fox has asserted a Claim against Granite and KBWB in excess of an aggregate amount of $28 million, the Debtors dispute such amount, and for purposes of the Plan, Fox and the Debtors have agreed to the treatment of the Fox Claims set forth in the Fox Stipulation.

Foster filed a Petition for Removal, purporting to remove the case to the U.S. District Court for the Northern District of California. On October 16, 2006, Granite and KNTV filed a Motion for Remand and a Motion to Dismiss. Ms. Foster then amended her Petition for Removal on October 30, 2006. Granite and KNTV filed a second Motion to Remand and Motion to Dismiss on November 14, 2006. On November 16, 2006, the District Court issued an Order denying Foster's Motion to Amend her Petition for Removal, and denied Foster's request to proceed *in forma pauperis* because "it appears on the face of the complaint that the Court likely lacks subject matter jurisdiction." On November 27, 2006, Ms. Foster appealed the District Court's November 16 Order. That appeal has been stayed by commencement of the Reorganization Cases.

## C.    Prepetition Capital Structure.

### 1.    Secured Notes.

On December 22, 2003, the Granite Entities completed a $405,000,000 offering of 9.75% Senior Secured Notes (the "**Secured Notes**") due December 1, 2010 issued pursuant to that certain Indenture, dated as of December 22, 2003 (as may be supplemented from time to time, the "**Secured Notes Indenture**") between the Granite Entities and The Bank of New York ("**BNY**"), as Indenture Trustee. Interest on the Secured Notes is payable on December 1 and June 1 of each year. The Secured Notes are secured by substantially all of the Granite Entities' assets (except their FCC licenses held by WEEK-TV and the Second-Tier Subsidiaries)[19], generally on a *pari passu* basis with the Term A Loan and Term B Loan, and all of the Granite Subsidiaries have guaranteed the Secured Notes. Pursuant to the Secured Notes Indenture, Granite has the right to redeem some or all of the Notes at any time on or after December 1, 2006 subject to the payment of the Redemption Price (as defined in the Secured Notes Indenture).

In connection with the execution of the Prepetition Credit Agreement (as defined below) and the acquisition of WBNG, the Secured Notes Indenture was further supplemented by the Second Supplemental Indenture, dated as of July 5, 2006 (the "**Second Supplemental Indenture**"), which added WBNG and WBNG License as guarantors to the Secured Notes Indenture. The holders of the Secured Notes have a second lien on substantially all of the assets and stock of WBNG (which stock is an asset of Granite) and WBNG License. The Second Supplemental Indenture also made changes necessary to allow the Granite Entities to enter into the Prepetition Credit Agreement and grant Liens securing the indebtedness incurred thereunder, among other things.

In connection with the Second Supplemental Indenture, the Granite Entities entered into the Supplemental Agreement, dated as of July 5, 2006 (the "**Supplemental Agreement**"). The Supplemental Agreement provides certain holders of a majority of the

---

[19] Pursuant to federal law, the FCC licenses cannot be pledged as collateral. The Granite Entities that hold the FCC licenses have no creditors other than the holders of Secured Claims and the stock of such Granite Entities has been pledged as security under the Secured Notes Indenture and the Prepetition Credit Agreement (as defined below).

Secured Notes with certain consent rights to actions by the Granite Entities, including, but not limited to, incurring additional indebtedness, making certain types of investments or acquisitions, selling assets, granting additional Liens on certain assets of the Granite Entities, and issuing or selling certain types of additional capital stock.  The Supplemental Indenture provides that defaults under the Supplemental Agreement will be defaults under the Secured Notes Indenture.

On August 1, 2006, the Granite Entities entered into a Third Supplemental Indenture, by and between Granite, the guarantors party thereto, and BNY, which amended the Secured Notes Indenture in accordance with, and to reflect the terms of, the Supplemental Agreement.

As of the Petition Date, the Granite Entities had outstanding obligations relating to the Secured Notes under the Secured Notes Indenture in an amount not less than $425,899,582.03, comprising outstanding principal of $405 million, accrued but unpaid interest of $20,899,582.03, as of the Petition Date, and unpaid fees, costs, and expenses thereunder in an unliquidated amount.  Pursuant to the DIP Order, if interest were to accrue postpetition, it would accrue at the default rate until the Effective Date (assumed to be March 31, 2007), resulting in a claim of not less than $439,851,234.37, comprising outstanding principal of $405 million, accrued but unpaid prepetition interest of $20,899,582.03, accrued but unpaid postpetition interest of $13,951,652.34, and unpaid fees, costs and expenses thereunder in an unliquidated amount (including any potential premium due under the Secured Notes Indenture, if any, which is estimated to be an additional $39.5 million).

2.    *Prepetition Credit Agreement.*

On July 5, 2006, the Granite Entities entered into a Credit and Guaranty Agreement with Silver Point Finance, LLC, as Administrative Agent and the lenders party thereto, from time to time (the "***Prepetition Credit Agreement***").  The Prepetition Credit Agreement provides for two secured loans:  (i) a $40 million Tranche A Term Loan (the "***Term Loan A***") and a $30 million Convertible Tranche B Term Loan (the "***Term Loan B***").  The Term Loan B is convertible, at the option of the lenders in the aggregate, into 200,000 shares of Granite's Preferred Interests.  Both term loans are secured by the existing assets of the Granite Entities (except their FCC licenses held by WEEK-TV and the Second-Tier Subsidiaries), including a first lien on substantially all of the assets and stock of WBNG (which stock is an asset of Granite) and WBNG License.  The liens granted to the Indenture Trustee under the Secured Notes Indenture are *pari passu* with the liens granted to the Administrative Agent under the Prepetition Credit Agreement, except with respect to WBNG and WBNG License (for which the liens granted to the Indenture Trustee are second in priority to those granted to the Administrative Agent under the Prepetition Credit Agreement).  Both term loans matured on December 1, 2006.  The Prepetition Credit Agreement is also guaranteed by each of the Granite Subsidiaries.

As of the Petition Date and assuming no accrued postpetition interest, the Granite Entities had outstanding obligations relating to (i) the Term Loan A Claims in an amount not less than $40,156,164.38, comprising outstanding principal of $40 million, accrued but unpaid interest of $156,164.38, and unpaid fees, costs, and expenses thereunder in an unliquidated amount and (ii) the Term Loan B Claims in an amount not less than $30,117,123.29, comprising

outstanding principal of $30 million, accrued but unpaid interest of $117,123.29, and unpaid fees, costs, and expenses thereunder in an unliquidated amount.

For purposes of clarity, as described below, the Debtors believe the value of the collateral securing the Term Loan A Claims and Term Loan B Claims exceed such Claims, and therefore assume interest continues to accrue postpetition at the default rate for the purposes of determining the amount of such Allowed Claims. Assuming an Effective Date of March 31, 2007, the Granite Entities will have outstanding obligations relating to (i) the Term Loan A Claims in an amount not less than $41,873,972.60, comprising outstanding principal of $40 million, accrued but unpaid interest of $1,873,972.60, and unpaid fees, costs, and expenses thereunder in an unliquidated amount and (ii) the Term Loan B Claims in an amount not less than $31,405,479.45, comprising outstanding principal of $30 million, accrued but unpaid interest of $1,405,479.45, and unpaid fees, costs, and expenses thereunder in an unliquidated amount.[20]

Based on the midpoint Houlihan Lokey valuation, the value of the collateral securing the Term Loan A Claims and the Term Loan B Claims exceeds such claims. The aggregate amount of such claims is approximately $73.3 million, assuming approximately $3.0 million of accrued postpetition interest at the default rate through the Effective Date (assumed to be March 31, 2007).[21] The holders of such claims hold (i) the sole first lien against WBNG and its assets and stock (which stock is an asset of Granite), which were acquired in July 2006 for approximately $45 million and (ii) a lien against all other assets of the Granite Entities, which is shared with the holders of the Secured Notes. Therefore, the claims of the holders of Term Loan A Claims and Term Loan B Claims are oversecured. Oversecurity is determined based on the midpoint of the Houlihan Lokey valuation ($493 million) after accounting for (a) the Malara Guaranty Claims (to represent the value provided by Malara within the Houlihan Lokey valuation) (approximately $29.3 million); and (b) the first lien granted to the Term Loan A and Term Loan B on WBNG, assuming its recent acquisition price of approximately $45 million. The remaining value is then allocated pro rata to (x) the aggregate Term Loan A Claims and Term Loan B Claims (approximately $73.3 million); and (y) the Secured Note Claims (approximately $425.9 million). This pro rata calculation, plus the value ascribed to WBNG, due to the first lien granted to the Term Loan A Claims and Term Loan B Claims results in total value allocated to the Term Loan A Claims and Term Loan B Claims of approximately $106.5 million. Under the Bankruptcy Code, oversecured creditors are entitled to receive postpetition interest or postpetition charges, while undersecured creditors are not entitled to any such postpetition interest or charges.

  3.    *Interests.*

Granite's capital structure includes three types of equity: (i) the Class A Interests; (ii) the Class B Interests; and (iii) the Preferred Interests. Only the holders of the Class A Interests have voting rights and W. Don Cornwell, Granite's Chief Executive Officer and

---

[20] Provided the Plan is confirmed and consummated, holders of the Term Loan A Claims and Term Loan B Claims have agreed to waive the payment in Cash by the Debtors of the postpetition interest.

[21] Provided the Plan is confirmed and consummated, holders of the Term Loan A Claims and Term Loan B Claims have agreed to waive the payment in Cash by the Debtors of the postpetition interest.

Chairman, owns all of the issued and outstanding shares of the Class A Interests (98,250 shares as of November 30, 2006).

The Class B Interests trade on the Over-the-Counter Bulletin Board under the symbol GBTVK.OB, and, as of November 30, 2006, approximately 19.8 million shares were issued and outstanding, with 263 holders of record.  As of November 30, 2006, the Class B Interests were trading for $0.06 per share.

As of January 10, 2007, approximately 200,376 shares of the Preferred Interests were issued and outstanding with 2 holders of record.  The Preferred Interests contain a liquidation preference of $1,000 per share.

4.      *The Malara Agreements.*

In March of 2005, the Granite Entities completed the sale of WPTA-TV ("***WPTA***"), the ABC affiliate for Fort Wayne, Indiana, to Malara.  At the same time, the Granite Entities acquired WISE-TV, the NBC affiliate for Fort Wayne, Indiana, from the New Vision Group, LLC ("***New Vision***"), and Malara acquired KDLH-TV ("***KDLH***"), the CBS affiliate serving Duluth, Minnesota from New Vision.  As part of these transactions, the Granite Entities entered into Agreements with Malara for WPTA and KDLH (collectively, the "***Malara Agreements***").

In connection with such transactions, Granite and two of its Non-Debtor Subsidiaries entered into the Agreements with Malara to provide advertising sales, promotion services, administrative services, and selected programming to two stations owned by Malara (as described above).   During the first ten months of 2006, Malara paid the Debtors approximately $3,650,000 under the Malara Agreements.  Malara pays the fees owed to the Granite Entities under the Malara Agreements only after paying for debt service and certain other direct expenses of Malara.

Malara financed its acquisition of WPTA and KDLH with the proceeds of a Senior Credit Facility (the "***Malara Credit Facility***").  The Malara Credit Facility consisted of a $23.5 million Tranche A Term Loan, a $25 million Tranche B Term Loan, and a Revolving Loan of $5 million.  The $25 million Tranche B Term Loan and the $5 million Revolving Loan are secured by the assets of WPTA and KDLH and guaranteed on an unsecured basis by Granite.

In connection with the Plan, any holders of Malara Guaranty Claims arising from such guarantee will receive no distributions under the Plan.  As set forth in section 3.5 of the Plan, the Malara Guarantee will be cancelled and Granite will enter into the New Malara Guarantee.

The Tranche A Term Loan was secured by a $25 million Standby Letter of Credit (the "***Letter of Credit***").  To secure the reimbursement obligations in the event of a draw on the Letter of Credit, Granite pledged $25 million in United States government securities.  On February 10, 2006, the lender drew upon the Letter of Credit in response to notice of the lender's non-renewal of the Letter of Credit, and Granite satisfied its obligation under the Letter of Credit.  A reimbursement agreement (the "***Reimbursement Agreement***") between Malara and Granite, dated as of March 8, 2005, obligates Malara and certain of its subsidiaries to repay

32

Granite for amounts drawn on the Letter of Credit plus interest at 8% per annum.  Granite has reduced Malara's debt under the Reimbursement Agreement to $16.6 million (in order to comply with FCC rules and regulations).

Under two Put and Call Option Agreements, also executed in March of 2005, in partial consideration for Granite's guarantee under the Malara Credit Facility, Granite was granted an option to purchase all of Malara's right, title, and interest in, the assets of both KDLH and WPTA, subject to (i) certain excluded assets thereunder and (ii) compliance with applicable FCC requirements.

Prior to the Petition Date, Granite, Malara, and the Administrative Agent and lenders under the Malara Credit Facility entered into that certain Limited Waiver and Second Amendment to Credit Agreement, dated as of December 8, 2006, whereby the Administrative Agent and lenders thereunder, among other things and subject to the terms of such amendment, waived the default under the Malara Credit Agreement that would have resulted upon the commencement of the Reorganization Cases.

## V.

## EVENTS LEADING TO THE
## COMMENCEMENT OF THE REORGANIZATION CASES

The Granite Entities have sustained net operating losses for the past three (3) years.  Specifically, the Debtors sustained net losses of $83,105,226 for the first nine months of 2006, $99,382,000 for the year ended December 31, 2005, $83,292,000 for the year ended December 31, 2004, and $46,948,000 for the year ended December 31, 2003.  These losses have, in large measure, been caused by (i) several burdensome and expensive programming contracts, (ii) rising losses from two former Warner Brothers Television Network (the "*WB Network*") affiliated stations in San Francisco and Detroit that the Granite Entities had been attempting to sell, as described further below, (iii) non-cash depreciation and amortization, (iv) cash interest expense, and (v) non-cash preferred dividend accruals (which are not liabilities of the Granite Entities).  As a result, the Granite Entities have, and continue to be confronted with, the inability to make interest and other payments due under the Secured Notes Indenture and Prepetition Credit Agreement.

## A.    **The Programming Contracts.**

In the television broadcasting industry, local stations enter into long-term agreements with media content providers (the "***Media Providers***") for content to broadcast to their audience.  These contracts (the "***Programming Contracts***") are generally negotiated well in advance and often last for long periods of time.  Indeed, the Programming Contracts may contain "evergreen" clauses that extend the length of the Programming Contract by one year for each additional season of the television program produced by the Media Providers.  The Granite Entities have entered into many multi-year Programming Contracts for the content that they broadcast on the Stations.

Due to the changing appetites of the viewing public and the "evergreen" clauses in certain of the Programming Contracts, Stations run the risk of agreeing to pay large sums for then-popular programs that later lose the viewing public's interest. In the worst case scenario, a Station may find that it is a party to an unprofitable Programming Contract whose term keeps lengthening in accordance with the "evergreen" clause due to the production of additional seasons of the underlying program.

In particular, two of the Debtors in these cases, KBWB and WXON, owners of the San Francisco and Detroit Stations, respectively were parties to certain Programming Contracts that, over time, became increasingly unprofitable and contributed to the Debtors recent operating losses. In particular, the San Francisco and Detroit Stations, owned and operated by KBWB and WXON, respectively, were parties to several burdensome and unprofitable long-term Programming Contracts that were the subject of the Fox Litigation, the WB Litigation, and the Warner Brothers Litigation (as described above).

## B.   Efforts to Sell the San Francisco and Detroit Stations.

On September 8, 2005, certain Granite Entities entered into two agreements to sell KBWB to AM Broadcasting KBWB, Inc. and WXON to AM Broadcasting WDWB, Inc. (the "*AM Sale*"). The gross proceeds from the AM Sale would have been $180 million.

On January 24, 2006, the WB Network announced that it would merge its network with CBS Corp.'s United Paramount Network to form the "CW Network." The WB Network further announced that, effective as of September 2006, it would no longer provide programming to current WB Network affiliates. Ultimately, the CW Network did not choose either KBWB or WXON as a new CW Network affiliate. The loss of WB Network affiliate status made it impossible to close the AM Sale and, thus, the buyers were permitted to terminate the AM Sale. The Granite Entities continued to negotiate with AM Broadcasting, but were unable to reach an agreement on a revised sale to take into account the loss of the WB affiliation. As a result, the Granite Entities terminated the AM Sale and pursued the DS Sale (as described below). The loss of the WB Network affiliate status resulted in the commencement of the WB Litigation (as described above).

The AM Sale Agreements terminated on May 1, 2006 and Granite announced new agreements to sell both KBWB and WXON to subsidiaries of DS Audible. The terms of the sale (the "*DS Sale*") provided for the Granite Entities to receive $150 million in the aggregate.

Because the DS Sale included an assignment of KBWB and WXON's broadcast licenses to DS Audible, Federal Law required the FCC to approve the DS Sale prior to its consummation. The Granite Entities and DS Audible filed an application for the proposed transfer with the FCC on May 8, 2006, with objections due by June 8, 2006. On June 7, 2006, Harbinger filed the Harbinger Litigation I and the Harbinger Litigation II. Despite the filing of such actions, the FCC approved the DS Sale on June 23, 2006 and, as noted above, the Chancery Court granted the Granite Entities, party thereto, motion to dismiss the Harbinger Litigation I. The litigation, however, prevented the timely closing of the DS Sale. On July 17, 2006, the Granite Entities terminated the agreements to sell KBWB and WXON after deciding to retain WXON. Subsequently, the Granite Entities decided to retain KBWB.

**C.**     **The Granite Entities' Inability to Make Payments Under**
**the Secured Notes Indenture and Entry into the Prepetition Credit Agreement.**

On June 1, 2006, an interest payment of $19,743,750 was due on the Secured Notes (the "***June 1 Payment***"). Due to the lack of available cash, the Debtors were unable to make the June 1 Payment and, because payment was not made within 30 days after the June 1 Payment was due, the Granite Entities were in default under the Secured Notes Indenture. To cure such default, the Granite Entities engaged in negotiations with Silver Point and several other parties that ultimately resulted in the execution of the Prepetition Credit Agreement.

Under the Prepetition Credit Agreement the Granite Entities entered into certain covenants, including the following: (i) the requirement to submit to Silver Point (as administrative agent thereunder) a proposed comprehensive restructuring plan for the Granite Entities no later than July 14, 2006; (ii) the execution of a definitive agreement effectuating a comprehensive restructuring of the Granite Entities in form and substance satisfactory to the lenders holding 51% of the loans under the Prepetition Credit Agreement by August 15, 2006; (iii) maintaining a minimum broadcast cash flow; and (iv) not making or incurring consolidated capital expenditures in excess of $4,038,000 during the term of the Prepetition Credit Agreement.

As stated above, the Prepetition Credit Agreement contained a covenant that required Granite to provide a proposed restructuring plan to the senior lenders thereunder no later than July 15, 2006, and to execute an agreement to effectuate such restructuring plan no later than August 15, 2006. Through amendments to the Prepetition Credit Agreement, these covenants were modified such that the deadline for executing an agreement to effectuate the restructuring plan was extended to September 15, 2006. Granite did not satisfy this extended deadline but Silver Point, as Administrative Agent under the Prepetition Credit Agreement, did not act to enforce remedies under the Prepetition Credit Agreement, but rather continued to negotiate with Granite for over two months over the terms of the restructuring until the execution of the Restructuring Support Agreement in December 2006.

On December 1, 2006, the Granite Entities failed to make the interest payment of $19,744,000 on the Secured Notes and repay the $70 million of loans under the Prepetition Credit Agreement, both of which were due on such date. The failure to make the aforementioned payments resulted in events of default under the Secured Notes Indenture and the Prepetition Credit Agreement.

**D.**     **The Granite Entities' Business Plan.**

The Granite Entities seek to increase operating profitability through the following strategies:

▪     ***Small Market Operating Strategy***. As part of their business model, the Granite Entities actively seek to own or provide services to more than one television station in a market or geographic region (a "***Small Market***

*Operating Strategy*"). Implementation of this Small Market Operating Strategy provides near term cost savings and long term revenue enhancement for the Granite Entities' operations in the subject market by enhancing revenue share, broadening audience share, and allowing significant operating efficiencies by streamlining the overall cost structure in the subject markets. The Granite Entities must structure transactions under and implement its Small Market Operating Strategy to comply with FCC regulations. As of November 30, 2006, the Granite Entities had implemented its Small Market Operating Strategy in four of the nine markets that the Granite Entities serve by entering into Agreements with an independently owned Station in each market. In each of these markets, the Granite Entities own a local affiliate and have an Agreement with another in-market television station owner. The Granite Entities continue to explore opportunities in other markets where the Granite Entities own a Station and in new markets, including acquiring or managing stations that allow them to implement the Small Market Operating Strategy.

- *Large Market Operating Strategy*. As part of their business model following the decision to retain and operate KBWB in San Francisco and WMYD in Detroit, the Granite Entities seek to reposition and enhance market niches in both of these large markets. In Detroit, WMYD-TV will seek to build upon and strengthen the newly implemented affiliation with MyNetworkTV while capitalizing on its established presence in local sports broadcasting. In San Francisco, KBWB-TV will seek to reposition itself as an independent operator providing niche local programming and content, including commencement of the broadcasting of a 9:00 p.m. newscast as contractually provided by another programmer, while also offering attractive programming series and films. The Granite Entities continue to explore opportunities in other markets where the Granite Entities own a Station and in new markets, including acquiring or managing stations that allow them to implement the Large Market Operating Strategy.

- *Continually evaluate programming opportunities*. The Granite Entities continue to make substantial progress replacing unprofitable programming with profitable programming.

- *Emphasize local news, weather, and sports*. Nine of the Stations that the Granite Entities own, operate, program, or provide sales and other services to, provide high quality, locally produced news, weather, and sports programming on the "Big Three" affiliated stations. Five of the Granite Entities' Big Three affiliated Stations ranked as the number 1 or number 2 news providers in their respective markets. Strong local news differentiates the Stations from other media alternatives and helps to attract a loyal audience, which is appealing to advertisers. In addition, the cost of producing local news is generally lower than the cost of syndicated

programming, and incremental local news programming can be added with relatively small increases in operating costs.

These combined strategies have been incorporated into the business plan for the Granite Entities and are reflected in the Projected Financial Information attached as <u>Exhibit 3</u>. The financial restructuring contemplated by the Plan will create a capital structure which the Debtors believe should provide for the successful execution of this business plan.

## E.      <u>Prepetition Restructuring Efforts</u>.

During the past year, the Debtors took a number of steps to address their financial condition that have been well documented in the Debtors' public filings (the most recent copies of each are annexed hereto).  In addition, in March 2006, Granite retained an independent financial advisor, Houlihan Lokey, to assist the Debtors in evaluating strategic options and to advise the Debtors on financing and restructuring alternatives.

As part of this process, and continuing through the negotiations of the terms of the Plan, Houlihan Lokey approached approximately 18 parties (including both financial and strategic parties) regarding a potential new investment in the Granite Entities in conjunction with a financial restructuring or sale transaction.[22]  Houlihan Lokey placed no conditions on potentially interested parties with regards to bid level, structure, financing, or management in connection with the solicitation of indications of interest.  Houlihan Lokey requested any and all indications of interest from each party to invest in or acquire Granite and its operating assets.  Several of these parties executed confidentiality agreements with the Granite Entities and performed due diligence.  None of the third parties approached by Houlihan Lokey, however, were willing to propose an investment at a valuation that would either fully satisfy or exceed the Secured Claims of the Debtors.  Throughout the postpetition period, Granite and Houlihan Lokey have had, and will continue to have, discussions with potential investors or acquirers, including those who indicated interest prepetition as well as additional parties.  To date, no potential investor, including Harbinger and GoldenTree, have proposed a transaction or investment under any terms or conditions that would provide for a valuation or recovery to fully satisfy or exceed the Secured Claims of the Debtors.

As discussed above, approximately eight months ago, the Debtors were required to make the June 1 Payment.  Due to the lack of available cash, the Debtors were unable to make the June 1 Payment and, because payment was not made within 30 days after the June 1 Payment was due, the Granite Entities were in default under the Secured Notes Indenture.

---

[22] In addition to these parties, Granite solicited 3 additional financial buyers (each with strategic television broadcasting portfolio assets) throughout 2005, but received no indication of interest that would have exceeded the Secured Claims of the Debtors.

As the due date of the June 1 Payment approached,[23] the Debtors considered various alternatives, including the sale of KBWB and WXON (as described above), to facilitate the making of the June 1 Payment and implementing viable restructuring alternatives.

The Prepetition Credit Agreement was a financing proposal offered by Silver Point, the Debtors' largest secured debt holder. The Prepetition Credit Agreement required the Debtors to submit a restructuring proposal to Silver Point for negotiation and approval and contained certain covenants limiting the Debtors' ability to take certain actions while the loans remained outstanding, such as selling certain assets, issuing voting stock, and engaging in certain other financing transactions. The Prepetition Credit Agreement was not contingent on the completion of due diligence.

Harbinger and GoldenTree also submitted a financing proposal, which contemplated an investment in the Debtors of approximately $85 to $90 million (the "*Harbinger Proposal*"). The Harbinger Proposal consisted of a $40 million investment in a new class of preferred stock (with a 20% annual dividend and which new preferred stock would be senior to the existing Preferred Stock) and a $45-50 million loan to a new Granite subsidiary that was convertible at the option of Harbinger and GoldenTree into shares of this new class of senior preferred stock (which would have been senior to the existing Preferred Stock and would have required amendments to the certificates of incorporation and approval of the board of directors and holders of the Class A Interests and Preferred Interests). The proposal on the new loan lacked detail on key terms including the interest rate and the terms for the conversion into the new preferred stock in the Harbinger Proposal. In addition, the proposal on the new loan had a cash flow sweep mechanism which would have made the cash flow after interest costs from the WBNG not accessible to Granite which would have greatly defeated the purpose of the acquisition, which was to enhance the cash flow of Granite. Also, the structure of such loan raised issues with respect to the Secured Notes Indenture and, therefore, would have likely required approval from a majority of the holders of the Secured Notes. The Harbinger Proposal also provided that Harbinger and GoldenTree would elect an additional two directors (for a total of four – they previously appointed two other directors as provided for under the terms of the existing Preferred Stock), who would have a new, supermajority voting right and, unlike the Prepetition Credit Agreement, control in every respect of a host of corporate matters, in addition to their control by membership of the board of directors, including, but not limited to, issuing securities, incurring debt, filing for bankruptcy, and approving a restructuring plan (the details of such plan, including how the various constituents would be treated and what amount, if any, distributions would have been made to holders of the existing Preferred Stock or Common Stock, was not provided). Significantly, unlike the Prepetition Credit Agreement, the Harbinger Proposal was contingent on the completion of due diligence. The Harbinger Proposal also provided for the immediate implementation of steps to change the Debtors' management and replace them with new unspecified management. Harbinger and GoldenTree allege, however, that the negotiations of the terms and conditions of the Harbinger Proposal abruptly ended because the Debtors' CEO and controlling shareholder made demands that were rejected by Harbinger and GoldenTree. As discussed above, the Debtors deny this allegation.

---

[23] The Secured Notes Indenture provides for a thirty-day grace period, which was set to expire on June 30, 2006.

After extensive review and discussion, and with the assistance of outside counsel and Houlihan Lokey, of both the Harbinger Proposal and the Prepetition Credit Agreement over four separate meetings of the board of directors, a majority of the board of directors ultimately approved the Prepetition Credit Agreement (the only directors of the board who voted against the Prepetition Credit Agreement were the two directors appointed by Harbinger and GoldenTree). W. Don Cornwell abstained from the vote.

To cure the default under the Secured Notes Indenture as a result of the failure to make the June 1 Payment, the Granite Entities agreed to and consummated the Prepetition Credit Agreement in early July 2006. Thereafter, on July 5, 2006, the Granite Entities borrowed $27.5 million under the Term Loan B—using approximately $19.9 million of the proceeds to pay the June 1 Payment, thus curing the default with respect to the Secured Notes.[24]

In an attempt to further increase revenues and profitability, on July 26, 2006, the Granite Entities borrowed the remaining $2.5 million of the Term Loan B and $40 million under the Term Loan A to complete the acquisition of WBNG. With the acquisition of WBNG, the Granite Entities now own and operate Stations in Buffalo, Syracuse, and Binghamton-Elmira, which permits the Granite Entities to take advantage of certain operating efficiencies in central and western New York State.

Thereafter, with the breathing space provided by the payment of the June 1 Payment, the Debtors, their management, and their professionals continued their significant efforts to procure an equity investor for, or acquirer of, Granite, while, at the same time, continuing to negotiate a comprehensive restructuring that would significantly delever the Debtors' balance sheet, which restructuring was required under the Prepetition Credit Agreement and necessary for the payment of the obligations thereunder upon maturity. As described above, in an effort to maximize value to all constituencies, Houlihan Lokey approached a number of parties to determine if any party would be interested in acquiring, or investing in, the Debtors at a value that exceeded (i) the valuation derived by Houlihan Lokey; and/or (ii) the total Secured Claims. Despite marketing the Debtors throughout the period leading up to the commencement of these chapter 11 cases, Houlihan Lokey was unable to uncover a party that was interested in acquiring, or investing in, the Debtors at a value that would exceed either of these thresholds. In fact, all parties who proposed a valuation proposed one that was significantly below the midpoint valuation determined by Houlihan Lokey as well as the total Secured Claims.

After significant diligence and analysis by Houlihan Lokey and the Debtors' other professionals, management, and board of directors, it became apparent that the holders of Secured Claims would not receive a full recovery under any proposed chapter 11 plan and, thus, pursuant to the "fair and equitable" standard embodied in section 1129(b) of the Bankruptcy Code, no junior class, including equity security interests, would be entitled to receive any distribution on account of their Claims or Interests under a plan of reorganization, including the holders of the Preferred Stock.

---

[24] Thereafter, Harbinger and GoldenTree commenced the Shareholder Litigation challenging the consummation of the Prepetition Credit Agreement.

Given the inability to find an equity investor or acquirer at a level that exceeded the Secured Claims (thereby implying a valuation that would impair the Secured Claims), the Debtors engaged in good faith, arm's length negotiations with Silver Point on the restructuring embodied in the Plan.  Because the Debtors' Secured Claims would be impaired and are undersecured, Silver Point initially resisted the concept of the Debtors' unsecured creditors or their equity security holders receiving any value under a plan of reorganization.  Ultimately, the Debtors' management and professionals were able to negotiate the meaningful distributions contained in the Plan, which, in fact, provide for an allocation of value for nearly all classes of claimants (and, in fact, for payment in full of the face amount of the Allowed General Unsecured Claims held by such claimants unless otherwise agreed, subject to the Fox Stipulation and the Beck Stipulation) and equity interest holders.

Given their circumstances, the Granite Entities concluded that the relief afforded by chapter 11 would help maintain their operations and enable the Debtors to take the necessary actions to protect and enhance their business and the value that will inure to their creditors, employees, and other parties in interest.

After protracted negotiations among the Granite Entities and Silver Point along with their respective advisors, the parties reached an agreement, in principle, on the terms of a restructuring of the Granite Entities to be effectuated pursuant to a confirmed plan under chapter 11 of the Bankruptcy Code.  The terms of the agreement in principle are embodied in the Plan and the Restructuring Support Agreement that was executed on the Petition Date.  The Restructuring Support Agreement is annexed hereto as <u>Exhibit 2</u>.

The Granite Entities believe that the Plan will provide an equitable distribution to the holders of Allowed Claims and Interests and enable the Debtors to emerge promptly from chapter 11 as a viable, de-levered business—with minimal effect on its operations—leaving the Granite Entities better able to compete in the marketplace.  Coupled with the Granite Entities' business plan (described above), the Granite Entities are optimistic of their long-term prospects.

The significant reduction in Secured Claims will provide Granite with a more stable balance sheet and structure to implement its business plan and operate as a reorganized company.

## VI.

## SIGNIFICANT EVENTS DURING THE REORGANIZATION CASES

### A.  <u>First Day Orders.</u>

On and shortly after the Petition Date, the Debtors obtained a series of orders from the Bankruptcy Court designed to minimize any disruption of their business operations and to facilitate their reorganization.

▪ ***Case Administration Orders***.  The Bankruptcy Court issued orders: (i) authorizing the joint administration of the Reorganization Cases, (ii) establishing notice procedures, (iii) establishing procedures for interim compensation for professionals, (iv) authorizing the Debtors to employ

professionals in the ordinary course of their business, (v) extending the time to file the Debtors' schedules and statements, (vi) authorizing the Debtors to mail initial notices and all other mailings directly to parties in interest and waiving the requirement to file a consolidated list of creditors, (vii) authorizing the Debtors to employ and retain Akin Gump Strauss Hauer & Feld LLP as attorneys for the Debtors, (viii) authorizing the Debtors to employ and retain Houlihan Lokey as financial advisors for the Debtors, and (ix) authorizing the Debtors to employ and retain The Trumbull Group, LLC d/b/a Wells Fargo Trumbull as the official claims, noticing, and voting agent.

- ***Payments on Account of Certain Prepetition Claims***.  The Bankruptcy Court authorized the Debtors to satisfy outstanding obligations including certain of those relating to: (i) wages, compensation, and employee benefits; (ii) sales and use taxes; and (iii) amounts related to certain customer rewards programs.

- ***Business Operations***.  Among other things, the Bankruptcy Court authorized the Debtors to: (i) assume certain of their Agreements with Malara; (ii) maintain existing bank accounts and business forms; and (iii) continue their centralized cash management system.

## B.    Debtor in Possession Financing.

In connection with the commencement of the Reorganization Cases and to enable the continued operation of their business, avoid short-term liquidity concerns, and preserve the going concern value of their estates, on the Petition Date, the Debtors entered into a post-filing credit facility (the "***DIP Credit Agreement***") with Silver Point, as Agent, and the Lenders under the DIP Credit Agreement, from time to time who have in the aggregate committed principal amount of $25 million.

The DIP Credit Agreement (as amended) required compliance with certain reorganization "milestones" including approval of this Disclosure Statement by February 15, 2007 and confirmation of the Plan within 65 days thereafter.

The DIP Credit Agreement allows the Debtors to fund their operations in the ordinary course of business and provides liquidity to the Debtors' businesses.  On December 15, 2006, the Bankruptcy Court entered an interim order approving the DIP Credit Agreement. Subsequently, on January 5, 2007, the DIP Credit Agreement was approved on a final basis.

## C.    The WB Settlement.

The Debtors entered into a settlement agreement (the "***WB Settlement***") with the WB/CBS Entities.  The WB Settlement resolved the respective disputes of the Debtors and the WB/CBS Entities in connection with The WB Litigation and the Warner Brothers Litigation (as described above).  The WB Settlement is evidenced by that certain Settlement Agreement, dated as of December 8, 2006, among the Debtors and the WB/CBS Entities.  Pursuant to the WB Settlement, among other things, the WB/CBS Entities (i) paid the Debtors $12,669,610.37

(which was equal to $15.5 million less cure amounts due under three Programming Contracts that were assumed) and (ii) waived past due amounts otherwise payable to the WB/CBS Entities. In addition, the parties exchanged mutual releases.  On December 22, 2006, the Debtors filed a motion with the Bankruptcy Court under Bankruptcy Rule 9019 seeking an order approving the WB Settlement.  Thereafter, on February 6, 2007, the Bankruptcy Court entered an order approving the WB Settlement.

## D.    The Schedules and Bar Date.

On January 15-16, 2007, the Debtors filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules and Statements**").

On January 24, 2007, the Debtors filed a motion (the "**Bar Date Motion**") seeking an order of the Bankruptcy Court establishing March 27, 2007 at 5:00 p.m. (prevailing Eastern Time) as the last date and time (the "**Bar Date**") for each person or entity to file proofs of Claim based on prepetition Claims against any of the Debtors, and June 11, 2007 at 5:00 p.m. (prevailing Eastern Time) as the last date and time for "governmental units" (as defined in section 101(27) of the Bankruptcy Code) to file proofs of Claim based on prepetition Claims against any of the Debtors.  A notice of the Bar Date will be published once in *The Wall Street Journal* at least twenty-five (25) days prior to the Bar Date and a proof of claim form will be mailed to all known creditors listed in the Debtors' Schedules and Statements.  On February 16, the Court entered an Order approving the Bar Date Motion.

The Debtors project that the Claims asserted against them will be resolved in and reduced to an amount that approximates the Claims contained in the Debtors' Schedules and Statements and the amounts estimated herein.  The actual aggregate amount of Allowed Claims in any class, however, may differ significantly from the Debtors' estimates.  The Plan contains a condition to confirmation, which provides that the Confirmation Order shall contain a finding that the total amount of Cash required to pay Allowed Claims in Classes 4A, 5, 6, 7, 8, and 9 shall not exceed $11.0 million.

## E.    Creditors Committee.

On December 21, 2006, the U.S. Trustee held the organizational meeting of creditors.  In addition, on January 16, 2007 and January 23, 2007, the U.S. Trustee convened a meeting of creditors pursuant to section 341 of the Bankruptcy Code.  The U.S. Trustee also contacted the twenty (20) largest unsecured creditors listed in the Debtors' petitions and otherwise attempted to form an Official Unsecured Creditors' Committee in these Reorganization Cases.  However, an insufficient number of eligible creditors indicated a willingness to serve on such a committee.  Accordingly, the U.S. Trustee was unable to appoint an Official Unsecured Creditors' Committee under section 1102(a) of the Bankruptcy Code and on January 29, 2007 filed her Statement of the U.S. Trustee of Inability to Appoint Committee of Unsecured Creditors.

### F.   Requests for the Appointment of an Equity Committee.

By letter dated December 19, 2006 (the "***Harbinger Letter***"), Ropes and Gray, LLC, counsel to certain holders of over 50% of Granite's Preferred Stock, including Harbinger, GoldenTree, and MFC Global Investment Management (U.S.), LLC ("***MFC***" and, collectively with Harbinger and GoldenTree, the "***Preferred Equity Holders***") requested that the U.S. Trustee appoint an official committee of equity security holders (an "***Equity Committee***"). By letter, dated January 4, 2007, the U.S. Trustee invited the Debtors to reply to the Harbinger Letter and by letter to the U.S. Trustee, dated January 10, 2007, the Debtors vigorously opposed the appointment of an Equity Committee (the "***Debtors' Letter***").

On December 29, 2007, the Preferred Equity Holders moved for the appointment of an official committee of equity holders (the "***Equity Committee Motion***"). By motion filed contemporaneously with the Examiner Motion (as defined below), the U.S. Trustee objected to the Equity Committee Motion and indicated her decision not to appoint an Equity Committee. Pursuant to the Examiner Order, as described and defined below, the Preferred Equity Holders withdrew the Equity Committee Motion.

### G.   The Examiner Motion.

On February 2, 2007, the U.S. Trustee moved for the appointment of an examiner (the "***Examiner Motion***"). In the Examiner Motion, the U.S. Trustee sought the appointment of an examiner (the "***Examiner***") to conduct the Investigation (as defined below).[25]

By Order dated February 20, 2007, the Court ordered the appointment of the Examiner (the "***Examiner Order***"). On February 22, 2007, the U.S. Trustee filed an application seeking the appointment of Mr. Andrew Hruska, Esq. of the law firm of King & Spalding LLC as the Examiner. On February 23, the Court entered an order approving the appointment of Mr. Hruska as the Examiner. Pursuant to the Examiner Order, the Examiner is authorized to investigate the following matters: (i) the perfection, validity, and enforceability of the liens granted to the holders of Secured Claims pursuant to the Prepetition Credit Agreement and the Prepetition Indenture; (ii) whether the Debtors and their officers and directors discharged their fiduciary duties in negotiating and entering into the Prepetition Credit Agreement and the Restructuring Support Agreement; and (iii) any claims of the Debtors or the estates against any third parties, including, without limitation, avoidance, insider status, equitable subordination, and recharacterization (collectively, the "***Investigation***"). The Examiner Order provides the Examiner with a budget of $250,000, which shall be applied first to any fees and expenses of the Examiner and thereafter to any fees and expenses of the Examiner's professionals, if any. The Examiner's report, setting forth the results of the Investigation, is due to be filed with the Bankruptcy Court by Monday, April 2, 2007 at 5:00 p.m. (Eastern Time). Nothing in the Examiner Order, however, impedes the rights of the Examiner, the U.S. Trustee, or any other party in interest from requesting any other lawful relief, including, but not limited to,

---

[25] The DIP Order does not contain any provision allowing the surcharge of the lenders' collateral to fund an examiner. Notwithstanding the foregoing, Silver Point has consented to entry of the Examiner Order.

modification of the budget or the timing of the Examiner's report, or the rights of other parties to oppose such relief.[26]

        The Debtors do not believe that the Investigation will uncover any claims held by the Debtors against the holders of Secured Claims because they contend such allegations are wholly without merit.  Silver Point concurs in the Debtors' belief, and additionally believes that the Debtors may hold claims against Harbinger and GoldenTree.  In addition, the Debtors believe that their board of directors fulfilled their fiduciary duties in consummating the Prepetition Credit Agreement, the Restructuring Support Agreement, and otherwise.  The Preferred Shareholders, however, believe the matters to be investigated have merit and could result in damages being recovered by the Debtors resulting in additional value available to be distributed to holders of Claims and Interests and, thus, could affect the distributions contemplated by the Plan.  Although the Debtors do not believe there is any merit to the allegations that any of their lenders could be deemed an "insider" of the Debtors or that any avoidable transfers were made to such lenders, a contrary determination by the Bankruptcy Court could have the following consequences: (i) the period during which payments made by the Debtors to an entity found to be an insider, may be avoided as preferential payments may be extended from 90 days before the Petition Date to one year before the Petition Date and (ii) any ballots cast by an entity found to be an insider may not be counted for purposes of determining whether the Plan satisfies the requirement for confirmation set forth in section 1129(a)(10).

## H.    __The Fox Motion to Allow Claims and the Fox Stipulation__.

        Among the liabilities listed on the Schedules and Statements filed by Granite and KBWB were contingent, disputed, and unliquidated general unsecured claims asserted by Fox against both Granite and KBWB relating to contract disputes with Fox being litigated in the Fox Litigation, as described above.

        On January 25, 2007, Fox filed its Motion of Twentieth Television and Twentieth Century Fox Film Corporation to Allow Claims (the "*Fox Motion*") seeking the allowance of the Fox Claims (as defined below) against both Granite and KBWB.  Contemporaneously with the filing of the Fox Motion, Fox asserted the following proofs of claim against the Debtors (collectively, the "*Fox Claims*"):  (i) a claim for $28,936,858 against Granite; and (ii) a claim for $27,247,917 against KBWB.

        Pursuant to a stipulation, Fox, Granite, and KBWB have resolved their disputes in connection with the Fox Motion, the Fox Claims, and the Fox Litigation provided that the Fox Stipulation is approved by the Bankruptcy Court and the Plan is consummated (the "*Fox Stipulation*").  Pursuant to the Fox Stipulation, among other things, (i) the Fox Claims shall be included solely in Class 5 (KBWB General Unsecured Claims) and no Fox Claims shall be included in Class 4A (Granite General Unsecured Claims); (ii) all Fox Claims shall be treated as Allowed Claims as part of such Class 5; (iii) Fox shall receive $8 million in Cash on the Effective Date of the Plan on account of the Fox Claims, in accordance with the payment of

---

[26] As stated above, the DIP Order does not provide a budget for an Examiner.  Silver Point has not indicated its willingness to consent to any such further relief including any enlargement of the Examiner's budget.

Allowed Claims in Class 5, *provided, however,* that while the amount of the Fox Claims, the treatment of the Fox Claims, and the Debtors against whom the Fox Claims may be asserted remains disputed and subject to the reservation of certain rights of the parties as set forth in the Fox Stipulation, for purposes of the Plan and provided that the Plan is consummated, the Debtors and Fox have agreed that the payment of $8 million in Cash on the Effective Date to Fox shall be deemed to be payment in full of all Claims of Fox against the Debtors; and (iv) certain mutual releases shall become effective.

In addition, pursuant to the Fox Stipulation, Fox has agreed to support and vote to accept the Plan (if and when solicited pursuant to a court-approved disclosure statement) and shall not (i) object to the Plan; (ii) solicit rejections of the Plan; or (iii) support any objection to the Plan. On March 2, 2007, the Bankruptcy Court approved the Fox Stipulation.[27]

## I.    The Beck Stipulation.

Prior to the Petition Date, Stuart Beck, Ambassador and Permanent Representative - Mission of Palau to the United Nations, was a member of the Debtors' board of directors. Prior to his resignation from Granite in September, 2004, Mr. Beck also served as Granite's President. At the time of his resignation, Mr. Beck was entitled to an award of $3,286,065 (the "***Performance Award***") he earned from Granite as of December 22, 2003. Upon resigning from Granite, Mr. Beck entered into a separation agreement (the "***Separation Agreement***") with Granite. In accordance with the Separation Agreement, the parties agreed to defer the timing of Granite's obligation to pay the Performance Award. To repay Mr. Beck's outstanding promissory note to Granite, the parties also agreed to reduce by $221,200 the amount of the Performance Award. The remaining vested award of $3,065,000 was to be paid in cash on December 22, 2006.

On January 15, 2007, Granite filed its Schedules and Statements which listed Mr. Beck as having a claim of $3,065,000 against Granite (the "***Beck Claim***").

Pursuant to a stipulation between Granite and Mr. Beck (the "***Beck Stipulation***"), Granite and Mr. Beck have agreed that, among other things, (i) the Beck Claim shall be included

---

[27] If the Fox Stipulation is terminated pursuant to certain provisions thereof, or otherwise not valid and binding on the Debtors and Fox, such parties agree to confer in good faith regarding scheduling of matters concerning the Fox Claims. In addition, in the event the Fox Stipulation is terminated or is otherwise not valid and binding on the Debtors and Fox, the Debtors and Fox reserve all rights with respect to the Fox Claims, including but not limited to the amount, validity, treatment, and classification of such claims or the proper Debtor entity against which the Fox Claims may be asserted and nothing in the Fox Stipulation shall in any way constitute an admission, a negative inference or be admissible for any purpose as to the amount, validity, treatment, and classification of the Fox Claims or the proper entity against which the Fox Claims may be asserted. In addition, if the Fox Stipulation is terminated or is otherwise not valid and binding on the Debtors and Fox, the Debtors and Fox agree that they shall be placed, as nearly as possible, in the position that they were in before entering into the Fox Stipulation, with the same rights and obligations, and shall not be prejudiced or affected by having entered into Fox Stipulation and, in such a case, Fox intends to assert that the Fox Claims constitute a separate claim of approximately $28 million (plus any other amounts that may be allowed) against each of Granite and KBWB and that Fox is entitled to a separate distribution from each such Debtor, up to the total allowed amount of the Fox Claims and that if the Debtors are solvent, Fox is entitled to payment in full of such amounts. The Debtors reserve all rights to dispute such assertions.

solely in Class 4 (Granite General Unsecured Claims); (ii) Mr. Beck shall receive $2 million in Cash on the Effective Date of the Plan on account of the Beck Claim, in accordance with the payment of Allowed Claims in Class 4, *provided, however,* that provided the Plan is consummated, Granite and Mr. Beck have agreed that the payment of $2 million in Cash to Mr. Beck shall be deemed to be payment in full of all Claims of Mr. Beck against the Debtors; and (iii) the parties exchange mutual releases.

In addition, pursuant to the Beck Stipulation, Mr. Beck has agreed to support and vote to accept the Plan (if and when solicited pursuant to a court-approved disclosure statement) and shall not (i) object to the Plan; (ii) solicit rejections of the Plan; or (iii) support any objection to the Plan. On March 2, 2007, Bankruptcy Court approved the Beck Stipulation.[28]

**J.      The Debtors' Exclusive Right to File and Solicit Acceptances of a Plan.**

The Debtors are operating in their exclusive period to file and solicit acceptances of a plan pursuant to section 1121(a), which current exclusivity period expires on April 10, 2007 (the "***Exclusivity Period***"). Prior to the Confirmation Hearing scheduled to begin April 16, 2007 at 10:00 a.m. (Eastern Time), the Debtors intend to file a motion to extend the Exclusivity Period.

**K.      Approval of the Rights Offering.**

Shortly after the approval of this Disclosure Statement, the Debtors will seek authority of the Bankruptcy Court to implement the Rights Offering as described in *Section VIII* so that the Rights Offering is concluded prior to the Confirmation Hearing (the "***Rights Offering Motion***").

**L.      Assumption and Rejection of Executory Contracts and Unexpired Leases.**

As set forth in *Section VII.J.1.*, upon the occurrence of the Effective Date, all executory contracts and unexpired leases not otherwise assumed will be rejected. On or before March 15, 2007, the Debtors will file Schedule 7.1 of the Plan setting forth those executory contracts and unexpired leases to be assumed and the amounts necessary to cure any defaults thereunder.

---

[28] If the Effective Date of the Plan does not occur, the Beck Stipulation shall be of no further force and effect, and, in such event, neither the Beck Stipulation nor any negotiations and writings in connection therewith shall in any way be construed as or deemed to be evidence of or an admission on behalf of any party thereto regarding any claim or right that such party may have against any other party hereto.

# VII.

## THE PLAN OF REORGANIZATION

### A.    Introduction.

The Plan provides for a restructuring of the Debtors' financial obligations which will result in a significant deleveraging of the Granite Entities to better compete in the broadcasting market.  The Granite Entities believe that the proposed restructuring will provide them with the necessary financial flexibility to compete effectively in today's business environment.

The Debtors believe, and will demonstrate to the Bankruptcy Court, that, under the Plan, creditors and stakeholders will receive no less value than they would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

The following is a non-technical discussion of the provisions of the Plan.

### B.    Summary of the Structure of the Reorganized
###        Debtors On and After the Effective Date.

Pursuant to the transactions to be effectuated under the Plan on the Effective, Reorganized Granite will be a Delaware corporation and shall own all of the Subsidiary Interests, which will remain unaffected by the Plan.  Reorganized Granite will be a private, non-SEC reporting company and issue the New Common Stock, none of which will be traded on any exchange.   The Exit Facility will be Reorganized Granite's only secured indebtedness, secured by all of the assets of the Reorganized Debtors and Non-Debtor Subsidiaries, and guaranteed by each Reorganized Subsidiary and Non-Debtor Subsidiary.

### C.    Classification and Treatment of
###        Claims and Interests Under the Plan.

Under the Bankruptcy Code only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Plan and the Disclosure Statement.  In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is deemed "allowed" unless the debtor or other party in interest objects.  However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is timely filed.  These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, and contingent claims for contribution and reimbursement.  Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the

debtor's Schedules or is listed as disputed, contingent, or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or equity interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights. Typically, this means that the holder of an unimpaired claim or equity interest will receive on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim or equity interest will be placed in the position it would have been in had the debtor's case not been commenced. Pursuant to 1126(f) of the Bankruptcy Code, holders of unimpaired claims or equity interests are "conclusively presumed" to have accepted the plan. Accordingly, their votes are not solicited. Under the Debtors' Plan, the claims in Class 2 (Secured Tax Claims) and Class 3 (Priority Non-Tax Claims) are unimpaired, and therefore, the holders of such claims are "conclusively presumed" to have voted to accept the Plan.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan of reorganization. For example, a class is deemed to reject a plan of reorganization under section 1126(g) of the Bankruptcy Code if the holders of claims or equity interests in such class do not receive or retain property under the plan on account of their claims or equity interests. Under this provision of the Bankruptcy Code, the holders of claims or equity interests in Class 4B (Malara Guaranty Claims), Class 10 (Preferred Interests), Class 11 (Class A Interests), Class 12 (Class B Interests), Class 13 (Securities Claims), and Class 14 (Subordinated Claims) are deemed to reject the Plan because they receive no distribution and retain no property interest under the Plan on account of their Claims or Interests. Because such Classes are deemed to reject the Plan, the Debtors are required to demonstrate that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such classes. Among these are the

requirements that the plan be "fair and equitable" with respect to, and not "discriminate unfairly" against, the claims and equity interests in such classes.  For a more detailed description of the requirements for confirmation, see *Section XI.B.* below, entitled "Requirements for Confirmation of the Plan of Reorganization."

Consistent with these requirements, the Plan divides the Allowed Claims against, and Allowed Interests in, the Debtors into the following classes:

| Unclassified | DIP Claims | |
| Unclassified | Compensation and Reimbursement Claims of Professionals | |
| Unclassified | Administrative Expenses | |
| Unclassified | Priority Tax Claims | |
| Class 1A | Granite Secured Claims | Impaired; entitled to vote. |
| Class 1B | KBWB Secured Claims | Impaired; entitled to vote. |
| Class 1C | KBWB License Secured Claims | Impaired; entitled to vote. |
| Class 1D | WEEK License Secured Claims | Impaired; entitled to vote. |
| Class 1E | WXON Secured Claims | Impaired; entitled to vote. |
| Class 1F | WXON License Secured Claims | Impaired; entitled to vote. |
| Class 2 | Secured Tax Claims | Unimpaired; conclusively presumed to accept. |
| Class 3 | Priority Non-Tax Claims | Unimpaired; conclusively presumed to accept. |
| Class 4A | Granite General Unsecured Claims | Impaired; entitled to vote. |
| Class 4B | Malara Guaranty Claims | Impaired; conclusively presumed to reject. |
| Class 5 | KBWB General Unsecured Claims | Impaired; entitled to vote. |
| Class 6 | KBWB License General Unsecured Claims | Impaired; entitled to vote. |
| Class 7 | WEEK-TV License General Unsecured Claims | Impaired; entitled to vote. |
| Class 8 | WXON General Unsecured Claims | Impaired; entitled to vote. |
| Class 9 | WXON License General Unsecured Claims | Impaired; entitled to vote. |

49

| Class 10 | Preferred Interests | Impaired; conclusively presumed to reject. |
| Class 11 | Class A Interests | Impaired, conclusively presumed to reject. |
| Class 12 | Class B Interests | Impaired, conclusively presumed to reject. |
| Class 13 | Securities Claims | Impaired, conclusively presumed to reject. |
| Class 14 | Subordinated Claims | Impaired, conclusively presumed to reject. |

1.    *Unclassified.*

**DIP Claims.**

The DIP Claims are Claims arising pursuant to the DIP Credit Agreement, the proceeds of which are to be used to finance the Reorganization Cases or related expenses. The DIP Claims are secured by substantially all the assets of the Debtors. On the Effective Date, all obligations of the Debtors under the DIP Credit Agreement shall be paid in full, in Cash, and in accordance with the terms of the DIP Order and DIP Credit Agreement.

Upon payment or satisfaction in full of all obligations under the DIP Credit Agreement in accordance with the terms thereof and termination of the DIP Credit Agreement, all Liens and security interests granted to secure such obligations shall be deemed terminated, released, and of no further force and effect.

**Administrative Expenses.**

Administrative Expenses are the actual and necessary costs and expenses of the Debtors' Reorganization Cases that are allowed under sections 503(b) (except pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4), and 503(b)(5) of the Bankruptcy Code, as discussed below) and 507(a)(1) of the Bankruptcy Code. Such expenses will include, but are not limited to, amounts owed to vendors providing goods and services to the Debtors during the chapter 11 cases, and tax obligations incurred after the Petition Date.

Allowed Administrative Expenses representing liabilities incurred by the Debtors, as debtors in possession, in the ordinary course of business and consistent with past practice, shall be paid by the Debtors in accordance with the terms and conditions of the particular transaction and any related agreements and instruments. Except to the extent that a holder of an Allowed Administrative Expense agrees to different treatment, subject to the terms of the DIP Order, all other Administrative Expenses will be paid, in full, in Cash, in the Allowed amount of such Administrative Expense, on the Effective Date, or as soon thereafter as is practicable.

The Debtors estimate, assuming the Effective Date occurs on March 31, 2007, Allowed unpaid Administrative Expenses on the Effective Date will be approximately $2.5 million (all of which is estimated as the cost of curing any defaults required to be cured to effect the assumption of executory contracts and unexpired leases proposed to be assumed under the Plan).

### *Compensation and Reimbursement Claims of Professionals.*

Compensation and reimbursement Claims are Administrative Expenses for the compensation of professionals and reimbursement of expenses incurred by such professionals pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4) and 503(b)(5) of the Bankruptcy Code (the "*Compensation and Reimbursement Claims*"). All payments to professionals for Compensation and Reimbursement Claims will be made in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses. The Debtors estimate, assuming the Effective Date occurs on March 31, 2007, Allowed Compensation and Reimbursement Claims on the Effective Date will aggregate approximately $6,460,000. The Bankruptcy Court will review and determine all applications for compensation for services rendered and reimbursement of expenses.

Section 503(b) of the Bankruptcy Code provides for payment of compensation to creditors, indenture trustees and other entities making a "substantial contribution" to a reorganization case, and to attorneys for and other professional advisors to such entities. The amounts, if any, which may be sought by entities for such compensation are not known by the Debtors at this time. Requests for compensation must be approved by the Bankruptcy Court after a hearing on notice at which the Debtors and other parties in interest may participate and, if appropriate, object to the allowance of any claims for compensation and reimbursement of expenses.

Pursuant to the Plan, all entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under section 503(b)(2), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (except pursuant to section 503(b)(3)(D), as described below) (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is sixty (60) days after the Effective Date, and (ii) shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (a) five (5) Business Days after the date upon which the order relating to any such Administrative Expense is entered or (b) upon such other terms as may be mutually agreed upon between the holder of such an Administrative Expense and the Debtors, or if on and after the Effective Date, the Reorganized Debtors.

All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred during the Reorganization Cases pursuant to section 503(b)(3)(D) of the Bankruptcy Code shall file their respective fee applications prior to or on the deadline for filing objections to the confirmation of the Plan.

If fees and expenses for compensation for services rendered or reimbursement of expenses incurred pursuant to section 503(b)(3)(D) of the Bankruptcy Code are allowed in an amount exceeding $300,000 in the aggregate, then, with respect to fees and expenses awarded to any holder of Preferred Interests, or any entity representing such holder or holders, including a committee of such holders or representing such holders, such fees and expenses which exceed the $300,000 cap (on a pro rata basis, if applicable, with any other fees and expenses subject to section 13.5 of the Plan) shall be deducted by a reduction in the shares of New Common Stock provided to the holders of Preferred Interests in section 3.11 of the Plan; *provided further, however*, that if such fees and expenses to be so deducted exceed the value of the New Common Stock provided to the holders of Preferred Interests in section 3.11 of the Plan, then the value of the distribution to such holders shall be reduced in a manner to be determined by the Debtors with Silver Point Consent.

If fees and expenses for compensation for services rendered or reimbursement of expenses incurred pursuant to section 503(b)(3)(D) of the Bankruptcy Code are allowed in an amount exceeding $300,000 in the aggregate, then, with respect to fees and expenses awarded to any holder of Common Interests, or any entity representing such holder or holders, including a committee of such holders or representing such holders, such fees and expenses which exceed the $300,000 cap (on a pro rata basis, if applicable, with any other fees and expenses subject to section 13.5 of the Plan) shall be deducted by a reduction in the shares of New Common Stock provided to the holders of Common Interests in sections 3.12 and 3.13 of the Plan; *provided further, however*, that if such fees and expenses to be so deducted exceed the value of the New Common Stock provided to the holders of Common Interests in sections 3.12 and 3.13 of the Plan, then the value of the distribution to such holders shall be reduced in a manner to be determined by the Debtors with Silver Point Consent.

Nothing contained in section 13.5 of the Plan shall be, or shall be interpreted as, a consent by the Debtors or the Silver Point Entities to the allowance of any such fees or expenses.

### *Priority Tax Claims.*

Priority Tax Claims essentially consist of unsecured claims of federal, state, and local governmental authorities for the types of taxes specified in section 507(a)(8) of the Bankruptcy Code, such as certain income taxes, property taxes, excise taxes, and employment and withholding taxes. These otherwise unsecured claims are given a statutory priority in right of payment under the Bankruptcy Code. The Debtors estimate that on the Effective Date, the Allowed amounts of such claims will aggregate $0.

With respect to any Allowed Priority Tax Claims not paid pursuant to prior Bankruptcy Court order, except to the extent that a holder of an Allowed Priority Tax Claim agrees to different treatment, each holder of an Allowed Priority Tax Claim will receive, at the option of the Debtors, subject to Silver Point Consent, (i) on the Effective Date, Cash in an amount equal to such Allowed Priority Tax Claim, or (ii) commencing on the first anniversary of the Effective Date and continuing on each anniversary thereafter over a period not exceeding five (5) years after the Petition Date, equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the option of the Debtors, subject to Silver Point Consent, to prepay

the entire remaining amount of the Allowed Priority Tax Claim at any time, or (iii) upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim. All Allowed Priority Tax Claims which are not due and payable on or before the Effective Date will be paid in the ordinary course of business as such obligations become due.

     2.    *Classified.*

     ***Classes 1A-1F – Secured Claims***
     *(Impaired. Entitled to vote.)*

     The Secured Claims are Claims against any of the Debtors[29] that are secured by the Debtors' assets and consist of: (i) the Secured Notes Claims; (ii) the Term Loan A Claims; and (iii) the Term Loan B Claims, which in each case is secured by a lien on collateral against any obligor to such indebtedness (including any Lien on Collateral) to the extent of the value of the holder of the Claim's interest in such collateral.

     The Secured Notes have been issued and outstanding since 2003. The Debtors engaged in good faith, arm's length negotiations with Silver Point, as Administrative Agent to enter into the Prepetition Credit Agreement. Prior to the Petition Date, the Debtors determined that the liens granted under the Secured Notes Indenture and the Prepetition Credit Agreement were properly perfected. The Debtors do not believe that viable claims exist against the holders of Secured Claims and there is no dispute with respect to the Allowed amounts of such Claims because, among other things, other than interest, fees, and reimbursement of expenses required under the documents evidencing the Debtors' secured indebtedness, no payments have been made (i) to the holders of Secured Claims, including Silver Point, under the Prepetition Credit Agreement or (ii) to the Indenture Trustee under the Prepetition Indenture. As set forth in *Section VII.L.12*, the Debtors do not believe any such payments are avoidable. The Preferred Equity Holders, however, allege that there could be a dispute with respect to the Allowed amount of the Secured Claims.

     Therefore, the Secured Claims are Allowed in full and are not subject to any avoidance reductions, set-off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under any applicable law or regulation by any person or entity.

     Pursuant to the Plan, the Secured Notes Claims are allowed in an amount not less than $425,899,582.03, comprising outstanding principal of $405 million, accrued but unpaid interest of $20,899,582.03, as of the Petition Date, and unpaid fees, costs, and expenses thereunder in an unliquidated amount. If interest were to accrue postpetition, it would, pursuant to the DIP Order, accrue at the default rate until the Effective Date (assumed to be March 31,

---

[29] The Secured Claims consist of the Granite Secured Claims, the KBWB Secured Claims, the KBWB License Secured Claims, the WEEK License Secured Claims, the WXON Secured Claims, and the WXON License Secured Claims.

2007), resulting in an estimated claim of not less than $439,851,234.37, comprising outstanding principal of $405 million, accrued but unpaid prepetition interest of $20,899,582.03, accrued but unpaid postpetition interest of $13,951,652.34, and unpaid fees, costs and expenses thereunder in an unliquidated amount.

   As of the Petition Date and assuming no accrued postpetition interest, the Granite Entities had outstanding obligations relating to (i) the Term Loan A Claims in an amount not less than $40,156,164.38, comprising outstanding principal of $40 million, accrued but unpaid interest of $156,164.38, and unpaid fees, costs, and expenses thereunder in an unliquidated amount and (ii) the Term Loan B Claims in an amount not less than $30,117,123.29, comprising outstanding principal of $30 million, accrued but unpaid interest of $117,123.29, and unpaid fees, costs, and expenses thereunder in an unliquidated amount.

   To the extent the value of the collateral securing a Secured Claim exceeds the amount of such Secured Claim, holders of Secured Claims are entitled to accrue, as part of their Allowed Claims, postpetition interest at the default rate as provided for in the DIP Order and the premiums, if any, owing under the Secured Notes Indenture.

   Assuming the Term Loan A Claims are oversecured, the Term Loan A Claims would be Allowed in an amount not less than $41,873,972.60, comprising outstanding principal of $40 million, accrued but unpaid interest of $1,873,972.60, including postpetition interest assuming an Effective Date of March 31, 2007, and unpaid fees, costs, and expenses thereunder in an unliquidated amount.   Assuming the Term Loan B Claims are oversecured, the Term Loan B Claims are Allowed in an amount not less than $31,405,479.45, comprising outstanding principal of $30 million, accrued but unpaid interest of $1,405,479.45, including postpetition interest assuming an Effective Date of March 31, 2007, and unpaid fees, costs, and expenses thereunder in an unliquidated amount.

   Holders of Term Loan A Claims and Term Loan B Claims (collectively, the "***Prepetition Credit Agreement Claims***"), despite being oversecured based upon Houlihan Lokey's valuation, have agreed, for the sole purpose of the Plan, to have their Allowed Claims classified with and treated identically to Secured Notes Claims, despite the fact that Prepetition Credit Agreement Claims are secured by liens senior to those securing the Secured Notes Claims with respect to the assets and stock of WBNG (which stock is an asset of Granite) and WBNG License.  The agreement on the part of the holders of Prepetition Credit Agreement Claims to this treatment under the Plan is conditional upon confirmation of the Plan and the occurrence of the Effective Date of the Plan.

   Because, based on the midpoint of the Houlihan Lokey valuation, the face amount of the Allowed Secured Claims exceeds the value of the assets securing such Allowed Secured Claims, the holders of Allowed Secured Claims will have Deficiency Claims under the Plan. The Debtors currently estimate that on the Effective Date, the Allowed amounts of such Deficiency Claims will aggregate $32,453,870 (assuming a midpoint valuation).[30]

---

[30] The Deficiency Claims were calculated after deducting approximately $29.3 million for the Malara Guaranty Claims (representing the value provided by Malara within the Houlihan Lokey valuation) from the $493 million

Notwithstanding the foregoing, for the sole purposes of the Plan (and subject to the Effective Date of such Plan occurring) and in accordance with the settlement among the Debtors and the holders of Secured Claims embodied therein, the holders of Allowed Deficiency Claims shall neither receive a distribution of property on account of such Claims nor vote to accept or reject the Plan with respect to such Deficiency Claims.  Such waiver is expressly conditioned on the confirmation of the Plan and the occurrence of the Effective Date.  In the event that the Plan is modified or amended, or if the Plan is not confirmed by the Bankruptcy Court, or if the Effective Date does not occur, and a new plan of reorganization or other transaction is proposed with respect to the Debtors' estates, the holders of Deficiency Claims, if any, will retain all of their rights with respect to any modifications or amendments to the Plan, or with respect to any new plan of reorganization or other transaction, including, but not limited to, retaining the right to assert such Deficiency Claims, vote on account of such Deficiency Claims, and receive distributions on account thereof.  Notwithstanding the foregoing, any holder of a Deficiency Claim shall retain the right to assert such Deficiency Claim as a setoff or recoupment against any claim of the Debtors against such holders.

On the Effective Date, each holder of an Allowed Secured Claim against any of the Debtors shall receive its Ratable Proportion of (i) the Exit Secured Term Loan; (ii) 10 million shares of the New Common Stock; (iii) the Rights; (iv) the New Warrants Series A; and (v) the New Warrants Series B, subject to reduction, in each case of (ii) through (v) above, if applicable, by the following distributions made pursuant to and in accordance with sections 3.11, 3.12, 3.13, and 5.15 of the Plan: (a) up to 300,000 shares of New Common Stock provided to holders of Preferred Interests in Class 10 and Common Interests in Classes 11 and 12; (b) the Rights offered to (x) certain "accredited investors" who are holders of Preferred Interests in Class 10 and (y) Class B Interests in Class 12; and (c) the New Warrants provided to holders of Preferred Interests in Class 10 and Common Interests in Classes 11 and 12.  Any Rights which revert to the holders of Secured Claims will be immediately extinguished.

While each holder of an Allowed Secured Claim possesses an Allowed Secured Claim against each of the Debtors and the Non-Debtor Subsidiaries due to Guarantees under the Secured Notes, Term Loan A, and Term Loan B, and will be entitled to vote on the Plan with respect to each such Allowed Secured Claim against each of the Debtors, each holder of a Secured Claim shall only receive one recovery on account of all Secured Claims held by such holder.

### Class 2 – Secured Tax Claims.
*(Unimpaired.  Conclusively presumed to accept the Plan.  Not entitled to vote.)*

Secured Tax Claims essentially consist of Claims of federal and state governmental authorities against any of the Debtors for certain taxes, such as certain income taxes, property taxes, excise taxes, and employment and withholding taxes that hold any of the Debtors' assets as Collateral.  But for their secured status, the Secured Tax Claims would be Priority Tax Claims entitled to statutory priority in right of payment under section 507(a)(8) of

---

midpoint valuation and subtracting from such amount approximately $496.2 million (representing the estimated Allowed amount of the Secured Claims, excluding postpetition interest, if any).

the Bankruptcy Code.  The Debtors estimate that on the Effective Date, the Allowed amounts of such claims will aggregate $0.

On the Effective Date, except to the extent that a holder of an Allowed Secured Tax Claim against any of the Debtors has agreed to a different treatment of such Claim, each holder of an Allowed Secured Tax Claim against any of the Debtors shall receive, at the sole option of the Debtors, with Silver Point Consent, either: (i) the Collateral securing such Allowed Secured Tax Claim; (ii) Cash in an amount equal to the face amount of such Allowed Secured Tax Claim; (iii) commencing on the first anniversary of the Effective Date and continuing on each anniversary thereafter over a period not exceeding five (5) years after the Petition Date, equal annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the sole option of the Debtors to prepay the entire amount of the Allowed Secured Tax Claim at any time, or (iv) upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Claim.

### Class 3 – Priority Non-Tax Claims.
*(Unimpaired.  Conclusively presumed to accept the Plan.  Not entitled to vote.)*

Priority Non-Tax Claims consist of certain claims against any of the Debtors granted priority status for payment pursuant to section 507(a) of the Bankruptcy Code.  Priority Non-Tax Claims include certain wage, salary, and other compensation obligations to the Debtors' employees, up to a statutory cap of $10,000 per employee.  The Debtors estimate that on the Effective Date, the allowed amounts of such claims will aggregate $0.

On the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim against any of the Debtors has agreed to a different treatment of such Claim, each such holder shall receive, in full satisfaction of the Allowed portion of such Claim, Cash in an amount equal to the Allowed portion of such Claim.

### Class 4A – Granite General Unsecured Claims.
*(Impaired.  Entitled to vote.)*

The Granite General Unsecured Claims consist of all Allowed non-priority General Unsecured Claims against Granite.  Granite General Unsecured Claims generally include the claims of vendors and other business creditors for goods and services provided to Granite prior to the Petition Date, damage claims arising from Granite's rejection of any executory contracts or unexpired leases, the Deficiency Claims, and Claims asserted against Granite in lawsuits relating to events arising prior to the Petition Date.  The Debtors estimate that on the Effective Date, the Allowed amounts of such Claims (excluding Deficiency Claims) will aggregate $2,086,899.

On the Effective Date, each holder of an Allowed Granite General Unsecured Claim shall receive, in full satisfaction of the Allowed amount of such Claim, Cash in an amount equal to the face amount of such Allowed Claim, *provided, however*, that (i) the Fox Claims shall receive the treatment provided in the Fox Stipulation and (ii) the Beck Claims shall receive the

treatment provided in the Beck Stipulation,[31] *provided, further however*, that holders of Deficiency Claims shall receive no distributions on account of such Deficiency Claims.[32]  In no event, however, shall (a) the holder of an Allowed General Unsecured Claim against Granite receive more than the face amount of its Allowed Claim or (b) the holder of an Allowed General Unsecured Claim against Granite that receives a distribution in any other Class on account of such Claim receive a distribution on account of such Claim in this Class.

As previously described, according to the Houlihan Lokey valuation, the value of the collateral securing the Secured Claims is less than the amount of such Claims, and, therefore, holders of Granite General Unsecured Claims are not entitled to receive a distribution under the Plan.  However, the holders of Secured Claims have agreed to support the Plan, which provides for the payment, in Cash, of the face amount of the Allowed Granite General Unsecured Claims.  Such agreement by the holders of Secured Claims is premised on the Claims in Classes 4A, 5, 6, 7, 8, and 9 not exceeding $11.0 million.  The Plan contains a condition to confirmation, which provides that the Confirmation Order shall contain a finding that the total amount of Cash required to pay Allowed Claims in Classes 4A, 5, 6, 7, 8, and 9 shall not exceed $11.0 million.

Because the holders of Allowed Claims in Class 4A are not receiving postpetition interest, it may be argued such holders are impaired.  Thus, out of an abundance of caution, notwithstanding the fact that such holders are receiving payment in Cash equal to the face amount of their Allowed Claims, such holders are classified as impaired under the Plan and their votes are being solicited.

### Class 4B – Malara Guaranty Claims
*(Impaired.  Conclusively presumed to Reject the Plan.  Not entitled to vote.)*

The Malara Guaranty Claims consist of the General Unsecured Claims arising as a result of Granite's guarantee of the $25 million Tranche B Loan and the $5 million Revolving Loan pursuant to Malara Credit Facility.  Although this Claim is unliquidated, the Debtors estimate that on the Effective Date, the Allowed amounts of such Claims could aggregate up to $29,281,000.

---

[31] Pursuant to the Beck Stipulation (as defined and discussed in *Section VI.I.*), Beck is entitled to a distribution of $2 million in Cash on account of the Beck Claim.  In addition, in accordance with and subject to the Fox Stipulation (also as defined and discussed in *Section VI.H.*) for purposes of the Plan, the Fox Claims will be included solely in Class 5 and shall not be included in Class 4A and Fox is entitled to a distribution of $8 million in Cash on the Effective Date on account of its Allowed KBWB General Unsecured Claim.  Pursuant to the Fox Stipulation, while the amount of the Fox Claims, the treatment of the Fox Claims, and the Debtors against whom the Fox Claims may be asserted remains disputed and subject to the reservation of certain rights of the parties as set forth in the Fox Stipulation, for purposes of the Plan, such payment to Fox shall be deemed payment in full of all Claims of Fox against the Debtors.

[32] For the sole purposes of the Plan (and subject to the Effective Date of such Plan occurring) and in accordance with the settlement among the Debtors and the holders of Secured Claims embodied therein, the holders of Allowed Deficiency Claims have agreed to neither receive a distribution of property on account of such Claims nor vote to accept or reject the Plan with respect to such Deficiency Claims.

On the Effective Date, the Malara Guaranty, to the extent the loans guaranteed by the Malara Guarantee are still outstanding, shall be cancelled and each holder of a Malara Guaranty Claim shall receive no distribution of property on account of such Claim.  In addition, on the Effective Date, Granite shall enter into the New Malara Guaranty, a copy of which will be contained in the Plan Supplement.

### Class 5 – KBWB General Unsecured Claims
*(Impaired.  Entitled to vote.)*

The KBWB General Unsecured Claims consist of all Allowed non-priority General Unsecured Claims against KBWB.  KBWB General Unsecured Claims generally include the claims of vendors and other business creditors for goods and services provided to KBWB prior to the Petition Date, damage claims arising from KBWB's rejection of any executory contracts or unexpired leases, the Deficiency Claims, and Claims asserted against KBWB in lawsuits relating to events arising prior to the Petition Date.  The Debtors estimate that on the Effective Date, the Allowed amounts of such Claims will aggregate $8,056,750.

On the Effective Date, each holder of a Allowed KBWB General Unsecured Claim shall receive, in full satisfaction of the Allowed amount of such Claim, Cash in an amount equal to the face amount of such Allowed Claim, *provided, however*, that the Fox Claims shall receive the treatment provided in the Fox Stipulation,[33] *provided, further however*, that holders of Deficiency Claims shall receive no distributions on account of such Deficiency Claims.[34]  In no event, however, shall (a) the holder of an Allowed General Unsecured Claim against KBWB receive more than the face amount of its Allowed Claim or (b) the holder of an Allowed General Unsecured Claim against KBWB that receives a distribution in any other Class on account of such Claim receive a distribution on account of such Claim in this Class.

As previously described, according to the Houlihan Lokey valuation, the value of the collateral securing the Secured Claims is less than the amount of such Claims, and, therefore, holders of KBWB General Unsecured Claims are not entitled to receive a distribution under the Plan.  However, the holders of Secured Claims have agreed to support the Plan, which provides for the payment, in Cash, of the face amount of the Allowed KBWB General Unsecured Claims.  Such agreement by the holders of Secured Claims is premised on the Claims in Classes 4A, 5, 6, 7, 8, and 9 not exceeding $11.0 million.  The Plan contains a condition to confirmation, which

---

[33] In addition, in accordance with and subject to the Fox Stipulation (also as defined and discussed in *Section VI.H.*) for purposes of the Plan, the Fox Claims will be included solely in Class 5 and shall not be included in Class 4A and Fox is entitled to a distribution of $8 million in Cash on the Effective Date on account of its Allowed KBWB General Unsecured Claim.  Pursuant to the Fox Stipulation, while the amount of the Fox Claims, the treatment of the Fox Claims, and the Debtors against whom the Fox Claims may be asserted remains disputed and subject to the reservation of certain rights of the parties as set forth in the Fox Stipulation, for purposes of the Plan, such payment to Fox shall be deemed payment in full of all Claims of Fox against the Debtors.

[34] For the sole purposes of the Plan (and subject to the Effective Date of such Plan occurring) and in accordance with the settlement among the Debtors and the holders of Secured Claims embodied therein, the holders of Allowed Deficiency Claims have agreed to neither receive a distribution of property on account of such Claims nor vote to accept or reject the Plan with respect to such Deficiency Claims.

provides that the Confirmation Order shall contain a finding that the total amount of Cash required to pay Allowed Claims in Classes 4A, 5, 6, 7, 8, and 9 shall not exceed $11.0 million.

Because the holders of Allowed Claims in Class 5 are not receiving postpetition interest, it may be argued such holders are impaired.  Thus, out of an abundance of caution, notwithstanding the fact that such holders are receiving payment in Cash equal to the face amount of their Allowed Claims, such holders are classified as impaired under the Plan and their votes are being solicited.

### Class 6 – KBWB License General Unsecured Claims
*(Impaired.  Entitled to vote.)*

The KBWB License General Unsecured Claims consist of all Allowed non-priority General Unsecured Claims against KBWB License, including the Deficiency Claims.  Because KBWB License is not an operating company and, therefore, does not incur unsecured trade debt, the Debtors do not believe that there are any KBWB License General Unsecured Claims other than the Deficiency Claims.  Because the Bar Date has not passed, however, such Claims are being classified in the event any creditor asserts an Allowed Claim against KBWB License.  The Debtors estimate that on the Effective Date, the Allowed amounts of such Claims will aggregate $0.

On the Effective Date, each holder of a Allowed KBWB License General Unsecured Claim shall receive Cash in an amount equal to the face amount of such Allowed Claim, *provided, however*, that holders of Deficiency Claims shall receive no distributions on account of such Deficiency Claims.[35]  In no event, however, shall (a) the holder of an Allowed General Unsecured Claim against KBWB License receive more than the face amount of its Allowed Claim or (b) the holder of an Allowed General Unsecured Claim against KBWB License that receives a distribution in any other Class on account of such Claim receive a distribution on account of such Claim in this Class.

As previously described, according to the Houlihan Lokey valuation, the value of the collateral securing the Secured Claims is less than the amount of such Claims, and, therefore, holders of KBWB License General Unsecured Claims are not entitled to receive a distribution under the Plan.  However, the holders of Secured Claims have agreed to support the Plan, which provides for the payment, in Cash, of the face amount of the Allowed KBWB License General Unsecured Claims.   Such agreement by the holders of Secured Claims is premised on the Claims in Classes 4A, 5, 6, 7, 8, and 9 not exceeding $11.0 million.  The Plan contains a condition to confirmation, which provides that the Confirmation Order shall contain a finding that the total amount of Cash required to pay Allowed Claims in Classes 4A, 5, 6, 7, 8, and 9 shall not exceed $11.0 million.

---

[35] For the sole purposes of the Plan (and subject to the Effective Date of such Plan occurring) and in accordance with the settlement among the Debtors and the holders of Secured Claims embodied therein, the holders of Allowed Deficiency Claims have agreed to neither receive a distribution of property on account of such Claims nor vote to accept or reject the Plan with respect to such Deficiency Claims.

Because the holders of Allowed Claims in Class 6 are not receiving postpetition interest, it may be argued such holders are impaired.  Thus, out of an abundance of caution, notwithstanding the fact that such holders are receiving payment in Cash equal to the face amount of their Allowed Claims, such holders are classified as impaired under the Plan and their votes are being solicited.  As stated above, however, the Debtors do not believe there are any KBWB License General Unsecured Claims other than the Deficiency Claims.  Pursuant to the Disclosure Statement Order, if no such creditors exist, and, therefore, no ballots to accept or reject the Plan are cast, Class 6 will be deemed to have accepted the Plan.

### Class 7 – WEEK-TV License General Unsecured Claims
*(Impaired.  Entitled to vote.)*

The WEEK-TV License General Unsecured Claims consist of all Allowed non-priority General Unsecured Claims against WEEK-TV License, including the Deficiency Claims.  Because WEEK-TV License is not an operating company and, therefore, does not incur unsecured trade debt, the Debtors do not believe that there are any WEEK-TV License General Unsecured Claims other than the Deficiency Claims.  Because the Bar Date has not passed, however, such Claims are being classified in the event any creditor asserts an Allowed Claim against WEEK-TV License.  The Debtors estimate that on the Effective Date, the Allowed amounts of such Claims will aggregate $0.

On the Effective Date, each holder of a Allowed WEEK-TV License General Unsecured Claim shall receive Cash in an amount equal to the face amount of such Allowed Claim, *provided, however*, that holders of Deficiency Claims shall receive no distributions on account of such Deficiency Claims.[36]  In no event, however, shall (a) the holder of an Allowed General Unsecured Claim against WEEK-TV License receive more than the face amount of its Allowed Claim or (b) the holder of an Allowed General Unsecured Claim against WEEK-TV License that receives a distribution in any other Class on account of such Claim receive a distribution on account of such Claim in this Class.

As previously described, according to the Houlihan Lokey valuation, the value of the collateral securing the Secured Claims is less than the amount of such Claims, and, therefore, holders of WEEK-TV License General Unsecured Claims are not entitled to receive a distribution under the Plan.  However, the holders of Secured Claims have agreed to support the Plan, which provides for the payment, in Cash, of the face amount of the Allowed WEEK-TV License General Unsecured Claims.   Such agreement by the holders of Secured Claims is premised on the Claims in Classes 4A, 5, 6, 7, 8, and 9 not exceeding $11.0 million.  The Plan contains a condition to confirmation, which provides that the Confirmation Order shall contain a finding that the total amount of Cash required to pay Allowed Claims in Classes 4A, 5, 6, 7, 8, and 9 shall not exceed $11.0 million.

---

[36] For the sole purposes of the Plan (and subject to the Effective Date of such Plan occurring) and in accordance with the settlement among the Debtors and the holders of Secured Claims embodied therein, the holders of Allowed Deficiency Claims have agreed to neither receive a distribution of property on account of such Claims nor vote to accept or reject the Plan with respect to such Deficiency Claims.

Because the holders of Allowed Claims in Class 7 are not receiving postpetition interest, it may be argued such holders are impaired.  Thus, out of an abundance of caution, notwithstanding the fact that such holders are receiving payment in Cash equal to the face amount of their Allowed Claims, such holders are classified as impaired under the Plan and their votes are being solicited.  As stated above, however, the Debtors do not believe there are any WEEK-TV License General Unsecured Claims other than the Deficiency Claims.  Pursuant to the Disclosure Statement Order, if no such creditors exist, and, therefore, no ballots to accept or reject the Plan are cast, Class 7 will be deemed to have accepted the Plan.

### Class 8 – WXON General Unsecured Claims
*(Impaired.  Entitled to vote.)*

The WXON General Unsecured Claims consist of all Allowed non-priority General Unsecured Claims against WXON.  WXON General Unsecured Claims generally include the claims of vendors and other business creditors for goods and services provided to WXON prior to the Petition Date, damage claims arising from WXON's rejection of any executory contracts or unexpired leases, the Deficiency Claims, and Claims asserted against WXON in lawsuits relating to events arising prior to the Petition Date.  The Debtors estimate that on the Effective Date, the Allowed amounts of such Claims will aggregate $129,817.

On the Effective Date, each holder of a Allowed WXON General Unsecured Claim shall receive, in full satisfaction of the Allowed amount of such Claim, Cash in an amount equal to the face amount of such Allowed Claim, *provided, however*, that holders of Deficiency Claims shall receive no distributions on account of such Deficiency Claims.[37]  In no event, however, shall (a) the holder of an Allowed General Unsecured Claim against WXON receive more than the face amount of its Allowed Claim or (b) the holder of an Allowed General Unsecured Claim against WXON that receives a distribution in any other Class on account of such Claim receive a distribution on account of such Claim in this Class.

As previously described, according to the Houlihan Lokey valuation, the value of the collateral securing the Secured Claims is less than the amount of such Claims, and, therefore, holders of WXON General Unsecured Claims are not entitled to receive a distribution under the Plan.  However, the holders of Secured Claims have agreed to support the Plan, which provides for the payment, in Cash, of the face amount of the Allowed WXON General Unsecured Claims.  Such agreement by the holders of Secured Claims is premised on the Claims in Classes 4A, 5, 6, 7, 8, and 9 not exceeding $11.0 million.  The Plan contains a condition to confirmation, which provides that the Confirmation Order shall contain a finding that the total amount of Cash required to pay Allowed Claims in Classes 4A, 5, 6, 7, 8, and 9 shall not exceed $11.0 million.

Because the holders of Allowed Claims in Class 8 are not receiving postpetition interest, it may be argued such holders are impaired.  Thus, out of an abundance of caution,

---

[37] For the sole purposes of the Plan (and subject to the Effective Date of such Plan occurring) and in accordance with the settlement among the Debtors and the holders of Secured Claims embodied therein, the holders of Allowed Deficiency Claims have agreed to neither receive a distribution of property on account of such Claims nor vote to accept or reject the Plan with respect to such Deficiency Claims.

notwithstanding the fact that such holders are receiving payment in Cash equal to the face amount of their Allowed Claims, such holders are classified as impaired under the Plan and their votes are being solicited.

### Class 9 – WXON License General Unsecured Claims
*(Impaired.  Entitled to vote.)*

The WXON License General Unsecured Claims consist of all Allowed non-priority General Unsecured Claims against WXON License, including the Deficiency Claims. Because WXON License is not an operating company and, therefore, does not incur unsecured trade debt, the Debtors do not believe that there are any WXON License General Unsecured Claims other than the Deficiency Claims.  Because the Bar Date has not passed, however, such Claims are being classified in the event any creditor asserts an Allowed Claim against WXON License.  The Debtors estimate that on the Effective Date, the Allowed amounts of such Claims will aggregate $0.

On the Effective Date, each holder of a Allowed WXON License General Unsecured Claim shall receive Cash in an amount equal to the face amount of such Allowed Claim, *provided, however*, that holders of Deficiency Claims shall receive no distributions on account of such Deficiency Claims.[38]  In no event, however, shall (a) the holder of an Allowed General Unsecured Claim against WXON License receive more than the face amount of its Allowed Claim or (b) the holder of an Allowed General Unsecured Claim against WXON License that receives a distribution in any other Class on account of such Claim receive a distribution on account of such Claim in this Class.

As previously described, according to the Houlihan Lokey valuation, the value of the collateral securing the Secured Claims is less than the amount of such Claims, and, therefore, holders of WXON License General Unsecured Claims are not entitled to receive a distribution under the Plan.  However, the holders of Secured Claims have agreed to support the Plan, which provides for the payment, in Cash, of the face amount of the Allowed WXON License General Unsecured Claims.  Such agreement by the holders of Secured Claims is premised on the Claims in Classes 4A, 5, 6, 7, 8, and 9 not exceeding $11.0 million.  The Plan contains a condition to confirmation, which provides that the Confirmation Order shall contain a finding that the total amount of Cash required to pay Allowed Claims in Classes 4A, 5, 6, 7, 8, and 9 shall not exceed $11.0 million.

Because the holders of Allowed Claims in Class 9 are not receiving postpetition interest, it may be argued such holders are impaired.  Thus, out of an abundance of caution, notwithstanding the fact that such holders are receiving payment in Cash equal to the face amount of their Allowed Claims, such holders are classified as impaired under the Plan and their votes are being solicited.  As stated above, however, the Debtors do not believe there are any

---

[38] For the sole purposes of the Plan (and subject to the Effective Date of such Plan occurring) and in accordance with the settlement among the Debtors and the holders of Secured Claims embodied therein, the holders of Allowed Deficiency Claims have agreed to neither receive a distribution of property on account of such Claims nor vote to accept or reject the Plan with respect to such Deficiency Claims.

WXON License General Unsecured Claims other than the Deficiency Claims.  Pursuant to the Disclosure Statement Order, if no such creditors exist, and, therefore, no ballots to accept or reject the Plan are cast, Class 7 will be deemed to have accepted the Plan.

### Class 10 – Preferred Interests.
*(Impaired.  Conclusively presumed to reject the Plan.  Not entitled to vote.)*

The Preferred Interests consist of the Interests of any holder of the Preferred Interests (the 12¾% Cumulative Exchangeable Preferred Stock of Granite), including any unpaid dividends, option, warrant, or right, contractual or otherwise, to acquire any such Interest.

In accordance with section 5.15 of the Plan, all Preferred Interests in Granite shall be extinguished and each holder of an Allowed Preferred Interest shall receive its Ratable Proportion of (i) 200,000 shares of New Common Stock on the Effective Date and (ii) the right to purchase up to 500,000 shares of the New Common Stock pursuant to the New Warrants Series A.  In addition, each Eligible Investor (as defined below) will receive Rights to purchase its Ratable Proportion of up to 1 million shares of New Common Stock at the Implied Equity Value.  Notwithstanding the foregoing, pursuant to section 3.11 of the Plan, (i) if the Plan is not confirmed pursuant to section 1129 of the Bankruptcy Code by the date that is sixty-five (65) days after entry of the Disclosure Statement Order on the Bankruptcy Court docket, (ii) any holder of a Preferred Interest files a notice of appeal of the Confirmation Order and such appeal has not been dismissed or denied within thirty (30) days after the date such appeal is filed, or (iii) any holder of a Preferred Interest objects to any application for regulatory approval referred to in section 10.2(e) of the Plan and such objection has not been dismissed or overruled within thirty (30) days after the date such objection is filed, then, in accordance with section 5.15, none of the distributions set forth in section 3.11 of the Plan (as described above) to the holders of Preferred Interests shall be made.  In such event, the distribution of (a) New Common Stock contemplated by section 3.11(i) of the Plan shall revert to the holders of Secured Claims to be distributed to such holders in accordance with each holder's Ratable Proportion and (b) the Rights and New Warrants contemplated by section 3.11 of the Plan shall revert to the holders of Secured Claims and, in each case, shall be extinguished.

Notwithstanding anything contained in the Plan, as described above, only certain "accredited investors," as such term is defined by Rule 501 of Regulation D promulgated under the federal securities laws, that are holders of Preferred Interests (each, an ***Eligible Investor***") will be entitled to participate in the Rights Offering.  No payments in lieu of the Rights will be made to any holder of an Allowed Preferred Interest that is not an Eligible Investor and, therefore, is unable to subscribe for any shares of New Common Stock pursuant to the Rights.

### Class 11 – Class A Interests.
*(Impaired.  Conclusively presumed to reject the Plan.  Not entitled to vote.)*

The Class A Interests consist of the Interests of any holder of Granite's Class A Interests, including any option, warrant, or right, contractual or otherwise, to acquire any such Interest.

In accordance with section 5.15 of the Plan, all Class A Interests in Granite shall be extinguished and each holder of the Class A Interests shall receive, jointly and equally with the Class B Interests, its Ratable Proportion of (i) 100,000 shares of New Common Stock on the Effective Date, (ii) the right to purchase up to 250,000 shares of New Common Stock pursuant to the New Warrants Series A, and (iii) the right to purchase up to 250,000 shares of New Common Stock pursuant to the New Warrants Series B; *provided*, *however*, that (a) if the Plan is not confirmed pursuant to section 1129 of the Bankruptcy Code by the date that is sixty-five (65) days after the date of the entry of the Disclosure Statement Order on the Bankruptcy Court docket, (b) any holder of a Class A Interest or Class B Interest files a notice of appeal of the Confirmation Order and such appeal has not been dismissed or denied within 30 days after the date such appeal is filed, or (c) any holder of a Class A Interest or Class B Interest objects to any application for regulatory approval referred to in section 10.2(e) of the Plan and such objection has not been dismissed or overruled within 30 days after the date such objection is filed, then, in accordance with section 5.15 of the Plan, none of the distributions described in section 3.12 of the Plan to the holders of Class A Interests in Class 11 shall be made. In such event, the distribution of (a) New Common Stock contemplated by subsection (i) of the Plan shall revert to the holders of the Secured Claims to be distributed to such holders in accordance with each holder's Ratable Proportion and (b) the New Warrants noted in subsections (ii) and (iii) of the Plan shall revert to the holders of the Secured Claims and shall be extinguished.

### Class 12 – Class B Interests.
*(Impaired.  Conclusively presumed to reject the Plan.  Not entitled to vote.)*

The Class B Interests consist of the Interests of any holder of Granite's Class B Interests, including any option, warrant, or right, contractual or otherwise, to acquire any such Interest.

In accordance with section 5.15 of the Plan, all Class B Interests in Granite shall be extinguished and each holder of the Class B Interests shall receive, jointly and equally with the Class A Interests, its Ratable Proportion of: (i) 100,000 shares of New Common Stock on the Effective Date; (ii) the right to purchase up to 250,000 shares of New Common Stock pursuant to the New Warrants Series A; (iii) the right to purchase up to 250,000 shares of New Common Stock pursuant to the New Warrants Series B; and (iv) any Rights with an aggregate Subscription Purchase Price of no more than $7.5 million that are not exercised by the holders of the Preferred Interests; *provided*, *however*, that (a) if the Plan is not confirmed pursuant to section 1129 of the Bankruptcy Code by the date that is sixty-five (65) days after the date of the entry of the Disclosure Statement Order on the Bankruptcy Court docket, (b) any holder of a Class A Interest or Class B Interest files a notice of appeal of the Confirmation Order and such appeal has not been dismissed or denied within 30 days after the date such appeal is filed, or (c) any holder of a Class A Interest or Class B Interest objects to any application for regulatory approval referred to in section 10.2(e) and such objection has not been dismissed or overruled within 30 days after the date such objection is filed, then, in accordance with section 5.15, none of the distributions described in section 3.13 of the Plan to the holders of Class B Interests in Class 12 shall be made. In such event, the distribution of (a) New Common Stock contemplated by subsection (i) of section 3.13 of the Plan shall revert to the holders of the Secured Claims to be distributed to such holders in accordance with each holder's Ratable Proportion and (b) the Rights and New

Warrants noted in subsections (ii), (iii), and (iv) of the Plan shall revert to the holders of the Secured Claims and shall be extinguished.

In addition, in lieu of the distribution contemplated by section 3.13 of the Plan, the Debtors shall pay to certain holders of Class B Interests, Cash equal to the value of such holder's distribution contemplated by the Plan.  In determining which holders of Class B Interests will receive such Cash treatment, the Debtors shall first pay the applicable Cash equivalent to the holder holding the fewest shares as of the Voting Record Date and thereafter shall pay the applicable Cash equivalent to the next largest holder until the total of such payments reaches $50,000 (or such larger amount disclosed by the Debtors, with Silver Point Consent).  All holders of Class B Interests not so selected shall receive the distribution contemplated by section 3.13 of the Plan.

### Class 13 – Securities Claims.
*(Impaired.  Conclusively presumed to reject the Plan.  Not entitled to vote.)*

The Securities Claims consist of Claims for damages arising from the rescission of a purchase or sale of any security of any of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim that is subordinated to other Claims or Interests in accordance with section 510(b) of the Bankruptcy Code.

On the Effective Date, each holder of a Securities Claim shall receive no distribution of property on account of such Claim.

### Class 14 – Subordinated Claims.
*(Impaired.  Conclusively presumed to reject the Plan.  Not entitled to vote.)*

The Subordinated Claims consist of Claims that are determined to be subordinated to other Claims pursuant to section 510(c) of the Bankruptcy Code, which empowers the Bankruptcy Court to subordinate claims for purposes of distribution under a plan of reorganization for equitable reasons.

On the Effective Date, each holder of a Subordinated Claim shall receive no distribution of property on account of such Claim.

**D.    Means of Implementation.**

*1.    Non-Substantive Consolidation.*

The Debtors' Plan is not premised on the substantive consolidation of the Debtors. Accordingly, (i) the assets and liabilities of each Debtor remain the assets and liabilities of each respective Debtor and (ii) all guarantees of any Debtor of any payment, performance, or collection of obligations of any Debtor remain in full force and effect for purposes of the Plan.

2.       *Intercompany Claims and Subsidiary Interests.*

As described in the Debtors' motion for approval of its cash management system, filed December 11, 2006, the Granite Entities utilize a centralized cash management system whereby funds received by each of the subsidiaries (whether Debtor or non-debtor) are swept daily to a central concentration account maintained by Granite. Funds are then downstreamed to the subsidiaries as needed to address their ordinary course obligations. These ordinary course transfers are the extent of the intercompany transfers among the Granite Entities; there are no cross-stream transfers among any of the Granite Entities. Thus, while Intercompany Claims may result from the operation of the cash management system, such balances constantly fluctuate and are incurred merely in the ordinary course of operating the businesses of the Granite Entities. Moreover, Intercompany Claims, to the extent they exist, are pledged as security to the holders of Secured Claims, which is reflected in the Houlihan Lokey valuation and the estimated recoveries to holders of Secured Claims contained herein and in the Plan. Therefore, to the extent any Intercompany Claims exist, any value relating thereto will not inure to any class junior to the Secured Claims.

Intercompany Claims consist of (i) any Claim against any Debtor held by another Debtor or Non-Debtor Subsidiary and (ii) any Claim against any Non-Debtor Subsidiary held by Granite. Notwithstanding anything to the contrary in the Plan, all Intercompany Claims will be adjusted, continued, or discharged to the extent determined appropriate by the Debtors or the Reorganized Debtors, in their discretion and with Silver Point Consent, as is necessary to (i) preserve any federal, state, and/or local tax benefits thereof and (ii) properly maintain the Granite Entities' cash management system. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the stockholders of any of the Debtors or the Reorganized Debtors. Notwithstanding the foregoing, no distributions will be made under the Plan on account of the Intercompany Claims.

The Subsidiary Interests consist of the Interests of any Debtor in the Debtor Subsidiaries and Non-Debtor Subsidiaries, including any option, warrant, or right, contractual or otherwise, to acquire any such Interest. The legal, equitable, and contractual rights to which such Allowed Subsidiary Interest entitles the holder shall be retained, unaltered.

3.       *New Corporate Structure for Reorganized Granite.*

Except as otherwise set forth in the Plan, prior to or as of the Effective Date, Granite, subject to Silver Point Consent, may cause any or all of the Debtors to engage in any restructuring transactions consistent with, and deemed necessary or appropriate (including, without limitation, merging, dissolving, or transferring assets between or among the Debtors and/or the Non-Debtor Subsidiaries) to implement, the provisions of the Plan.

4.       *Authorization of Plan Securities.*

The issuance by Reorganized Granite of the New Common Stock, the New Warrants, and the Rights is authorized under the Plan without the need for any further corporate action and without any further action by holders of Claims or Interests. Such securities shall be distributed as described in section 3 of the Plan. None of the Plan Securities shall be registered

under applicable securities laws and neither the Debtors nor the Reorganized Debtors shall have any obligation to register the Plan Securities except as provided in the registration rights agreement between Granite and Silver Point, a copy of which will be attached as an exhibit to the Plan Supplement.

>    5.    *Incurrence of New Indebtedness – the Exit Facility.*

The Reorganized Debtors' entry into the Exit Facility and the incurrence of the indebtedness thereunder on the Effective Date is authorized under the Plan without the need for any further corporate action and without any further action by holders of Claims or Interests.

On the Effective Date, the Reorganized Debtors expect to enter into the Exit Facility consisting of (i) the $200 million Exit Secured Term Loan and (ii) the Exit Secured Revolver in an amount equal to the amount needed to satisfy any outstanding balance under the DIP Credit Agreement, plus $25 million, up to a cap of $50 million. The term of the Exit Secured Term Loan is five and one-half years and the term of the Exit Secured Revolver will be five years. The proceeds of the Exit Secured Revolver together with those from Rights Offering and cash generated from operations, will be used to repay any obligations under the DIP Credit Agreement, to fund payments required to be made under the Plan, and to meet working capital and other corporate needs of the Reorganized Debtors, thereby facilitating their emergence from chapter 11. The Exit Secured Term Loan and the Exit Secured Revolver will be secured, on a pari passu basis, by a first Lien on substantially all of the existing and after-acquired assets of the Reorganized Debtors and Non-Debtor Subsidiaries. The terms of the Exit Facility are outlined in <u>Exhibit B</u> to the Plan.

>    6.    *Cancellation of Existing Securities and Agreement*
>          *and Related Indentures/Discharge of Indenture Trustee.*

Except as otherwise expressly provided in the Plan with respect to any Claim or Interest that is reinstated and rendered unimpaired pursuant to the Plan, all instruments evidencing any Claim against or Interest in the Debtors will be automatically cancelled without any further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder will be discharged, and none of the Debtors or Reorganized Debtors will thereafter be liable in any way for any amounts in connection therewith.

On the Effective Date, the Secured Notes shall be cancelled and the holders thereof shall have no further rights or entitlements in respect thereof against the Debtors or Non-Debtor Subsidiaries except the rights to receive the distributions to be made to such holders under the Plan and all Liens against Non-Debtor Subsidiaries shall be automatically released. To the extent possible, distributions to be made under the Plan to the beneficial owners of the Secured Notes shall be made through the Depository Trust Company and its participants. The Confirmation Order shall authorize the Disbursing Agent to take whatever action may be necessary or appropriate, in its reasonable discretion, to deliver the distributions, including, without limitation, obtaining an order of the Bankruptcy Court.

On the Effective Date, the Indenture Trustee and its agents shall be discharged of all their obligations associated (i) with the Secured Notes, (ii) the Secured Notes Indenture, and

(iii) any related documents, and released from all Claims arising in the Reorganization Cases. As of the Effective Date, the Secured Notes Indenture shall be deemed fully satisfied and cancelled, except that such cancellation shall not impair the rights of the holders of the Secured Notes to receive distributions under the Plan, or the rights of the Indenture Trustee under its charging Liens pursuant to the Indenture, to the extent that the Indenture Trustee has not received payment as provided for in section 13.7 of the Plan. All Liens in favor of the Indenture Trustee for the benefit of the holders of Secured Claims, or otherwise, arising under the Secured Notes Indenture shall be deemed released.

>    7.    *Reorganized Granite Board of Directors.*

On the Effective Date, the operation of Reorganized Granite will become the general responsibility of its new Board of Directors. The initial Board of Directors of Reorganized Granite shall consist of seven members whose names and biographical information will be set forth in the Plan Supplement. As described in *Section VII.C.2.* the holders of Secured Claims will hold at least 88-97% (depending upon the number of shares issued pursuant to the Rights Offering) of the New Common Stock on the Effective Date of the Plan. Given that Silver Point holds more than a majority of the Secured Claims, Silver Point will appoint five (5) of the members of the board of directors of Reorganized Granite after the Effective Date of the Plan.

After the Petition Date, a group of holders of the Secured Notes (the "***Minority Holders***") formed and contacted the Debtors and Silver Point. The Minority Holders consist of Strategic Value Partners, L.L.C., Regiment Capital Ltd., Blackport Capital Fund Ltd., and Southpaw Asset Management. Together with other holders of Secured Notes with whom the Minority Holders have been in contact, the Minority Holders hold, in the aggregate, approximately $70 million of the Secured Notes. The Minority Holders, the Debtors, and Silver Point have reached agreement on the principal terms that will be embodied in the Shareholders' Agreement (and certain other related documentation that will be included in the Plan Supplement), including that the sixth member of the new Board of Directors will be an independent director appointed by the Minority Holders if certain conditions contained in the Shareholders' Agreement are satisfied (and in the event such conditions are not satisfied, such sixth director shall be elected by a majority vote of the shareholders of New Common Stock). W. Don Cornwell shall be the remaining member of the initial board of directors. Each of the members of the new Board of Directors will serve in accordance with the New Certificate of Incorporation and New By-Laws of Reorganized Granite, as the same may be amended from time to time.

The precise terms of the agreement between the Minority Holders, the Debtors and Silver Point will be reflected in a Shareholders' Agreement and related documentation, all of which will be filed with the Plan Supplement. The Minority Holders have indicated that, subject to final agreement on the definitive documentation embodying their agreement with the Debtors and Silver Point, and subject to receipt and review of a court-approved disclosure statement, they intend to vote to support the Plan.

8.      *Reorganized Subsidiaries Board of Directors.*

The initial board of directors of each Debtor Subsidiary shall consist of three members whose names and biographical information will be set forth in the Plan Supplement. Silver Point will appoint two members of each Debtor Subsidiary's board of directors. W. Don Cornwell shall be the remaining member of the initial board of directors of each Debtor Subsidiary. Such directors will serve in accordance with the applicable Reorganized Subsidiary Certificate of Incorporation and applicable Reorganized Subsidiary By-Laws, as the same may be amended from time to time.

9.      *Officers of Reorganized Debtors.*

W. Don Cornwell, John Deushane, and Larry Wills, who will be the senior management of the Debtors immediately prior to the Effective Date, shall serve as the initial officers of the Reorganized Debtors on and after the Effective Date. Such officers shall serve in accordance with applicable non-bankruptcy law and their New Employment Agreements with Granite. Biographical information concerning the officers is annexed hereto as <u>Exhibit 10</u>.

10.     *Management Incentive Plan.*

On the Effective Date, and subject to the occurrence thereof, Reorganized Granite shall be deemed to have adopted the Management Incentive Plan with any changes thereto (except for ministerial changes) subject to Silver Point Consent. The solicitation of votes on the Plan shall include, and be deemed to be, a solicitation for approval of the Management Incentive Plan. Entry of the Confirmation Order shall constitute such approval. The Management Incentive Plan is attached to the Plan as <u>Exhibit C</u>.[39]

11.     *New Employment Agreements.*

On the Effective Date, and subject to the occurrence thereof, Reorganized Granite shall be deemed to have adopted the New Employment Agreements for W. Don Cornwell, John Deushane, and Larry Wills, with any changes thereto (except for ministerial changes) subject to Silver Point Consent. The solicitation of votes on the Plan shall include, and be deemed to be, a solicitation for approval of the New Employment Agreements. Entry of the Confirmation Order shall constitute such approval. The New Employment Agreements are annexed to the Plan as <u>Exhibit A</u>.

12.     *Corporate Action.*

On the Effective Date, Reorganized Granite shall file the New Certificate of Incorporation and each of the Reorganized Subsidiaries shall file the Reorganized Subsidiaries Certificates of Incorporation with the Secretary of State of the State of Delaware. The New Certificate of Incorporation and the Reorganized Subsidiaries Certificates of Incorporation shall

---

[39] The exercise price of any Options (as such term is defined in the Management Incentive Plan) issued pursuant to the Management Incentive Plan will be set by the compensation committee of Reorganized Granite's Board of Directors based on the Fair Market Value (as such term is defined in the Management Incentive Plan).

prohibit the issuance of nonvoting equity securities, subject to further amendment of such New Certificate of Incorporation and Reorganized Subsidiaries Certificates of Incorporation as permitted by applicable law. The Board of Directors of Reorganized Granite shall adopt the New By-Laws and the board of directors of each Debtor Subsidiary shall adopt the applicable Reorganized Subsidiary By-Laws.

13.    *By-Laws and Certificates of Incorporation.*

The New By-Laws, Reorganized Subsidiaries By-Laws, New Certificates of Incorporation, and the Reorganized Subsidiaries Certificates of Incorporation shall contain provisions necessary: (i) to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of such certificates of incorporation and by-laws as permitted by applicable law; and (ii) to effectuate the provisions of the Plan, in each case without any further action by the stockholders or directors of the Debtors or the Reorganized Debtors, but subject to Silver Point Consent.

## E.    **Securities to Be Issued Under the Plan.**

Pursuant to the Plan, on the Effective Date, all Class A Interests, Class B Interests, and Preferred Interests will be cancelled and extinguished.

Pursuant to the Plan, the Reorganized Debtors are authorized, without further act or action under applicable law, regulation, order, or rule to issue the following Plan Securities: (i) the New Common Stock; (ii) the New Warrants; and (iii) the Rights. The documents evidencing the Plan Securities will be included in the Plan Supplement.

1.    *The New Common Stock.*

As of the Effective Date, the authorized common stock of Reorganized Granite will consist of 15 million shares of New Common Stock, par value $0.01, per share, of which 11 million such shares shall be issued and distributed pursuant to the Plan. An aggregate of 10 million shares of New Common Stock will be issued to holders of Allowed Secured Claims, which will be subject to (i) reduction by up to 300,000 shares of New Common Stock to be distributed to holders of Preferred Interests, Class A Interests, and Class B Interests as provided in and subject to the Plan and (ii) dilution as a result of any exercise of the Rights, the New Warrants issued pursuant to the New Warrant Agreements, and the options issued pursuant to the Management Incentive Plan. As noted above, the New Common Stock will not be listed on any exchange and will be subject to certain transfer restrictions.

2.    *The New Warrants Series A and the New Warrants Series B.*

As of the Effective Date, Reorganized Granite will enter into the New Warrant Agreements. Pursuant to the New Warrant Agreements and subject to sections 3.11, 3.12, and 3.13 of the Plan, Reorganized Granite will issue two series of warrants. The New Warrants Series A will be five (5) year warrants to purchase 750,000 shares of New Common Stock at an exercise price of $32.37 per share, which represents 125% of the Implied Equity Value. The New Warrants Series B will be five (5) year warrants to purchase 250,000 shares of New Common Stock at an exercise price of $36.26, which represents 140% of the Implied Equity

Value.  The Implied Equity Value is based on a hypothetical total enterprise value of Reorganized Granite of $493 million.  As noted above, the New Warrants will not be listed on any exchange and will be subject to certain transfer restrictions.  Shares issuable upon exercise of such warrants will be entitled to the same rights and will be subject to the same restrictions and limitations as the other then outstanding shares of the New Common Stock.

3.      *The Rights.*

Pursuant to the Plan (and as described below), holders of Allowed Preferred Interests and, (in the event that holders of Allowed Preferred Interests do not exercise all such subscription Rights), holders of Allowed Class B Interests shall be entitled to the Rights to purchase up to 1 million shares of New Common Stock at the Implied Equity Value, subject to the limitations set forth in section 8 of the Plan.  As noted above, the New Common Stock issuable upon exercise of the Rights will not be listed on any exchange and will be subject to certain transfer restrictions.

## F.    <u>Securities Law Matters.</u>

Holders of Allowed Claims in Classes 1A-1F (Secured Claims) will receive New Common Stock and holders of Allowed Interests in Class 10 (Preferred Interests), Class 11 (Class A Interests), and Class 12 (Class B Interests) will receive New Common Stock and New Warrants pursuant to the Plan.  Section 1145 of the Bankruptcy Code provides an exemption from the securities registration requirements of federal and state securities laws with respect certain distributions of securities under a plan of reorganization.  Pursuant to the Plan, the New Common Stock and New Warrants issued to holders of Allowed Claims in Classes 1A-1F (Secured Claims) and Interests in Class 10 (Preferred Interests), Class 11 (Class A Interests), and Class 12 (Class B Interests) will be exempt from registration under otherwise applicable federal and state securities laws pursuant to section 1145 of the Bankruptcy Code, as described below.

1.      *Issuance and Resale of New Securities Under the Plan.*

Section 1145(a) of the Bankruptcy Code generally exempts from registration under the Securities Act of 1933 (as amended, the "***Securities Act***") the offer or sale of a debtor's securities under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or an equity interest in, such debtor, and in the case of warrants so issued under a chapter 11 plan, also generally exempts the issuance of the securities issued upon exercise of such warrants.  In reliance upon this exemption, the New Common Stock and New Warrants will be issued on the Effective Date (or on a Subsequent Distribution Date) as provided in the Plan, and will be exempt from the registration requirements of the Securities Act, except to the extent described below.  Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in the Bankruptcy Code.  In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from

registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (i) purchases an administrative claim with a view to distribution of any security to be received in exchange for the claim other than in ordinary trading transactions, or (ii) offers to sell securities issued under a plan for the holders of such securities, or (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities, or (iv) is a control person of the issuer of the securities or other issuer of the securities within the meaning of section 2(11) of the Securities Act.  The legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the securities of a reorganized debtor may be presumed to be a "control person."

Whether any particular person would be deemed to be an "underwriter" with respect to any security issued under the Plan would depend upon the facts and circumstances applicable to that person.  Accordingly, the Debtors express no view as to whether any particular person receiving distributions under the Plan would be an "underwriter" within the meaning of section 1145 of the Bankruptcy Code with respect to any security issued under the Plan. However, section 11.10 of the Plan provides that neither Silver Point nor any holder of a Secured Claim will be an "underwriter" within the meaning of section 1145 of the Bankruptcy Code, or otherwise, solely on account of the distributions to be made pursuant to sections 3.11, 3.12, and 3.13 of the Plan.

**Notwithstanding the foregoing, statutory underwriters may be able to sell their securities pursuant to the provisions of Rule 144 promulgated under the Securities Act or another applicable exemption from registration.  Rule 144 permits the resale of securities received by statutory underwriters pursuant to a chapter 11 plan, subject to certain holding period and volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144 or any other applicable exemption from registration.**

As set forth herein and in the Plan, the New Common Stock issued pursuant to the Rights Offering to the Eligible Investors in Class 10 and the New Common Stock issued pursuant to the Management Incentive Plan will be exempt from registration under the Securities Act by virtue of section 4(2) thereof and Regulation D promulgated thereunder (although one or more other exemptions from registration also may apply to the New Common Stock issued pursuant to the Management Incentive Plan).

In view of the complex, subjective nature of the question of whether a particular person may be an underwriter or an affiliate of the reorganizing Debtors and the fact specific nature of the availability of Rule 144 or any other exemption from registration, the Debtors make no representations concerning the right of any person to trade in the Plan Securities to be distributed pursuant to the Plan.  Accordingly, the Debtors recommend that potential recipients of

Plan Securities consult their own counsel concerning whether they may freely trade such securities.

## G.    **The Rights Offering.**

### 1.    *Issuance of Rights.*

(a)    *The Rights Offering.*  Pursuant and subject to section 3.11 the Plan, each Eligible Investor as of the Voting Record Date, will have the opportunity, but not the obligation, to participate in a Rights Offering (the "***Rights Offering***") entitling such holder to subscribe for its Ratable Proportion of the Rights, determined as of the Voting Record Date, of up to an aggregate, of 1 million shares of the New Common Stock at the Implied Equity Value.  Any Eligible Investor who participates in the Rights Offering may also oversubscribe (on a pro rata basis) to exercise any Rights not subscribed for by other Eligible Investors.  However, in accordance with section 3.13 of the Plan, to the extent Eligible Investors do not fully exercise the Rights by the Subscription Expiration Date, each holder of the Class B Interests will have the opportunity to participate in the Rights Offering and shall receive its Ratable Proportion of Rights with an aggregate Subscription Purchase Price of no more than $7.5 million that are not exercised by Eligible Investors pursuant to the above, if applicable.  To the extent the Class B Interests do not fully exercise the remaining Rights, such Rights shall revert to the holders of the Secured Claims and shall be extinguished.  No payments in lieu of the Rights will be made to any holder of an Allowed Preferred Interest that is not an Eligible Investor and, therefore, unable to subscribe for any shares of New Common Stock pursuant to the Rights.

(b)    The Rights Offering shall commence on the Subscription Commencement Date, which is (i) a Business Day determined by the Debtors with Silver Point Consent, which shall be a reasonable time after the Voting Record Date and shall not be later than five (5) business days after the date of the entry of an order approving the Rights Offering Motion on the Bankruptcy Court's docket and (ii) the day on which the Subscription Form is mailed.  The Rights Offering shall expire at 5:00 p.m. (Eastern Time) on the Voting Deadline (the "***Subscription Expiration Date***").  The Subscription Expiration Date is the final date by which an Eligible Investor or holder of a Class B Interest may elect to subscribe to the Rights Offering.  Each Eligible Investor or holder of a Class B Interest intending to participate in the Rights Offering must affirmatively elect to exercise its Right(s) on or prior to the Subscription Expiration Date.

(c)    At the Subscription Expiration Date, Rights shall be allocated to the Eligible Investors pursuant to each such holders' Ratable Proportion.  Any unexercised Rights shall then be allocated to any Eligible Investor that has elected on its Subscription Form to participate in the oversubscription in the Rights Offering for its Ratable Proportion of the unexercised Rights (subject to adjustment to reflect any failure by any Eligible Investor to exercise any Rights).  Thereafter, any remaining unexercised Rights will then be allocated to the holders of Allowed Class B Interests that affirmatively elect to exercise their Rights on their Subscription Forms for such holders' Ratable Proportion of such remaining Rights, subject to the limitations set forth in section 3.13 of the Plan.  In the event there are any remaining Rights not exercised by the Eligible Investors and holders of Class B Interests, such Rights shall revert to the holders of Secured Claims and shall be extinguished.

2.      *Exercise of Rights.*

Each Eligible Investor or holder of an Allowed Class B Interest, as the case may be, may exercise all or any portion of such holder's Rights pursuant to the procedures outlined below, as appropriate, but the exercise of any Rights shall be irrevocable.

All questions concerning the timeliness, viability, form, and eligibility of any exercise of Rights shall be determined by the Debtors, with Silver Point Consent, and the Debtors' good faith determination shall be final and binding. The Debtors, in their discretion reasonably exercised in good faith and with Silver Point Consent, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject any purported exercise of any Rights. Subscription Forms and subscription instructions from the Depository Trust Company shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in their discretion reasonably exercised in good faith and with Silver Point Consent. The Debtors will use commercially reasonable efforts to give notice to any Eligible Investor or holder of an Allowed Class B Interest regarding any defect or irregularity in connection with any purported exercise of Rights by such holder and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Debtors nor the Disbursing Agent shall incur any liability for failure to give such notification.

In order to exercise the Rights, each Eligible Investor or holder of an Allowed Class B Interest must return a duly completed Subscription Form (making a binding and irrevocable commitment to participate in the Rights Offering) to the Disbursing Agent so that such form is actually received by the Disbursing Agent on or before the Subscription Expiration Date. If, on or prior to the Subscription Expiration Date the Disbursing Agent for any reason does not receive from a given holder of Rights a duly completed Subscription Form, such holder shall be deemed to have relinquished and waived its right to participate in the Rights Offering. On the Subscription Notification Date (not later than five (5) days after the day on which the Bankruptcy Court enters an order confirming the Plan), the Debtors will notify each Eligible Investor and holder of an Allowed Class B Interest of their Final Allocation and their Subscription Purchase Price. Each Eligible Investor and holder of an Allowed Class B Interest must tender the Subscription Purchase Price to the Disbursing Agent so that it is actually received by the Subscription Purchase Date (two (2) Business Days following the Subscription Notification Period).

The payments made in accordance with the Rights Offering shall be deposited and held by the Disbursing Agent in a trust account, or similarly segregated account or accounts which shall be separate and apart from the Disbursing Agent's general operating funds and any other funds subject to any Lien or any cash collateral arrangements and which segregated account or accounts will be maintained for the purpose of holding the money for administration of the Rights Offering until the Effective Date, or such other later date, at the option of the Reorganized Debtors, with Silver Point Consent, but not later than twenty (20) days after the Effective Date. The Disbursing Agent shall not use such funds for any other purpose prior to such date and shall not encumber or permit such funds to be encumbered with any Lien or other encumbrance.

To facilitate the exercise of the Rights, on the Subscription Commencement Date, the Debtors will mail the Subscription Form to each holder of an Allowed Preferred Interest the Debtors know to be an "accredited investor" and Allowed Class B Interest as of the Voting Record Date, together with appropriate instructions for the proper completion, due execution, and timely delivery of the Subscription Form, as well as instructions for the payment of the eventual Subscription Purchase Price for that portion of the Rights sought to be exercised by such holder. The Debtors may adopt, with Silver Point Consent, such additional detailed procedures consistent with the provisions of the Plan to more efficiently administer the exercise of the Rights.

3.        *Transfer and Revocation of the Rights.*

The Rights are not Transferable. Any such Transfer or attempted Transfer will be null and void and the Debtors will not treat any purported transferee as the holder of any Rights. Once the holder of an Allowed Preferred Interest or Allowed Class B Interest has properly exercised its Subscription Right, such exercise cannot be revoked.

4.        *Use of Proceeds from the Rights Offering.*

The proceeds of the Rights Offering shall be used, in order, (i) to repay the DIP Claims, (ii) to fund Cash payments required to be made under the Plan, and (iii) for general corporate purposes of the Reorganized Debtors.

5.        *Private Placement Exemption.*

The Debtors will only make the Rights Offering available to those Eligible Investors. Therefore, the New Common Stock issued pursuant to the Rights Offering to the Eligible Investors in Class 10 will be exempt from registration under the Securities Act by virtue of Section 4(2) thereof and Regulation D promulgated thereunder. In addition, the Debtors believe the New Common Stock issued pursuant to the Management Incentive Plan will also be exempt from registration under the Securities Act by virtue of section 4(2) thereof and Regulation D promulgated thereunder (although one or more other exemptions from registration also may apply to the New Common Stock issued pursuant to the Management Incentive Plan). Unlike the New Common Stock issued to holders of Allowed Secured Claims (Classes 1A-1F), Class A Interests (Class 11), and Class B Interests (Class 12), such New Common Stock issued to the Eligible Investors in Class 10 pursuant to the Rights Offering will not be exempted under section 1145 of the Bankruptcy Code.

6.        *1145 Exemption.*

Section 1145 of the Bankruptcy Code exempts from registration under the Securities Act securities issued under a chapter 11 plan either entirely in exchange for a claim against or interest in a debtor or issued principally in such exchange and partly for cash or property. The Debtors believe that together with the New Common Stock and New Warrants to be issued to holders of Class A Interests (Class 11) and Class B Interests (Class 12) under sections 3.12 and 3.13 of the Plan, the issuance of shares of New Common Stock pursuant to the Rights Offering to holders of Class B Interests satisfies the requirements of the "principally in exchange and partly for cash" aspects of Section 1145. Restrictions in the Rights Offering and

section 8 of the Plan specifically limit the value of shares of New Common Stock that may be subscribed for and purchased by holders of Common Interests in the Rights Offering such that they may not exceed the approximate aggregate value -- $7.5 million -- of the New Common Stock and New Warrants to be issued to holders of Class B Interests under the Plan. Therefore, the shares of New Common Stock issued to holders of Class B Interests in the Rights Offering will be exempt from registration under the Securities Act pursuant to section 1145 of the Bankruptcy Code.

## H.    **Plan Provisions Governing Distributions.**

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "Allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an Allowed Claim or Allowed Interest simply means that the Debtors agree, or in the event of a dispute, that the Bankruptcy Court determines, that the Claim or Interest, and the amount thereof, is in fact a valid obligation of the Debtors.

Any Claim which is not a Disputed Claim and for which a proof of Claim has been timely filed is an Allowed Claim. Any Claim that has been listed by any Debtor in such Debtors' schedules of assets and liabilities, as may be amended from time to time, as liquidated in amount and not disputed or contingent is an Allowed Claim in the amount listed in the Schedules unless an objection to such Claim has been filed. Any Claim for which an objection has been timely interposed is a Disputed Claim. For an explanation of how Disputed Claims will be determined, see *Section VII.I.*

### 1.    *Record Date for Distributions.*

As of the date of the entry of the Confirmation Order, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Interests. The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Voting Record Date.

### 2.    *Date of Distributions.*

Except as otherwise provided for in the Plan, any distributions and deliveries on account of Allowed Claims will be made on the Effective Date or as soon thereafter as is practicable but in no event later than sixty (60) days following the Effective Date. Such distributions will be deemed made on the Effective Date. However, all distributions to (i) holders of Secured Claims, (ii) Fox, and (iii) Beck shall be made on the Effective Date. Disputed Claims will be treated as set forth below.

### 3.    *Subsequent Distributions.*

Unless otherwise provided in the Plan, to the extent Cash, New Common Stock, or New Warrants are available subsequent to the Effective Date from undeliverable, time-barred, or unclaimed distributions to holders of Allowed Claims or Interests pursuant to the Plan, such

Cash, New Common Stock, or New Warrants shall be transferred to the Reorganized Debtors to be used for general corporate purposes.

    4.    *Surrender of Instruments.*

Plans of reorganization generally require a holder of an instrument or security of a debtor to surrender such instrument or security prior to receiving a new instrument or security in exchange therefore under a plan of reorganization. This rule avoids disputes regarding who is the proper recipient of instruments or securities under a plan of reorganization.

Other than with respect to book entry securities, as a condition to receiving any distribution under the Plan, each holder of Secured Notes or Interests must either (i) surrender such (a) Secured Notes to the Indenture Trustee or (b) Interests to Reorganized Granite or its designee or (ii) submit evidence satisfactory to the appropriate Indenture Trustee with respect to the Secured Notes and the Reorganized Debtors with respect to the Preferred Interests of the loss, theft, mutilation, or destruction of such Secured Notes or Interests before the second anniversary of the Effective Date. Any holder that fails to do either (i) or (ii) above shall be deemed to have forfeited all rights and Claims and may not participate in any distribution under the Plan. After the second anniversary of the Effective Date, all property or interest in property not distributed pursuant to section 5.3 of the Plan shall be deemed unclaimed property pursuant to section 347(b) of the Bankruptcy Code. Such property or interest in property shall be returned by the Disbursing Agent to the Reorganized Debtors and shall revert to Reorganized Granite, and the Claim of any holder to such property or interest in property shall be discharged and forever barred.

    5.    *Setoffs.*

Except with respect to the Intercompany Claims, the Debtors, with Silver Point Consent, may, but will not be required to, setoff against any Claim (for purposes of determining the Allowed amount of such Claim in respect of which distribution shall be made), any claims of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors of any such claim the Debtors may have against the holder of such Claim, provided, that in the event the Debtors seek to exercise such setoff rights against the holder of a Claim that is a debtor in a case under the Bankruptcy Code, the Debtors shall comply with the requirements of the Bankruptcy Code, including seeking relief from the automatic stay. Pursuant to section 5.5 of the Plan, any creditor, including any holder of a Deficiency Claim, with a valid right of setoff shall retain the ability to effectuate such setoff prior to the Effective Date; *provided, however*, that in no event shall such holder be considered a holder of a Secured Claim under the Plan or receive a distribution in accordance with section 3.1 of the Plan on account of their right of setoff.

    6.    *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents, unless the Debtors

have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim or Interest by such holder that contains an address for such holder different from the address reflected on such Schedules for such holder.  In the event that any distribution to any holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made to such holder; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the second anniversary from the date of distribution.  After such date, all Plan Securities and Cash shall be returned to Reorganized Granite to be used for general corporate purposes, and the claim of any other holder to such property or interest in property shall be discharged and forever barred.

> 7.      *Manner of Payment Under the Plan.*

All distributions of Cash, Plan Securities, and interests in the Exit Secured Term Loan to the creditors and/or holders of Interests of each of the Debtors under the Plan of Reorganization shall be made by or on behalf of the applicable Reorganized Debtor.  Where the applicable Reorganized Debtor is a subsidiary of Reorganized Granite, Reorganized Granite shall be treated as if it were making a capital contribution, either directly or indirectly, to the applicable Reorganized Debtor equal to the amount distributed (other than the Cash distributed from such Reorganized Debtor's own funds), but only at such time as, and to the extent that, the amounts are actually distributed to holders of Allowed Claims.

At the option of the Debtors, any Cash payment to be made under the Plan may be made by a check or wire transfer from a domestic bank or as otherwise required or provided in applicable agreements.

> 8.      *No Fractional Distributions.*

No fractional shares of New Common Stock, New Warrants, and/or no fractional dollars, shall be distributed under the Plan.  For purposes of distribution, fractional shares of New Common Stock and fractional shares of New Warrants shall be rounded up or down, as applicable, to the nearest whole number, or, in the event of a Cash payment, up or down to the nearest whole dollar.

> 9.      *Withholding and Reporting Requirements.*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

> 10.     *Time Bar to Cash Payments.*

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  Any party that is entitled to receive a check under the Plan but who fails to cash such

check within 120 days of its issuance shall be entitled to receive a reissued check from Disbursing Agent for the amount of the original check if the party requests that the Disbursing Agent reissue such check and provides the Disbursing Agent with such documentation as the Disbursing Agent requests to verify that such party is entitled to such check, prior to the later of (a) the second anniversary of the Effective Date or (b) six (6) months after any such Claim becomes an Allowed Claim. If a party fails to cash a check within 120 days of its issuance and fails to request reissuance of such check prior to the later to occur of (a) the second anniversary of the Effective Date or (b) six (6) months following the date such party's Claim becomes an Allowed Claim, such party shall not be entitled to receive any Distribution under the Plan with respect to the amount of such check.

11.    *Transactions on Business Days.*

If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day.

12.    *Allocation of Distributions.*

Distributions to any holder of an Allowed Claim under the Plan shall be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes), and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising prepetition interest, costs, expenses, and fees(including any redemption premium) (but solely to the extent such interest, costs, expenses, fees, or redemption premium are an allowable portion of such Allowed Claim).

13.    *Disbursing Agent.*

In general, a disbursing agent is an entity designated to administratively effect the distributions to be provided under a plan of reorganization. All distributions under the Plan shall be made by Reorganized Granite, as Disbursing Agent, or such other entity designated by Reorganized Granite as a Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court; and, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by Reorganized Granite.

14.    *Rights and Powers of Disbursing Agent.*

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated by the Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions thereof.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense

reimbursement claims (including, without limitation, reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by Reorganized Granite.

   15.    *Distributions to Preferred Interests and Common Interests.*

        Pursuant to the Holihan Lokey valuation (as discussed below), the holders of Secured Claims are impaired.  Under the absolute priority rule (described below), no junior creditor or interest holder is permitted to receive any distribution until all holders of Secured Claims are paid in full, with interest.  Notwithstanding the foregoing, after months of negotiations with Silver Point, the Debtors were successful in procuring recoveries for junior creditors and interest holders to minimize disruption to the Debtors' businesses and maximize the value of the Granite Entities going forward.

        Accordingly, the distributions specified in sections 3.11, 3.12, and 3.13 of the Plan to the holders of Preferred Interests in Class 10, Class A Interests in Class 11, and Class B Interests in Class 12 shall be in lieu of a pro rata, direct distribution to the holders of the Secured Claims in Classes 1A-1F.

## I.    Procedures for Treating Disputed Claims.

   1.    *No Distribution Pending Allowance.*

        Notwithstanding any other provision of the Plan, no Cash shall be distributed under the Plan on account of any Claim that is not Allowed, unless and until such Claim becomes an Allowed Claim.  Notwithstanding any other provision of the Plan, no interest shall accrue or be Allowed on any Claim during the period after the Petition Date, except as provided for in the DIP Order or under section 506(b) of the Bankruptcy Code.

   2.    *Resolution of Disputed Claims.*

        Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Debtors and, after the Effective Date, the Reorganized Debtors, and any party in interest may make and file objections to Claims and shall serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than the latest of: (i) 30 days after the Effective Date; (ii) 30 days after a proof of Claim with respect to the Claim objected to has been filed with the claims agent appointed in the Reorganization Cases; or (iii) such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clauses (i) and (ii) above.  From and after the Effective Date, all objections shall be litigated to a Final Order except to the extent Reorganized Granite elects to withdraw any such objection or Reorganized Granite and the claimant elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim without the necessity of Bankruptcy Court approval.

   3.    *Estimation of Claims.*

        The Debtors and, after the Effective Date, Reorganized Granite, may request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such Claim, and the

Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including, without limitation, during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any Disputed Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court, subject to any rights pursuant to section 502(j) of the Bankruptcy Code (i) to have such Claim reconsidered and, if Allowed, (ii) to have the distribution on account thereof adjusted.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  On and after the Confirmation Date, Claims that have been estimated may be compromised, settled, withdrawn, or otherwise resolved, without further order of the Bankruptcy Court, but in a manner consistent with the treatment of such Claims under the Plan.

4.    *Allowance of Disputed Claims.*

If, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall, on the fifteenth Business Day of the first month following the month in which the Claim becomes an Allowed Claim, make any distribution to the holder of such Allowed Claim in an aggregate amount sufficient to provide such holder with the amount that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim on the Effective Date or any Subsequent Distribution Date.

## J.    Provisions Governing Executory Contracts and Unexpired Leases.

1.    *General Treatment.*

Subject to the approval of the Court, the Bankruptcy Code empowers the Debtors to assume or reject their executory contracts and unexpired leases.  Except as otherwise provided in the Plan or pursuant thereto, as of and subject to the occurrence of the Effective Date, the Debtors will be deemed to have rejected each executory contract and unexpired lease to which they are a party, except for any contract or lease that, subject to Silver Point Consent (provided that such Silver Point Consent shall not be so required for programming contracts and leases of real property) (i) has been assumed or rejected pursuant to Final Order of the Bankruptcy Court; (ii) is specifically designated or generally described on Schedule 7.1 to be filed with the Bankruptcy Court on or before March 15, 2007, with Silver Point Consent, as a contract or lease to be assumed; or (iii) is the subject of a separate motion filed under section 365 of the Bankruptcy Code by the Debtors prior to the Effective Date; *provided, however,* that such Silver Point Consent is only required with respect to executory contracts and unexpired leases (other than programming contracts and leases of real property) to the extent the assumption of such contract or lease would cause the aggregate cure costs for, and future contractual obligations under, as of the date of such assumption, all contracts and leases to be assumed (other than programming contracts and leases of real property) to exceed $1,000,000.

Each executory contract and unexpired lease listed or generally described on Schedule 7.1 that relates to the use or occupancy of real property shall include (i) modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any

agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed on Schedule 7.1, and (ii) executory contracts or unexpired leases appurtenant to the premises listed on Schedule 7.1 including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vault, tunnel, or bridge agreements, or franchises, and any other interests in real estate or rights in rem relating to such premises to the extent any of the foregoing are executory contracts or unexpired leases, unless any of the foregoing agreements are specifically rejected.  A non-Debtor party to an executory contract or unexpired lease that is being rejected under the Plan may request that the Debtors assume such contract or lease by sending written notice to the Debtors, which notice shall include a waiver of any defaults (including any payment defaults) and any right to any cure payment under such contract or lease.  The Debtors may assume such contract or lease with Silver Point Consent without further action of the Bankruptcy Court; *provided, however*, that such Silver Point Consent is only required with respect to executory contracts and unexpired leases (other than programming contracts and leases of real property) to the extent the assumption of such contract or lease would cause the aggregate cure costs for, and future contractual obligations under, as of the date of such assumption, all contracts and leases to be assumed (other than programming contracts and leases of real property) to exceed $1,000,000. The Debtors reserve their right, subject to Silver Point Consent, to add any executory contract or unexpired lease to Schedule 7.1 prior to the Effective Date (which addition shall be subject to Silver Point Consent other than with respect to programming contracts and leases of real property).

    2.    *Cure of Defaults.*

    The Bankruptcy Code authorizes a debtor to make any payments necessary to cure outstanding defaults under such executory contracts or unexpired leases in connection with their assumption.  Accordingly, a condition to the assumption of an executory contract or unexpired lease is that any default under an executory contract or unexpired lease that is to be assumed pursuant to the Plan will be cured in a manner consistent with the Bankruptcy Code and as set forth in the Plan.

    Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to section 7.1, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, on or before March 15, 2007, file a pleading with the Bankruptcy Court, with Silver Point Consent, listing the cure amounts of all executory contracts to be assumed.  The parties to such executory contracts to be assumed by the Debtors shall have twenty (20) days to object to the cure amounts listed by the Debtors.  If there are any objections filed, the Bankruptcy Court shall hold a hearing.  If the Bankruptcy Court determines that the cure amount is greater than the cure amount listed by the Debtors, the Debtors may reject the contract at such time rather than paying such greater amount.

3.    *Rejection Claims.*

Subject to the approval of the Bankruptcy Court, the Bankruptcy Code authorizes a debtor to reject any of its executory contracts or unexpired leases.  Proofs of all Claims arising out of the rejection of executory contracts and unexpired leases pursuant to the Plan must be filed with the claims agent appointed in the Reorganization Cases, with proper supporting documentation detailing the calculation of such claim.

If an entity has a Claim for damages arising from the rejection of an executory contract or unexpired lease pursuant to the Plan, unless a proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors before the date that is thirty (30) days after the later of the Effective Date or the date of such rejection, such Claim shall be barred and shall not be enforceable against the Debtors.

## K.    Conditions Precedent to Occurrence of Effective Date.

1.    *Conditions Precedent to Confirmation.*

The Plan may not be confirmed unless each of the conditions set forth in section 10.1 of the Plan is satisfied.  Except as provided in Section 10.3 of the Plan, any one or more of the following conditions may be waived at any time by the Debtors with Silver Point Consent.

(a)    An Order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been (i) issued by the Bankruptcy Court, (ii) entered on the docket maintained by the Clerk of the Bankruptcy Court, and (iii) become a Final Order.

(b)    The Confirmation Order (i) shall be in a form and substance satisfactory to the Debtors and Silver Point and (ii) shall include a finding by the Bankruptcy Court that the Plan Securities to be issued on the Effective Date will be exempt from registration under applicable securities laws pursuant to Section 1145 of the Code, unless (x) counsel to the Debtors provide to Granite and Silver Point a customary opinion, satisfactory in form and substance to Silver Point and their counsel, that another exemption from registration is available and (y) the Company obtains the consent of Silver Point, not to be unreasonably withheld.

(c)    The Confirmation Order shall contain a finding that the aggregate amount of Cash necessary to satisfy the Allowed Claims in Classes 4A, 5, 6, 7, 8, and 9 shall not exceed $11.0 million.

2.    *Conditions Precedent to the Occurrence of the Effective Date.*

The Effective Date for the Plan may not occur unless and until each of the conditions set forth below is satisfied.  Except as provided in section 10.3 of the Plan, any one or more of the following conditions may be waived at any time by the Debtors with Silver Point Consent.

(a)     A Confirmation Order, in form and substance satisfactory to the Debtors and Silver Point, shall have been entered by the Bankruptcy Court, and such Order shall have become a Final Order.

(b)     All actions, and all agreements, instruments, and other documents necessary to implement the terms and provisions of the Plan shall be effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors and Silver Point on the Effective Date.

(c)     Any settlements reached with any holder of a Claim prior to the Effective Date that provides for special treatment of such holder's Claim in lieu of the treatment otherwise accorded to such Claim under the Plan shall be in form and substance satisfactory to Silver Point.

(d)     The DIP Claims shall have been paid in full in accordance with section 2.1 of the Plan.

(e)     All authorizations, consents, and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained (or waived) and not revoked, including, without limitation, FCC Approval.

  3.  *Waiver of Conditions.*

The Debtors may, at their option, but only with Silver Point Consent, waive any of the conditions set forth in sections 10.1 and 10.2 of the Plan, provided, however, that the Debtors may not waive entry of the Order approving the Disclosure Statement, entry of the Confirmation Order, or any condition the waiver of which is proscribed by law. Any permissible waivers shall be evidenced by a writing, signed by the waiving parties, served upon the U.S. Trustee, and filed with the Bankruptcy Court. The waiver may be a conditional one, such as to extend the time under which a condition may be satisfied.

  4.  *Effect of Failure of Conditions.*

If the conditions specified in section 10.2 of the Plan have not been satisfied or waived in the manner provided in section 10.3 of the Plan within twenty (20) days (or solely with respect to FCC Approval, by the earlier of (a) 10 business days after receipt of FCC Approval or (b) July 1, 2007), or such longer time as agreed to by Silver Point, following the Confirmation Date, then: (a) the Confirmation Order shall be of no further force and effect; (b) no distributions under the Plan shall be made; (c) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (d) all the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained herein or in the Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors. Upon such occurrence, the Debtors shall file a written notification with the Bankruptcy Court and serve it upon counsel for Silver Point and the U.S. Trustee.

L.    **Effect of Confirmation.**

1.    *Vesting of Assets.*

Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' bankruptcy estates shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan or in the Confirmation Order. From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, subject to the terms and conditions of the Plan.

2.    *Binding Effect.*

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interest including any Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to a distribution under the Plan.

3.    *Discharge of Claims and Termination of Interests.*

Unless otherwise provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made thereunder will discharge all existing debts and Claims, and terminate all Interests, of any kind, nature or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the occurrence of the Effective Date, all existing Claims against the Debtors and Interests in the Debtors, shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assigns or any of their assets or properties, any other or further Claim or Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Interest and whether or not the respective facts or legal bases were known or existed prior to the Effective Date.

4.    *Release and Discharge of Debtors.*

Upon the occurrence of the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided therein, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Liens, Claims, claims, causes of action, rights, and/or liabilities, including, without limitation, those arising from the Guarantees granted to the holders of Secured Claims under the Secured Notes Indenture, Term Loan A, and Term Loan B, as well as any Deficiency Claims. In addition, the Confirmation Order shall authorize the Indenture Trustee to take whatever action

may be necessary or appropriate, in its reasonable discretion, to effectuate the foregoing, including without limitation, providing a release of the Liens. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors.

5.    *Release and Discharge of Non-Debtor Subsidiaries.*

In addition to the terms of section 11.4 of the Plan, each holder of a Secured Claim and the Indenture Trustee of the Secured Notes, and any agent under the Prepetition Credit Agreement shall be deemed to have forever waived, released, and discharged the Non-Debtor Subsidiaries of any Liens, Claims, claims, causes of action, rights, or liabilities arising from the Guarantees granted to the holders of the Secured Claims under the Secured Notes Indenture, Term Loan A, and Term Loan B, as well as any Deficiency Claims. In addition, the Confirmation Order shall authorize and direct the Indenture Trustee to take whatever action may be necessary or appropriate, in its reasonable discretion, to effectuate the foregoing, including, without limitation, providing a release of the Liens.

6.    *Terms of Injunctions or Stays.*

Unless otherwise expressly provided in the Plan or the Confirmation Order, all injunctions or stays arising under or entered during the Reorganization Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

7.    *Indemnification Obligations.*

Subject to the occurrence of the Effective Date the obligations of the Debtors as of the Petition Date to indemnify, defend, reimburse, or limit the liability of directors or officers who were directors or officers of the Debtors against any claims or causes of action as provided in the Debtors' certificates of incorporation, bylaws, or applicable state law, shall be treated as a Securities Claim (Class 13) and are otherwise discharged. Nothing contained in the Plan shall be deemed to affect or alter any rights of any director or officer against any insurer with respect to the Debtors' directors' and officers' insurance policies.

8.    *D&O Tail Coverage Policies.*

The Reorganized Debtors will obtain a D&O insurance policy with tail coverage for a period of six years with the same coverage limit as in existence as of the Petition Date for the current and former officers and directors of the Debtors, *provided, however*, that such policy (i) shall have an aggregate cost of no more than $875,000 and (ii) shall be subject to Silver Point Consent as to form and substance.

9.    *Injunction Against Interference with the Plan.*

Except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or entities who have held, hold, or may hold Claims against or Interests in the Debtors are permanently enjoined, from and after the Effective Date, from: (i) commencing or

continuing in any manner any action or other proceeding of any kind on any such Claim or Interest against any of the Reorganized Debtors or the Non-Debtor Subsidiaries on account of such Claims or Interests; (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against any Reorganized Debtor or Non-Debtor Subsidiary with respect to such Claim or Interest; (iii) creating, perfecting, or enforcing any encumbrance of any kind against any Reorganized Debtor or Non-Debtor Subsidiary or against the property or interests in property of any Reorganized Debtor or Non-Debtor Subsidiary with respect to such Claim or Interest; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to any Reorganized Debtor or Non-Debtor Subsidiary or against the property or interest in property of any Reorganized Debtor or Non-Debtor Subsidiary with respect to such Claim or Interest; and (v) pursuing any claim released pursuant to section 11 of the Plan.

     10.     *Exculpation.*

     On the Effective Date, the Silver Point Entities, and any Disbursing Agent selected by the Debtors, as well as the respective current and former officers, directors, employees, members, affiliates, financial advisors, professionals, accountants, and attorneys, as applicable, of the Debtors, Non-Debtor Subsidiaries, the Indenture Trustee, the Silver Point Entities, and any disbursing agent selected by the Debtors (and solely with respect to the Silver Point Entities, their current and former owners) shall be exculpated by the Debtors and any holder of any Claim or Interest for any act or omission in connection with, or arising out of, the Reorganization Cases, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or property to be distributed under the Plan, except for willful misconduct, gross negligence, intentional fraud, and/or criminal conduct.  Moreover, neither the Silver Point Entities nor any holder of a Secured Claim shall be an "underwriter," within the meaning of section 1145 of the Bankruptcy Code or otherwise, solely on account of the distributions to be made pursuant to sections 3.11, 3.12, and 3.13, and the Silver Point Entities and any other holder of a Secured Claim are specifically exculpated from any and all liability arising from their role in the Reorganization Cases, including any claim that any Silver Point Entity or any other holder of a Secured Claim may be deemed to be an underwriter within the meaning of section 1145 of the Bankruptcy Code, or otherwise solely on account of the distributions to be made pursuant to sections 3.11, 3.12, and 3.13.  Nothing in section 11.10 of the Plan shall limit the liability of the professionals to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

     11.     *Limited Releases.*

     The Plan provides that, on the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties (as defined below), including, but not limited to: (i) the discharge of debt and any other good and valuable consideration paid pursuant to the Plan or otherwise; and (ii) the services of the Released Parties in facilitating the expeditious implementation of the restructuring contemplated by the Plan, any and all Claims of the Debtors and Non-Debtor Subsidiaries (except for willful misconduct, gross negligence, intentional fraud and/or criminal conduct) against the Silver Point Entities and any Disbursing Agent selected by the Debtors, as well as the respective current and former officers, directors, employees, members, financial advisors, accountants, representatives,

and attorneys, as applicable, of the Debtors, Non-Debtor Subsidiaries, the Indenture Trustee, the Silver Point Entities, and any disbursing agent selected by the Debtors (collectively, "**Released Parties**") shall be released and forever discharged.  The foregoing release shall not, however, operate as a waiver of or release from any Claim arising out of any express contractual obligation owing by any former director, officer, or employee of the Debtors or the Non-Debtor Subsidiaries or any reimbursement obligation of any former director, officer, or employee with respect to a loan or advance made by the Debtors or the Non-Debtor Subsidiaries to such former director, officer, or employee and nothing in the Plan or in the Confirmation Order shall affect a release of any claim against the parties released in section 11.11 of the Plan for any claim arising under the Internal Revenue Code of 1986, the securities laws, the environmental laws, or any criminal laws of the United States or any state and local authority, nor shall anything in the Plan or in the Confirmation Order enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceeding against any such person or entity for any liability whatsoever, including, without limitation, any claim, suit, or action arising under the Internal Revenue Code of 1986, the environmental laws, or any criminal laws of the United States or any state or local authority.  Nothing in section 11.11 of the Plan shall limit the liability of the professionals to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

The Released Parties have made enormous contributions to the reorganization efforts to be implemented pursuant to the Plan.  Therefore, it is important that these parties be relieved of the threat of any derivative actions against them by parties in the Reorganization Cases that may be dissatisfied with the treatment provided in the Plan.

Accordingly, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the forgoing release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (i) in exchange for good and valuable consideration provided by the Released Parties, representing good faith settlement and compromise of the claims released by the Released Parties; (ii) in the best interests of the Debtors and all holders of Claims and Interests; (iii) fair, equitable, and reasonable; (iv) approved after due notice and opportunity for hearing; and (v) a bar to the Debtors or Reorganized Debtors asserting any Claim released by the Released Parties against any of the Released Parties or their respective property.

12.    *Avoidance Actions.*

The Debtors have determined, in their business judgment, that waiving potential avoidance actions under section 544, 547, or 548 of the Bankruptcy Code against the Debtors' vendors is in the best interest of the Debtors, their estates, and their creditors.  Among other reasons, the Debtors' vendors will be critical to the Reorganized Debtors' future operations, and the Debtors must maintain a good reputation in their television broadcast markets and with their vendors.

Other than interest, fees, and reimbursement of expenses required under the documents evidencing the Debtors' secured indebtedness, no payments have been made (i) to the holders of Secured Claims, including Silver Point, under the Prepetition Credit Agreement or

(ii) to the Indenture Trustee under the Prepetition Indenture.  Further, the holders of Secured Claims have Liens on substantially all of the Debtors' assets.  Therefore, any such payments to holders of Secured Claims cannot be avoided as preferential as such payments have been made out of the collateral pledged to the holders of Secured Claims.  Additionally, these payments cannot be avoided as fraudulent conveyances because such payments were on account of an antecedent debt.  Further, all General Unsecured Creditors will be paid the full face amount of their Allowed Claims under the Plan, subject to the Fox Stipulation and the Beck Stipulation, unless otherwise agreed.  Thus, the Debtors have determined to waive any potential avoidance actions under section 544, 547, or 548 of the Bankruptcy Code against the holders of Secured Claims.

Except as otherwise provided in the Plan, and other than any releases granted in the Plan, by the Confirmation Order, and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, Reorganized Granite shall have the right to prosecute any avoidance or recovery actions under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or debtors in possession, and the proceeds of such actions shall be retained by the Reorganized Debtors; *provided, however*, that, pursuant to the Plan, avoidance actions under sections 544, 547, or 548 of the Bankruptcy Code are hereby waived by the Debtors and the estates, and may not be instituted by the Debtors or any party in interest other than by the Debtors and only as an offset against a Claim of such party asserted against the Debtors.

13.    *Injunctions Regarding Worthless Stock Deduction.*

Unless otherwise ordered by the Bankruptcy Court, on and after the Confirmation Date, any "fifty percent shareholder" within the meaning of section 382(g)(4)(D) of the Internal Revenue Code of 1986, as amended, shall be enjoined from claiming a worthless stock deduction with respect to any Interests for any taxable year of such shareholder ending prior to the Effective Date.

## M.    **Retention of Jurisdiction.**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Reorganization Cases and the Plan pursuant to, and for purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a)    To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom, and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising out of or relating to the Reorganization Cases;

(b)    To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on the Confirmation Date;

(c)    To ensure that distributions to holders of Allowed Claims are accomplished as provided therein;

(d)     To consider Claims or the allowance, classification, priority, compromise, estimation, objection to, or payment of any Claim, Administrative Expense, or Interest;

(e)     To hear and determine all actions pursuant to sections 105, 502, 510, 505, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, any collection matters related thereto, and settlements thereof;

(f)     To hear and determine any disputes or issues arising under the settlement agreements referred to in the Plan or any other settlements of Claims approved by the Bankruptcy Court;

(g)     To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(h)     To issue injunctions, enter and implement other orders, and take such other actions that are not inconsistent with the term of the Plan as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(i)     To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(j)     To hear and determine all applications of retained professionals under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(k)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated thereby or any agreement, instrument, or other document governing or relating to any of the foregoing;

(l)     To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

(m)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors prior to the Effective Date or request by the Reorganized Debtors after the Effective Date for an expedited determination of taxes under section 505(b) of the Bankruptcy Code);

       (o)     To hear and determine any other matters related thereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

       (p)     To enter a final decree closing the Reorganization Cases; and

       (q)     To recover all assets of the Debtors and property of the Debtors' estates, wherever located.

## N.    **Miscellaneous Provisions.**

The Plan contains provisions relating to revocation or withdrawal of the Plan, corporate actions, payment of statutory fees, compensation and reimbursement claims of professionals, dissolution of any statutory committee of unsecured creditors or any other committee appointed in these Reorganization Cases (on the Effective Date), no deemed waiver of causes of action, Indenture Trustee fees and expenses, Indenture Trustee and Administrative Agent as Claimholders, expedited determination of taxes, substantial consummation, exemption from transfer taxes, amendments to the Plan, governing law, and severability.  For more information regarding these items, see the Plan attached as <u>Exhibit 1</u> to this Disclosure Statement.

**VIII.**

**PROJECTIONS AND VALUATION ANALYSIS**

## A.    **Projected Financial Statements.**

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor.  This standard is referred to as "feasibility."  In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management has analyzed the ability of the Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct its business.

The projections, which are set forth in <u>Exhibit 3</u> to this Disclosure Statement (the "***Projections***"), should be read in conjunction with *Section IX* below, entitled "CERTAIN FACTORS AFFECTING THE DEBTORS" and with the assumptions, qualifications and footnotes to tables containing the Projections (which include projected statements of operations, projected balance sheets, and projected statements of cash flows) set forth in <u>Exhibit 3</u>, and the historical consolidated financial information (including the notes and schedules thereto) set forth in <u>Exhibit 4</u>.

The Projections assume an Effective Date of January 1, 2007 with Allowed Claims and Allowed Interests treated as described in the Plan.  Except as otherwise provided in the Plan, expenses incurred as a result of the Reorganization Cases are assumed to be paid on the Effective Date.  If the Debtors do not emerge from chapter 11 as currently scheduled, additional Administrative Expense will be incurred until such time as a plan of reorganization is confirmed and becomes effective.  These Administrative Expense could significantly impact the Debtors'

cash flows if the Effective Date is materially later than the Effective Date assumed in these Projections.

It is important to note that the Projections and estimates of equity values for the Reorganized Debtors may differ from actual performance and are highly dependent on significant assumptions concerning the future operations of the Reorganized Debtors. These assumptions include growth of business, labor and other operating costs, regulatory environment, inflation, and the level of investment required for capital expenditures and working capital. Please refer to *Section IX*, below, for a discussion of many of the factors that could have a material effect on the information provided in this section.

The estimates of equity value for the Reorganized Debtors are not intended to reflect the equity values that may be attainable in public or private markets. They also are not intended to be appraisals or reflect the value that may be realized if assets are sold.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTORS' INDEPENDENT ACCOUNTANT HAS NOT REVIEWED THE ACCOMPANYING PROJECTIONS TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.**

**THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, THE DEBTORS DO NOT INTEND TO, AND DISCLAIM ANY OBLIGATION TO, (I) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF REORGANIZED GRANITE'S NEW COMMON STOCK, AND NEW WARRANTS, OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (II) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (III) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.**

**THE PROJECTIONS PROVIDED IN CONNECTION WITH THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED EXCLUSIVELY BY THE DEBTORS' MANAGEMENT. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, AFTER CONSULTATION WITH THE DEBTORS' FINANCIAL ADVISORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. OTHER THAN REDUCING PROJECTED EXPENSES, NO IMPACT FROM REORGANIZED GRANITE BEING A PRIVATE COMPANY AFTER THE EFFECTIVE DATE HAS BEEN CONSIDERED. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE MATERIAL ACCURACY OF**

**THESE FINANCIAL PROJECTIONS OR TO THE DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. FINALLY, THE PROJECTIONS INCLUDE ASSUMPTIONS AS TO THE ENTERPRISE VALUE OF THE DEBTORS, THE FAIR VALUE OF THEIR ASSETS, AND THEIR ACTUAL LIABILITIES AS OF THE EFFECTIVE DATE.**

B.      <u>Valuation.</u>

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH TRADING VALUE, IF ANY MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZATION VALUE RANGES ASSOCIATED WITH THE VALUATION ANALYSIS.

Houlihan Lokey has advised Granite with respect to the reorganization value of Reorganized Granite (including Malara, as described below) on a going concern basis. Solely for purposes of the Plan, the estimated range of reorganization value of Reorganized Granite (including Malara, as described below) was assumed to be $463 million to $523 million (with a midpoint value of $493 million) as of an assumed Effective Date of January 1, 2007. This estimated reorganization value includes (i) value provided by Malara (as more fully described below); and (ii) a separate valuation for the Debtors KBWB and WXON based on the recent competitive bid of $150 million, as this represents a recent market-based valuation for these assets. Houlihan Lokey's estimate of a range of enterprise values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

**THE ESTIMATED RANGE OF THE REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF JANUARY 1, 2007, REFLECTS WORK PERFORMED BY HOULIHAN LOKEY ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF GRANITE AVAILABLE TO HOULIHAN LOKEY AS OF DECEMBER 8, 2006. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT HOULIHAN LOKEY'S CONCLUSIONS, HOULIHAN LOKEY DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.**

Based upon the estimated range of the reorganization value of Reorganized Granite (including Malara, as described below) of between $463 million and $523 million and assumed total debt of $234.5 million (including $200.0 million in Exit Secured Term Loan, an estimated $29.3 million

of debt outstanding under the Malara Credit Facility and an estimated $5.2 million outstanding under the Exit Secured Revolver[40] as of the Effective Date, assuming an Effective Date of March 31, 2007), Houlihan Lokey has estimated the range of equity value for Reorganized Granite (including Malara, as described below) between approximately $229.0 million and $289.0 million, with a mid-point equity value of $259.0 million. Assuming the issuance of 10.0 million shares of Reorganized Granite Common Stock pursuant to the Plan, the imputed estimate of the range of equity values on a per share basis for Reorganized Granite is between $22.90 and $28.90 per share, with a midpoint value of $25.90 per share. The per share Equity Value range of $22.90 to $28.90 does not give effect to the potentially dilutive impact of any options or warrants to be issued or granted pursuant to the Management Incentive Plan (see section 4.9 of the Plan, entitled, "*Management Incentive Plan*"), or the New Warrants proposed to be issued under the Plan.

The foregoing estimate of the reorganization value of Reorganized Granite is based on a number of assumptions, including a successful reorganization of the Granite Entities' business and finances in a timely manner, the implementation of Reorganized Granite's business plan, the achievement of the forecasts reflected in the Projections, access to the Exit Financing, the continuing leadership of the existing management team, market conditions as of December 8, 2006 continuing through the assumed Effective Date of January 1, 2007, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

With respect to the Projected Financial Information prepared by the management of Granite and included in the Financial Appendix that is Exhibit 3 to this Disclosure Statement, Houlihan Lokey assumed that such Projected Financial Information has been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of Granite as to the future operating and financial performance of Reorganized Granite. Houlihan Lokey's estimate of a range of reorganization values assumes that Granite's Projections will be achieved by Reorganized Granite in all material respects, including revenue growth and improvements in operating margins, earnings and cash flow. Certain of the results forecasted by the management of Granite are significantly better than the recent historical results of operations of Granite. As a result, to the extent that the estimate of enterprise values is dependent upon Reorganized Granite performing at the levels set forth in the Projections, such analysis must be considered speculative. If the business performs at levels below those set forth in the Projected Financial Information, such performance may have a material impact on the Projections and on the estimated range of values derived therefrom.

Additionally, please note that although Granite does not own Malara or its television stations, Granite is deemed to be the primary beneficiary of Malara as a result of (i) Granite's guarantee of the obligations incurred under the Malara Credit Facility, (ii) local service agreements Granite has with Malara, (iii) the fees owed to Granite under the Reimbursement Agreement and strategic arrangements and (iv) contractual put or call option agreements Granite has with Malara to acquire all of the assets and assume the liabilities of each

---

[40] This reflects the net increase of the aggregate change to treatment of the Debtors' General Unsecured Creditors in Classes 4A, 5, 6, 7, 8, and 9 offset by the Debtors' revised balance of available cash, which currently exceeds previously forecasted levels.

Malara television station, subject to compliance with FCC regulations.  Therefore, for purposes of the Projected Financial Information and Valuation analysis, Granite has consolidated the cash flows of Malara, as Granite is deemed to be the primary beneficiary of those cash flows, as well as having the potential to acquire the Malara stations under the put or call agreements (for a de minimus price), subject to compliance with FCC regulations.  Similarly, to be technically accurate, as denoted above, Houlihan Lokey has subtracted the estimated debt outstanding as of the Effective Date under the Malara Credit Facility.

IN ESTIMATING THE RANGE OF THE REORGANIZATION VALUE AND EQUITY VALUE OF REORGANIZED GRANITE, HOULIHAN LOKEY:

- REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF GRANITE FOR RECENT YEARS AND INTERIM PERIODS;

- REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF GRANITE, INCLUDING THE PROJECTIONS, WHICH WERE PREPARED AND PROVIDED TO HOULIHAN LOKEY BY GRANITE'S MANAGEMENT AND WHICH RELATE TO GRANITE'S BUSINESS AND ITS PROSPECTS;

- MET WITH CERTAIN MEMBERS OF SENIOR MANAGEMENT OF GRANITE TO DISCUSS GRANITE'S OPERATIONS AND FUTURE PROSPECTS;

- REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES THAT HOULIHAN LOKEY DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESS OF GRANITE;

- CONSIDERED RELEVANT PRECEDENT TRANSACTIONS IN THE TELEVISION BROADCASTING INDUSTRY;

- REVIEWED THE TERMS OF THE COMPETITIVE BID RECEIVED FOR KBWB AND WXON;

- CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESS; AND

- CONDUCTED SUCH OTHER STUDIES, ANALYSIS, INQUIRIES, AND INVESTIGATIONS AS IT DEEMED APPROPRIATE.

ALTHOUGH HOULIHAN LOKEY CONDUCTED A REVIEW AND ANALYSIS OF GRANITE'S BUSINESS, OPERATING ASSETS AND LIABILITIES AND REORGANIZED GRANITE'S BUSINESS PLAN, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY GRANITE, AS WELL AS PUBLICLY AVAILABLE INFORMATION.  IN ADDITION, HOULIHAN LOKEY DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF GRANITE WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

IN THE CASE OF REORGANIZED GRANITE, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY HOULIHAN LOKEY REPRESENT THE HYPOTHETICAL REORGANIZATION VALUE OF REORGANIZED GRANITE.  SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER.  SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION ENTERPRISE VALUE OF REORGANIZED GRANITE THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS.  AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF REORGANIZED GRANITE SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN.  SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND ACTUAL OUTCOMES AND RESULTS MAY DIFFER MATERIALLY FROM THOSE SET FORTH HEREIN.  IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.  ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT

RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH
GENERALLY INFLUENCE THE PRICES OF SECURITIES.

> 1.      *Valuation Methodology*

Houlihan Lokey performed a variety of analyses and considered a variety of
factors in preparing the valuation of Granite (including Malara, as described).  Several generally
accepted valuation techniques for estimating Granite's enterprise value were used.  Houlihan
Lokey primarily relied on three methodologies: comparable public company analysis, discounted
cash flow analysis, and precedent transactions analysis.  Houlihan Lokey placed equal weighting
on each of these analyses and made judgments as to the significance of each analysis in
determining Granite's indicated enterprise value range.  Houlihan Lokey's valuation must be
considered as a whole, and selecting just one methodology or portions of the analyses, without
considering the analyses as a whole, could create a misleading or incomplete conclusion as to
Granite's enterprise value.

In addition to the three methodologies above, as previously mentioned, Houlihan
Lokey included the market-based valuation for the Debtors KBWB and WXON as that market-
based valuation was the result of a competitive bidding process.  In order to incorporate the bid-
based value of KBWB and WXON, Houlihan Lokey excluded those stations' financial
projections from the consolidated Granite Projections, but added $150 million to the results
derived from each of the three methodologies above in an effort to appropriately reflect the
market value of those stations.

In preparing its valuation estimate, Houlihan Lokey performed a variety of
analyses and considered a variety of factors, some of which are described herein.  The following
summary does not purport to be a complete description of the analyses and factors undertaken to
support Houlihan Lokey's conclusions.  The preparation of a valuation is a complex process
involving various determinations as to the most appropriate analyses and factors to consider, as
well as the application of those analyses and factors under the particular circumstances.  As a
result, the process involved in preparing a valuation is not readily summarized.

As described in *Section V.E* of the Disclosure Statement, in an effort to maximize
value to all constituencies, in conjunction with its retention in March 2006, Houlihan Lokey
approached a number of parties with existing strategic or financial interest in the television
broadcast industry to determine if any party would be interested in acquiring Granite at a value
that exceeded (i) the valuation derived by Houlihan Lokey; and/or (ii) the total Secured Claims.
Despite active marketing efforts throughout the period leading up to the Petition Date, Houlihan
Lokey was unable to discover a party that was interested in acquiring Granite at a value that
would achieve either of these targets.  In fact, most parties proposed a valuation that was
significantly below the midpoint valuation determined by Houlihan Lokey as well as the total
Secured Claims.

> (a)      ***Comparable Public Company Analysis***.  A comparable public company
analysis estimates value based on a comparison of the target company's financial statistics with
the financial statistics of public companies that are similar to the target company.  It establishes a
benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a

common variable such as revenues, earnings, and cash flows. The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet, and cash flow statement. In addition, each company's performance, profitability, margins, leverage and business trends are also examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses (in this case, television broadcasting), business risks, target market segments, location of markets, network affiliation, growth prospects, market presence, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value.

In performing the Comparable Public Company Analysis, the following publicly traded companies in the television broadcasting sector were deemed generally comparable to Granite in some or all of the factors described above and were selected: Nexstar Broadcasting Group, Inc., Gray Television, Inc., Hearst-Argyle Television, Inc., Entravision Communications Corporation, Lin TV Corporation, Ion Media Networks, Inc., Sinclair Broadcast Group, Inc., and Young Broadcasting, Inc. Houlihan Lokey excluded several television broadcasters that were deemed not comparable because of (i) size; (ii) broadcasting or media businesses that, in addition to television, provided radio broadcasting and/or print media; and/or (iii) status of comparable companies. Houlihan Lokey analyzed the current trading value for the comparable companies as a multiple of actual fiscal year 2005 and projected fiscal years 2006 and 2007 broadcast cash flow ("**BCF**") and earnings before interest, taxes, depreciation, and amortization ("**EBITDA**"). As television broadcasters may experience significant variance in earnings from one year to the next due to (i) whether or not the local market was in an election cycle, thus increasing political advertising revenue; or (ii) the broadcaster was affiliated with a network that broadcasts special events (for example NBC during the Olympics), Houlihan Lokey applied multiples to average BCF and EBITDA in an effort to "normalize" these earnings variances. Based on research, this methodology was consistent with common valuation practices in the television broadcast industry. As such, the derived multiples were applied to Granite's average BCF and EBITDA for the twelve months ending December 31, 2006 and December 31, 2007 to determine the range of enterprise value.

(b)     ***Precedent Transactions Analysis.*** Precedent transactions analysis estimates value by examining publicly announced merger and acquisition transactions. An analysis of the disclosed purchase price as a multiple of various operating statistics reveals industry acquisition multiples for companies in similar lines of businesses to Granite. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to Granite. As nearly all of the recent precedent transactions were for individual stations or groups of stations versus a consolidated group with associated corporate overhead, Houlihan Lokey specifically focused on prices paid as a multiple of BCF, as this is typically reflective of the cash flow derived at the station-level, in determining a range of values for Granite. These multiples are then applied to Granite's projected BCF for the fiscal years ending December 31, 2006 and December 31, 2007 to determine the total

enterprise value or value to a potential buyer.  In order to compensate for the difference in acquiring individual stations versus a consolidated operating business such as Granite (including the associated corporate overhead), Houlihan Lokey adjusted the resulting implied valuation for the estimated costs of winding down the corporate entity.

Unlike the comparable public company analysis, the valuation in this methodology includes a "control" premium, representing the purchase of a majority or controlling position in a company's assets.  Thus, this methodology generally produces higher valuations than the comparable public company analysis.  Other aspects of value that manifest itself in a precedent transaction analysis include the following:

- Circumstances surrounding a sale transaction may introduce "diffusive quantitative results" into the analysis (e.g., an additional premium may be extracted from a buyer in the case of a competitive bidding contest).

- The market environment is not identical for transactions occurring at different periods of time.

- Circumstances pertaining to the financial position of a company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable company analysis, because no acquisition used in any analysis is identical to a target transaction, valuation conclusions cannot be based solely on quantitative results.  The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each.  Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition.  The number of completed transactions for which public data is available also limits this analysis.

(c)    *Discounted Cash Flow Approach.*  The discounted cash flow ("*DCF*") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business.  The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to consolidated Granite.  The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the Projections).  Houlihan Lokey's discounted cash flow valuation is based on the business plan Projections of Granite's operating results.  Houlihan Lokey discounted the projected cash flows using Granite's estimated weighted average cost of capital and calculated the terminal value of Granite using the EBITDA multiple methodology in order to incorporate corporate overhead costs associated with operating a consolidated group of

television broadcast stations.  Consistent with the methodology applied in the comparable public company analysis, Houlihan Lokey derived a terminal value that was based on projected average 2009 and 2010 EBITDA.

This approach relies on the company's ability to project future cash flows with some degree of accuracy.  Because Granite's Projections reflect significant assumptions made by Granite's management concerning anticipated results, the assumptions and judgments used in the Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized.  Houlihan Lokey cannot and does not make any representations or warranties as to the accuracy or completeness of Granite's Projections.

THE ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DETERMINED BY HOULIHAN LOKEY REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.  THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF REORGANIZED GRANITE ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE.  ANY SUCH VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE RANGE FOR REORGANIZED GRANITE ASSOCIATED WITH HOULIHAN LOKEY'S VALUATION ANALYSIS.

## IX.

## CERTAIN FACTORS TO BE CONSIDERED

### A.    Certain Reorganization Considerations.

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of or amendments to the Plan will not be required for confirmation or that any amendments would not necessitate the resolicitation of votes.  In addition, although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

The Plan provides for certain conditions that must be satisfied or waived prior to confirmation of the Plan (including that the total amount of Cash required to pay Allowed Claims in Classes 4A, 5, 6, 7, 8, and 9 shall not exceed $11.0 million) and the occurrence of the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be met (or waived) or that the other conditions to consummation, if any, will be satisfied.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.  If a liquidation or protracted reorganization were to occur, there is a substantial risk that that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.

Although the Debtors believe that the Plan satisfies the legal requirements for confirmation and their valuation analysis is accurate, if the Bankruptcy Court were to rule otherwise, the Plan would not be confirmed and any offending provisions in the Plan would need to be amended or modified, including with respect to the allocation of value to the holders of Claims in Classes 4A, 5, 6, 7, 8, and 9 and the holders of Interests in Classes 10, 11, and 12.

**As described throughout this Disclosure Statement, according to the Houlihan Lokey valuation, the value of the collateral securing the Secured Claims is less than the amount of such Claims, and, therefore, holders of (i) Claims in Classes 4A, 5, 6, 7, 8, and 9 and (ii) Interests in Classes 10, 11, and 12 are not entitled to receive a distribution under the Plan and/or the Bankruptcy Code's distribution priority scheme. THERE CAN BE NO ASSURANCES THAT THE BANKRUPTCY COURT WILL ADOPT THE DEBTORS' POSITION ON THIS POINT AND THEREFORE HOLDERS OF INTERESTS IN CLASSES 10, 11 AND 12 SHOULD NOT ASSUME THAT THEY WILL NECESSARILY RECEIVE THE PROJECTED DISTRIBUTIONS TO SUCH CLASSES UNLESS AND UNTIL THE BANKRUPTCY COURT ENTERS THE CONFIRMATION ORDER. MOREOVER, BECAUSE THE DISTRIBUTIONS TO SUCH CLASSES ARE NOT MANDATORY UNDER THE BANKRUPTCY CODE, UNDER CERTAIN CIRCUMSTANCES, THE DEBTORS COULD MODIFY THE PLAN TO INCREASE, REDUCE, OR ELIMINATE THE DISTRIBUTIONS TO HOLDERS OF INTERESTS IN CLASSES 10, 11, AND 12 WITHOUT PROVIDING ANY NOTICE REGARDING SUCH MODIFICATIONS TO THESE PARTIES. THEREFORE, HOLDERS OF INTERESTS IN CLASSES 10, 11, AND 12 ARE ADVISED TO MONITOR CLOSELY THE PROCESS LEADING TO CONFIRMATION OF THE PLAN.**

B.      **Risks Relating to the Plan Securities.**

      1.      *Variances from Projected Financial Information.*

The Projections included in this Disclosure Statement are dependent upon the successful implementation of the Debtors' business plan and the validity of the other assumptions contained therein. These Projections reflect numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, industry performance, certain assumptions with respect to competitors of the Reorganized Debtors, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Debtors. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Reorganized Debtors. Although the Debtors believe that the projections are reasonably attainable, variations between the actual financial results and those projected may occur and be material.

The Debtors have not completed an outside audit since December 31, 2005. Accordingly the Debtors' historical financial results for 2006 were prepared without the assistance of an outside auditor. As a result, the Debtors cannot provide creditors with financial statements prepared or reviewed by outside auditors with which the financial projections in this Disclosure Statement can be compared.

2.      *Lack of Trading Market.*

The Plan Securities issued under the Plan will not be listed on any exchange and Reorganized Granite will not be a public reporting company.  There will not be current financial information regarding the Reorganized Debtors and their business generally available to holders of Plan Securities and there can be no assurance that an active trading market for the Plan Securities will develop.  Accordingly, no assurance can be given that a holder of Plan Securities will be able to sell such securities in the future or as to the price at which any such sale may occur.  If such markets were to exist, such securities could trade at prices higher or lower than the value ascribed to such securities herein depending upon many factors, including the prevailing interest rates, markets for similar securities, general economic and industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors.

3.      *Restrictions on Transfer.*

The Plan Securities will be distributed pursuant to the Plan without registration under the Securities Act and without qualification or registration under state securities laws, pursuant to exemptions from such registration and qualification contained in section 1145 of the Bankruptcy Code and section 4(2) of the Securities Act.  With respect to certain persons who receive such securities pursuant to the Plan, the Bankruptcy Code exemptions apply only to the distribution of such securities under the Plan and not to any subsequent sale, exchange, transfer or other disposition of such securities or any interest therein by such persons.  Therefore, subsequent sales, exchanges, transfers, or other dispositions of such securities or any interest therein by "underwriters" or "issuers" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or state securities laws.

Holders of Plan Securities who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, including holders who are deemed to be "affiliates" or "control persons" within the meaning of the Securities Act, will be unable to transfer or to sell their securities freely except pursuant to (i) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (ii) an effective registration of such securities under the Securities Act and under equivalent state securities or "blue sky" laws or (iii) pursuant to the provisions of Rule 144 under the Securities Act or another available exemption from registration requirements.  For a more detailed description of these matters, see *Section VII.D.*

As a result, the Plan provides that Reorganized Granite will enter into a registration rights agreement with Silver Point with respect to the New Common Stock to be issued to Silver Point in the Plan.

The organizational documents of Reorganized Granite will set forth other transfer restrictions applicable to the New Common Stock and New Warrants.

## C.    **Competition in the Broadcasting Industry.**

The Debtors experience competition from numerous types of broadcasting service providers.  Accordingly, there can be no assurance that the Debtors will be able to compete successfully against other providers of such services, or that the Debtors will be able to achieve profitability from such services in future years.

In addition, the broadcasting industry in general is subject to rapid and significant changes in technology.  These changes may increase competitive pressures on the Reorganized Debtors or require capital investments by the Reorganized Debtors in excess of its available resources.  Because of the rapid and high level of technological change in the industry, the effect on the businesses of the Reorganized Debtors cannot be predicted with any certainty.

**D.**     **Government Regulation.**

The broadcasting industry is extensively regulated by the FCC.  There can be no assurance the FCC will renew, or permit the transfer or assignment of, the Debtors' broadcast licenses.  Moreover, because of the transfers or assignments of broadcast licenses under the Plan, the FCC must approve any such transfer or assignment.  A loss of the Debtors' broadcast licenses, or the failure of the FCC to approve the transfer or assignment of licenses pursuant to the Plan would have a material adverse effect on the Debtors.

**E.**     **Reliance on Key Personnel.**

One of the Debtors' primary assets is their highly skilled professionals, who have the ability to pursue other employment opportunities and deprive the Debtors of the skill and knowledge essential for performance of new and existing contracts.  A loss of a significant number of key professionals could have a material adverse effect on the Debtors.

The Debtors' successful transition through the restructuring process is dependent in part on their ability to retain and motivate their officers and key employees.  There can be no assurance that the Debtors will be able to retain and employ qualified management and technical personnel.

**F.**     **Liquidity and Capital Resources.**

Prior to the Petition Date, the Debtors incurred significant operating losses. Given the current volatility in the broadcasting industry, there can be no assurance that the Reorganized Debtors will be able to generate operating profits on a sustained basis.  Further, due to the bankruptcy filing and related events, there is no assurance that the carrying amounts of certain assets will be realized or that liabilities will be liquidated or settled for the amounts recorded.

The Debtors believe that their cash, short-term investments, and remaining capacity under the Exit Secured Revolver upon emergence from chapter 11 should enable the Reorganized Debtors to fund operations.  There can be no assurance, however, that such resources will be sufficient for anticipated or unanticipated working capital and capital expenditure requirements, or that the Reorganized Debtors will achieve or sustain profitability or positive cash flow in the future.

**G.** **Additional Factors to Be Considered.**

*1.* *The Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

*2.* *No Representations Outside This Disclosure Statement Are Authorized.*

No representations concerning or related to the Debtors, the Reorganization Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

*3.* *Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary.*

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various classes that might be Allowed.

*4.* *Claims Could Be More Than Projected.*

The Allowed amount of Claims in each class could be significantly more than projected, which in turn, could cause the value of distributions and/or recoveries to be reduced substantially. If DIP Claims, Administrative Expenses, Priority Tax Claims, Secured Claims, Priority Non-Tax Claims, and General Unsecured Claims exceed projections, it may impair the value of the Plan Securities and/or recoveries being distributed to the holders of Allowed Claims and Interests in Classes 1A-F (Secured Claims), Class 10 (Preferred Interests), Class 11 (Class A Interests) and Class 12 (Class B Interests).

*5.* *No Legal or Tax Advise Is Provided to You By This Disclosure Statement.*

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each creditor or Interest holder should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest. This Disclosure Statement is not legal advice to you and may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

6.      *No Admission Made.*

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

## X.

## VOTING PROCEDURES AND REQUIREMENTS

Detailed voting instructions are provided with the Ballot accompanying this Disclosure Statement.  The following classes (the "***Voting Classes***") are entitled to vote to accept or reject the Plan.

| Classes | Description |
|---------|-------------|
| 1A-1F | Secured Claims |
| 4A | Granite General Unsecured Claims |
| 5 | KBWB General Unsecured Claims |
| 6 | KBWB License General Unsecured Claims |
| 7 | WEEK-TV License General Unsecured Claims |
| 8 | WXON General Unsecured Claims |
| 9 | WXON License General Unsecured Claims |

If your Claim or Interest is not in the Voting Classes, you are not entitled to vote and you will not receive a Ballot with this Disclosure Statement.  If your Claim is in the Voting Class, you should read your Ballot and follow the listed instructions carefully.  Please use only the Ballot that accompanies this Disclosure Statement.

## A.      <u>Vote Required for Acceptance by a Class.</u>

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims occurs if creditors in that class who actually cast ballots for acceptance of such Plan hold at least two-thirds in dollar amount and more than one-half in number of the claims in such class.  Thus, acceptance of the Plan by Class 1A-1F will occur only if at least two-thirds in dollar amount and a majority in number of the holders of such Claims in each Voting Classes that actually cast their Ballots vote in favor of acceptance.

Any properly executed, timely received Ballot that does not indicate either an acceptance or rejection of the Plan will not be counted.  Any properly executed, timely received Ballot that indicates both acceptance and rejection of the Plan will not be counted.  Ballots should not be delivered directly to the debtors, the court, or counsel to the debtors.

## B.      <u>Classes Not Entitled to Vote.</u>

Under the Bankruptcy Code, creditors are not entitled to vote if their contractual rights are unimpaired by the Plan or if they will receive no distributions under the Plan.  Based on this standard, for example, the holders of Secured Tax Claims (Class 2) and Priority Non-Tax Claims (Class 3), are not being affected by the Plan.  In addition, the holders of Malara Guaranty

Claims (Class 4B), Preferred Interests (Class 10), Class A Interests (Class 11), Class B Interests (Class 12), Securities Claims (Class 13), and Subordinated Claims (Class 14) are not receiving any property and are not entitled to vote.  For a summary of the Classes entitled to vote, see the chart in *Section II*.

**C.**     **<u>Voting.</u>**

   In order for your vote to be counted, your vote must be actually received by the voting agent before the Voting Deadline of 4:00 p.m., Eastern Time, on April 6, 2007.  If you are entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting on the Plan, please contact the Voting Agent.  All Ballots, except those beneficial owner Ballots that are to be returned to the nominee, should be returned in the envelope provided to:

| Granite Broadcasting Corporation<br>c/o The Trumbull Group, LLC<br>d/b/a Wells Fargo Trumbull | |
| --- | --- |
| If by regular mail:<br><br>Attention: Granite Broadcasting Corporation Balloting Center, P.O. Box 721, Windsor, CT 06095 | If by overnight or hand delivery:<br><br>Attention: Granite Broadcasting Corporation Balloting Center, 4 Griffin Road North, Windsor, CT 06095 |
| Tel.:  (860) 687-3951 | |

   If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims; *provided, however*, that holders of Secured Claims in Classes 1A-1F will only receive one Ballot to vote its Secured Claims against each of the Debtors.  Please vote and return your Ballot(s) to the respective location specified in the instructions accompanying each Ballot.

   If the instructions on your Ballot require you to return the Ballot to your bank, broker, or other nominee, or to their agent, you must deliver your Ballot to them in sufficient time for them to process it and return it to the voting agent before the Voting Deadline.

DO NOT RETURN ANY NOTES OR SECURITIES WITH YOUR BALLOT.

TO BE COUNTED, YOUR BALLOT (OR, IN THE CASE OF PUBLICLY HELD BONDS, THE MASTER BALLOT CAST ON YOUR BEHALF BY YOUR NOMINEE) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE FORWARDED IN ACCORDANCE WITH THE ACCOMPANYING INSTRUCTIONS IN SUFFICIENT TIME

FOR IT TO BE RECEIVED BY THE DEBTORS' VOTING AGENT NO LATER THAN **4:00 P.M., EASTERN TIME, ON APRIL 6, 2007.**

Any Claim in an impaired Class as to which an objection or request for estimation is pending or which is scheduled by the Debtors as unliquidated, disputed, or contingent and for which no proof of Claim has been filed is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.

As stated above, the Debtors do not believe there are any Claims in Classes 6, 7, and 9. If, in fact, no such creditors exist, and, therefore, no ballots to accept or reject the Plan are cast, pursuant to the Disclosure Statement Order, Classes 6, 7, and 9, as applicable, will be deemed to have accepted the Plan.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set March 2, 2007 as the record date for voting on the Plan. Accordingly, only holders of record as of such date that otherwise are entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

## XI.

## CONFIRMATION OF THE PLAN OF REORGANIZATION

### A.    Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization. As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the confirmation hearing for April 16, 2007 at 10:00 a.m. (Eastern Time). The confirmation hearing may be adjourned from time-to-time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of claims or interests held or asserted by the objector against the Debtors' estate or property, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (i) Akin Gump Strauss Hauer & Feld LLP, Attorneys for the Debtors, 590 Madison Avenue, New York, New York 10022, (Attention: Ira Dizengoff, Esq. and Philip Abelson, Esq.), (ii) Milbank, Tweed Hadley & M$^c$Cloy LLP, Attorneys for Silver Point, One Chase Manhattan Plaza, New York, New York 10005 (Attention: Luc Despins, Esq. and Brian Kinney, Esq.), and (iii) the U.S. Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Lisa L. Lambert, Esq.) so as to be received no later than April 6, 2007.

Pursuant to section 1128(b) of the Bankruptcy Code, a party in interest may object to confirmation of the Plan. Objections to confirmation of the Plan of Reorganization are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### B.    Requirements for Confirmation of the Plan of Reorganization.

*1.    Requirements of Section 1129(a) of the Bankruptcy Code.*

(a)    ***General Requirements***. At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(1)    The Plan complies with the applicable provisions of the Bankruptcy Code.

(2)    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(3)    The Plan has been proposed in good faith and not by any means proscribed by law.

(4)     Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Reorganization Cases, or in connection with the Plan and incident to the Reorganization Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(5)     The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan of Reorganization, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

(6)     With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

(7)     Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

(8)     Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims other than priority tax claims will be paid in full on the Effective Date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date, equal to the allowed amount of such claims.

(9)     At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

(10)     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  See discussion of "Feasibility" below.

(11)     The Debtors have no "retiree benefits" (as defined in section 1114 of the Bankruptcy Code) and, thus, the requirement that the Plan provides for the continuation after the Effective Date of payment of all, at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits, does not apply.

(b)    ***Best Interests Test***.  As described above, the Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the chapter 7 case.  The next step, is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.  Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code.  Finally, the present value of such allocations (taking into account the time necessary to accomplish the liquidation) are compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the chapter 11 case and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed.  Moreover, additional claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors both prior to, and during the pendency of, the chapter 11 cases.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims.  Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest.  The Debtors believe the Plan satisfies the rule of absolute priority.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) substantial increases in claims which would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

Moreover, the Debtors believe that the value of any distributions from the liquidation proceeds to each class of allowed claims and equity interests in a chapter 7 case would be the same or less than the value of distributions under the Plan because such distributions in a chapter 7 case may not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the claims and prepare for distributions. In the event litigation were necessary to resolve claims asserted in the chapter 7 case, the delay could be further prolonged and administrative expenses further increased.

The Debtors' liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the assets of the Debtors. The analysis is based upon a number of significant assumptions which are described. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.

(c)     *Liquidation Analysis*. The Debtors' chapter 7 liquidation analysis and assumptions are set forth in <u>Exhibit 5</u> to this Disclosure Statement.

(d)     *Feasibility*. The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder. As part of this analysis, the Debtors have prepared the Projections contained in *Section VIII* above, entitled "PROJECTIONS AND VALUATION ANALYSIS," and in <u>Exhibit 3</u> to this Disclosure Statement. These Projections are based upon the assumption that the Plan will be confirmed by the Bankruptcy Court, and for projection purposes, that the Effective Date of the Plan and its substantial consummation will take place on or about March 31, 2007. The Projections include balance sheets, statements of operations and statements of cash flows. Based upon the Projections, the Debtors believe they will be able to make all payments required to be made pursuant to the Plan.

2.     *Requirements of Section 1129(b) of the Bankruptcy Code.*

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

(a)     *No Unfair Discrimination*. This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

(b)     *Fair and Equitable Test*. This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

- *Secured Claims*. Each holder of an impaired secured claim either (i) retains its Liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim or (ii) receives the "indubitable equivalent" of its allowed secured claim.

- *Unsecured Claims*. Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization on account of their claims and equity interests.

- *Interests*. Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization on account of their claims and equity interests.

The Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement notwithstanding Malara Guaranty Claims (Class 4B), Preferred Interests (Class 10), Class A Interests (Class 11), Class B Interests (Class 12), Securities Claims (Class 13), and Subordinated Claims (Class 14) are deemed to reject the Plan, there is no class of equal priority receiving more favorable treatment and no class that is junior to such a dissenting class will receive or retain any property on account of the claims or equity interests in such class.

## XII.

## ALTERNATIVES TO CONFIRMATION AND
## CONSUMMATION OF THE PLAN OF REORGANIZATION

### A.    Liquidation Under Chapter 7.

If no chapter 11 plan can be confirmed, the Reorganization Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a chapter 7 trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effect that a chapter 7 liquidation would have on the recoveries of holders of Claims is set forth in *Section XI* of this Disclosure Statement. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (i) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion, (ii) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (iii) additional

expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

## B.    Alternative Plan of Reorganization.

If the Plan is not confirmed, the Debtors or, if the Debtors' exclusivity period will have expired, any other party in interest could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets under chapter 11. The Debtors have concluded that the Plan enables creditors and equity holders to realize the most value under the circumstances. In a liquidation under chapter 11, the Debtors would still incur the expenses associated with closing or transferring numerous facilities to new operators. The process would be carried out in a more orderly fashion over a greater period of time. Further, if a trustee were not appointed, because such appointment in not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case which would contribute an extra layer of chapter 7 administrative claims as well as the chapter 7 trustee's statutory fees. Although preferable to a chapter 7 liquidation, the Debtors believe that liquidation under chapter 11 is a much less attractive alternative to creditors and equity holders than the Plan because of the greater return provided by the Plan.

## XIII.

## CERTAIN US FEDERAL INCOME TAX CONSIDERATIONS

*IRS CIRCULAR 230 NOTICE REQUIREMENT:* **TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DOCUMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following is a discussion of the principal United States federal income tax consequences of the Plan for holders of Secured Claims who are US Holders (as defined below). This discussion is based upon the Internal Revenue Code of 1986, as amended (the "***Code***"), Treasury regulations and proposed Treasury regulations issued under the Code, Internal Revenue Service ("***IRS***") rulings and pronouncements and judicial decisions in effect as of the date of this document all of which may change, possibly with retroactive effect. This discussion applies only to US Holders that hold the Secured Claims as "capital assets" within the meaning of Code Section 1221. This discussion does not apply to holders of Claims or Interests other than holders of the Secured Claims and the Exit Secured Term Loan. For example, this discussion does not apply to holders of Secured Tax Claims, Priority Non-Tax Claims, Granite General Unsecured Claims, Malara Guaranty Claims, KBWB General Unsecured Claims, KBWB License General

Unsecured Claims, WEEK License General Unsecured Claims, WXON General Unsecured Claims, WXON License General Unsecured Claims, Preferred Interests, Class A Interests, Class B Interests, Securities Claims, and Subordinated Claims.

This discussion does not address all aspects of United States federal income taxation that may be relevant to US Holders in light of their particular circumstances, such as holders to whom special tax treatment applies, including (1) banks, regulated investment companies, real estate investment trusts, insurance companies, employee stock ownership plans, brokers, dealers in securities or currencies, subchapter S corporations, entities treated as partnerships for US federal income tax purposes, and tax exempt organizations, (2) persons who hold claims or interests or who will hold the New Common Stock, or the Exit Secured Term Loan as part of a straddle, hedge, conversion transaction or other integrated investment, (3) persons whose functional currency is not the US dollar and (4) persons that use a mark to market method of accounting.  In addition, this discussion does not address alternative minimum taxes or state, local or non-US taxes.  Furthermore, estate and gift tax issues are not addressed herein.

No opinion of counsel has been sought or obtained with respect to any US tax consequences of the Plan and no tax opinion is given by this Disclosure Statement.  No rulings or determination letters from the IRS or any other taxing authorities have been obtained or sought with respect to the Plan, and the description below is not binding upon the IRS or such other taxing authorities.  With respect to some of the tax consequences discussed herein, the tax law is unclear.  Accordingly, it is possible that the IRS will disagree with the description below of the tax consequences, and there can be no certainty that the IRS would not prevail in any challenge it may decide to make in that regard.

FOR THE FOREGOING REASONS, ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE, AND LOCAL) OF THE PLAN TO THEM.  GRANITE IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY SPECIFIC HOLDER OF A CLAIM AGAINST OR INTEREST IN GRANITE, NOR IS GRANITE RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

For purposes of this discussion the term "*US Holder*" means a holder of Secured Claims, the Exit Secured Term Loan, or New Common Stock who is a beneficial owner of such instrument or right and that is, for US federal income tax purposes: (i) an individual who is a citizen or resident of the United States, (ii) a corporation (or any other entity treated as a corporation for US federal income tax purposes) created or organized in the United States or under the laws of the United States or of any state of the United States or the District of Columbia, (iii) an estate whose income is subject to US federal income tax regardless of its source, or (iv) a trust if (A) a court within the United States is able to exercise primary supervision over the administration of the trust and at least one US person has authority to control all substantial decisions of the trust or (B) it has a valid election in effect to be treated as a US person.

114

A.    **Tax Treatment of Implementing the Plan**

    *1.*    Certain U.S. Federal Income Tax Consequences to Reorganized Debtors

        (a)    *Cancellation of Indebtedness and Reduction of Tax Attributes.*

        As a result of the anticipated exchange of Secured Claims for New Common Stock and the Exit Secured Term Loan, the amount of the Debtors' aggregate outstanding indebtedness will be reduced. In general, outside of Title 11 bankruptcy proceedings, a debtor will realize and recognize cancellation of indebtedness income ("***COD Income***") upon satisfaction of its outstanding indebtedness for an amount less than its adjusted issue price. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of the issue price of any new indebtedness of the taxpayer issued, the amount of cash paid and the fair market value of any other consideration (including stock of the Debtor) given in satisfaction of such indebtedness at the time of the exchange. Because the amount of COD will depend, in part, on the value of the New Common Stock and such value will not be known prior to the Effective Date, it is not possible to know the amount of COD Income. No COD Income is realized for cancelled debt the payment of which would have given rise to a deduction. For example, the settlement of litigation regarding the payment by the Debtors for programming should not result in the Debtors realizing COD Income since payments for programming should be deductible items.

        To the extent there is any COD Income, the Debtors must (as of the first day of the next taxable year following the Effective Date) reduce their tax attributes by the amount of COD Income which it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("***NOLs***"), (b) tax credits and capital loss carryovers, and (c) tax basis in assets.

        (b)    *Limitation of Net Operating Loss Carryovers and Other Tax Attributes.*

        Code Section 382(l)(6) generally limits (the "***L6 Limit***") a corporation's use of its NOLs (and may limit a corporation's use of certain built-in losses if such built-in losses are recognized within a five-year period following an ownership change) if a corporation undergoes an "ownership change" pursuant to a bankruptcy court approved plan of reorganization. On the Effective Date, Granite will undergo an "ownership change" when it issues New Common Stock pursuant to the Plan.

        The L6 Limit on the use of pre-change losses (the NOLs and built-in losses recognized within the five year post-ownership change period) in any "post-change year" is generally equal to the product of the fair market value of the loss corporation's outstanding stock immediately after the ownership change and the long term tax-exempt rate (which is published monthly by the Treasury Department and is currently 4.14% for ownership changes occurring in February 2007) in effect for the month in which the ownership change occurs. For illustrative purposes only, when using this Disclosure Statement's post-Effective Date midpoint equity valuation of $259 million, the L6 Limit would be approximately $10.72 million annually. Code Section 383 applies a similar limitation to capital loss carryforwards and tax credits. Under Notice 2003-65, Granite should be able to increase its annual L6 Limit based on a hypothetical increase in its depreciation and amortization as a result of Granite's anticipated net unrealized

built-in gain on the Effective Date, estimated by Granite to be approximately $250 million. This should result in an annual increase in the L6 Limit during the five years following the Effective Date of approximately $15 million. Under this illustration, the total annual L6 Limit would be approximately $26 million.

The L6 Limit does not apply if certain requirements under Section 382(l)(5) of the Code (the "**L5 Exception**") are satisfied and the Debtors do not elect out of the L5 Exception. A Debtor qualifies for the L5 Exception if "qualified creditors" and historic shareholders own at least 50 percent of the loss corporation's stock by value and voting power after the ownership change. A person is a "qualified creditor" to the extent such creditor's claim (a) has been held by the creditor (or is treated as held) continuously for the period beginning at least 18 months before the Petition Date or (b) arose in the ordinary course of the loss corporation's trade or business and has been held by the person who has at all times held the beneficial interest in the claim.

Under the L5 Exception, the Debtor would avoid entirely the application of the L6 Limit to the NOLs and recognized built-in losses, if any, but would be required to reduce its NOLs and possibly other tax attributes by any deduction for interest claimed by Granite with respect to any indebtedness converted into New Common Stock for (a) the three-year period preceding the taxable year of the "ownership change" and (b) the portion of the year of the "ownership change" prior to the consummation of the Plan. In addition, under Section 382(l)(5)(D) of the Code, if a second "ownership change" with respect to the Debtor occurs within the two-year period following the consummation of the Plan, the L5 Exception will not apply and any pre-Effective Date Tax Attributes will be eliminated for the year of such "second ownership change" and any subsequent years. At this time, Granite does not believe that it is in the best interest of the Debtors to consummate a Plan that will utilize the L5 Exception, however, it has until the due date for the filing of its tax return for the year including the Effective Date to decide whether or not to elect out of the L5 Exception. Therefore, if the Effective Date is in 2006 or 2007, then the Debtors should have until September 2007 or 2008, respectively, to make such election.

2.    **Tax Treatment of US Holders of Secured Claims**

The tax treatment of US Holders that exchange Secured Claims for New Common Stock and the Exit Secured Term Loan will depend on whether or not such exchange qualifies as a "recapitalization" under the Code. In general, the Code requirements for recapitalization treatment will be met so long as the Secured Claims are treated as "securities" for US federal income tax purposes. In this regard, the term "securities" is not clearly defined under current US federal income tax law.

Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including among others, the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity

interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued. While the matter is not free from doubt, based on an analysis of the terms of the Secured Claims, Granite will take the position that the Secured Claims are securities for US federal income tax purposes. Holders of Secured Claims should consult their own tax advisors regarding whether the Secured Claims are securities for these purposes.

If the Secured Claims are securities, the exchange of the Secured Claims for New Common Stock and the Exit Secured Term Loan (other than any such consideration treated as paid in respect of accrued interest) pursuant to the Plan should qualify as a recapitalization under the Code. If the exchange of Secured Claims for New Common Stock and the Exit Secured Term Loan is treated as a recapitalization, a US Holder of Secured Claims will not recognize gain or loss on the exchange of such Secured Claims for New Common Stock and the Exit Secured Term Loan, except to the extent any portion of the consideration received is treated as (i) a payment of accrued interest on the Secured Claims as discussed more fully below, or (ii) not stock or securities for US federal income tax purposes (i.e., "boot"). It is possible that the Exit Secured Term Loan will be treated as "boot" under the factual analysis relating to when a debt instrument is a "security" for US federal income tax purposes, discussed above in this Section.

If the exchange is a recapitalization, and the Exit Secured Term Loan is treated as a security (as discussed above), a US Holder's tax basis in New Common Stock and the Exit Secured Term Loan will be equal to that holder's tax basis in their Secured Claims surrendered pursuant to the Plan. Such basis will be allocated between the New Common Stock and the Exit Secured Term Loan based on the relative fair market value of such property. If the Exit Secured Term Loan is not treated as a security, a US Holder's tax basis in its portion of the Exit Secured Term Loan will be the fair market value of such holder's portion of the Exit Secured Term Loan. A US Holder's holding period for the New Common Stock and the Exit Secured Term Loan received in the exchange (other than any such notes received in exchange for accrued interest or received as boot) will include that person's holding period for their Secured Claims.

If the Secured Claims are not treated as "securities," a US Holder will recognize taxable gain (or loss) in an amount equal to the excess (or deficit) of (x) the sum of the fair market values of the New Common Stock plus (ii) the issue price of the Exit Secured Term Loan (other than any such consideration treated as paid in respect of accrued interest) less (y) the holder's tax basis in their Secured Claims. See Section B.1 for a discussion of the determination of the issue price of the Exit Secured Term Loan. Subject to the discussion below as to accrued market discount, any such gain or loss will be capital gain or loss, and such capital gain or loss generally will be long-term capital gain or loss if the US Holder held the Secured Claims for more than one year at the Effective Date. To the extent the exchange is taxable to holders of Secured Claims, a US Holder's tax basis in the New Common Stock and the Exit Secured Term Loan received pursuant to the Plan will be equal to the fair market value or issue price of such consideration, as the case may be. The holding period for the New Common Stock and the Exit Secured Term Loan received pursuant to the Plan will begin on the day immediately following the Effective Date.

As discussed more fully below in Section B.2, a US Holder that acquired Secured Claims subsequent to their original issuance with more than a de minimis amount of market

discount will be subject to the market discount rules under the Code.  Under those rules, assuming that a US Holder has made no election to include market discount in income on a current basis, any gain recognized on the Effective Date from the exchange will be characterized as ordinary income to the extent of the accrued market discount as of the Effective Date.  If the exchange of Secured Claims for New Common Stock and the Exit Secured Term Loan is treated as a recapitalization, any accrued market discount remaining thereon which has not been recognized as ordinary income should be carried over to the New Common Stock and the Exit Secured Term Loan.  See Section B.2 for a discussion regarding the treatment of market discount.

> *3.*        **Tax Treatment of Amounts Received for Accrued Interest**

Notwithstanding the above, a US Holder of Secured Claims will be treated as receiving an interest payment to the extent that a portion of the New Common Stock and the Exit Secured Term Loan is treated as paid with respect to accrued interest on the Secured Claims.  Any such amounts will be treated as ordinary taxable income for a holder that had not previously included such accrued interest in income.  Where the US Holder has previously included such accrued interest in income, the US Holder should recognize an ordinary loss to the extent of the excess of the amount of accrued interest previously included in income over the amount of New Common Stock and the Exit Secured Term Loan treated as received in exchange for accrued interest.  A US Holder's tax basis in any Exit Secured Term Loan and New Common Stock, treated as received in exchange for accrued interest, generally will be equal to the issue price of the notes or fair market value of the stock as of the Effective Date, and the holding period of such loan or interests generally will begin on the day immediately following the Effective Date.  The Plan provides that, for US federal income tax purposes, any amounts received by a holder of Secured Claims will be allocated first to the principal portion of such Secured Claims and thereafter to any accrued interest on such claims.  However, there is no assurance that such allocation would be respected by the IRS for US federal income tax purposes.  Each US Holder of claims is urged to consult its tax advisor regarding the allocation of consideration.

## B.        **Tax Consequences of Owning the Exit Secured Term Loan**

Original Issue Discount.   If the "issue price" of a debt instrument is less than the instrument's "stated redemption price at maturity" by more than a de minimis amount (1/4 of 1 percent of the debt instrument's stated redemption price at maturity multiplied by the number of complete years or, in certain cases, weighted average life, to their stated maturity), the debt instrument will be treated as having original issue discount ("***OID***").

Issue Price.  The issue price of debt instruments in an issue depends on whether a substantial amount of the debt instruments are treated as "traded on an established market" within the meaning of the applicable Treasury Regulations.  Debt instruments are treated as "traded on an established market" if, among other things, the debt is listed on a national securities exchange registered under section 6 of the Securities Exchange Act of 1934 or if price quotations are readily available from dealers, brokers or traders.

Stated Redemption Price at Maturity.  The stated redemption price at maturity of a debt instrument is the sum of all payments due under the instrument other than payments of

qualified stated interest.  "Qualified stated interest" includes stated interest, calculated as the product of a single fixed rate of interest (or certain qualified floating rates) and the outstanding principal amount of the instrument that is unconditionally payable in cash at least annually.

In general, a US Holder is required to include OID in gross income under a constant yield method over the term of the instrument (and such income will be treated as ordinary income) in advance of cash payments attributable to such income, regardless of whether such US Holder is a cash or accrual method taxpayer, and without regard to the timing or amount of any actual payments.

### *1.*    **The Exit Secured Term Loan**

Original Issue Discount.  As noted under the discussion of "Issue Price" above, if the Exit Secured Term Loan is treated as "traded on established market," the issue price of the Exit Secured Term Loan would be its fair market value on the Effective Date of the Plan.  If the Exit Secured Term Loan is not so traded but the Secured Claims are, the issue price of the Exit Secured Term Loan would be equal to the fair market value of the Secured Claims on the Effective Date.  It is expected that either the Exit Secured Term Loan or the Secured Claims will be treated as traded on an established market, with the consequence that the issue price of the Exit Secured Term Loan will be determined by reference to the fair market value of the Exit Secured Term Loan or, if those notes are not treated as traded on an established market, by reference to the fair market value of the Secured Claims.

All interest on the Exit Secured Term Loan is payable in cash at least quarterly at one or more floating rates that are based on a fixed spread over (a) LIBOR or (b) the higher of (i) the prime lending rate as publicly announced from time to time by JPMorgan Chase Bank, N.A. (the "***Prime Rate***"), and (ii) the federal funds effective rate from time to time plus 0.5%. As a result, it is possible that the Exit Secured Term Loan could be treated as either a "variable rate debt instrument" or a "contingent payment debt instrument" ("***CPDI***") for US federal income tax purposes.  Application of these rules is complicated.  If the Debtors determine the Exit Secured Term Loan is a CPDI, then it will make information available to allow US Holders to report in accordance with the Treasury regulations governing CPDIs.

### *2.*    **Acquisition Premium, Market Discount and Bond Premium With Respect to the Exit Secured Term Loan.**

If a US Holder has a tax basis in the Exit Secured Term Loan that is more than the issue price of such loan but less than or equal to the stated redemption price at maturity of such loan, such holder has acquisition premium with respect to such notes to the extent of any excess of tax basis over issue price, and the holder will not include OID on the Exit Secured Term Loan, if any, in income for a given accrual period to the extent of the acquisition premium allocable to that accrual period.

A US Holder that has a tax basis in the Exit Secured Term Loan that is less than the stated redemption price at maturity of such note (or the revised issue price of the note, if the note has OID) will be subject to the market discount rules (unless the amount of the excess of the issue price over the basis is less than a specified de minimis amount, in which case market

discount is considered to be zero).  A US Holder may elect (but is not required) to take market discount into income over the remaining life of a note, either on a ratable or economic yield basis.  This election to include market discount in income currently once made applies to all market discount obligations acquired in or after the first taxable year to which the election applies and may not be revoked without the consent of the IRS.  Absent such an election, a US Holder will be required to treat any principal payment on, or any gain recognized on the sale, exchange, redemption, retirement or other disposition of the Exit Secured Term Loan as ordinary income to the extent of any accrued market discount that has not previously been included in income at the time of such payment or disposition.  In addition, a US Holder may be required to defer, until the maturity date of the note or its earlier disposition, the deduction of all or a portion of the interest expense on any indebtedness incurred or continued to purchase or carry such note.  As discussed in Section A, above, assuming that the exchange of Secured Claims for the Exit Secured Term Loan is treated as a recapitalization, a US Holder who acquired its Secured Claims at a market discount may be required to carry over to the Exit Secured Term Loan and New Common Stock that they receive any accrued market discount with respect to the Secured Claims to the extent that the accrued market discount was not previously included in income.  If the issue price of the Secured Claims is less than the stated principal amount of the Exit Secured Term Loan, a US Holder receiving the Exit Secured Term Loan may have all or part of any market discount effectively converted into OID.

If a US Holder has a tax basis in a Secured Claim that exceeds the note's stated redemption price at maturity, the note has bond premium to the extent of that excess, and the holder will not be required to include OID, if any, on a Secured Claim into income.  A US Holder generally may elect to amortize the bond premium using the constant yield to maturity method as a reduction of the US Holder's interest income from the note.  The election to amortize bond premium on a constant yield to maturity method once made applies to all debt obligations held or subsequently acquired by the electing US Holder on or after the first day of the first taxable year to which the election applies and may not be revoked without the consent of the IRS.  Bond premium on a note held by a US Holder that does not make such election will decrease the gain or increase the loss otherwise recognized on disposition or retirement of the Exit Secured Term Loan.

## C.      Limitation on Use of Capital Losses

Holders of Claims who recognize capital losses as a result of the exchange under the Plan will be subject to limits on their use of capital losses. For noncorporate Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  US Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.  Corporate Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

**D.**        **Information Reporting and Backup Withholding**

         In general, US tax information reporting requirements may apply to transfers and payments made pursuant to the Plan, payments with respect to the New Common Stock and the Exit Secured Term Loan and the proceeds of sale of such common stock or debt by US Holders other than certain exempt persons (such as corporations).  Backup withholding of US federal income tax may apply at applicable rates (currently 28%) to payments made pursuant to the Plan, payments with respect to the New Common Stock and the Exit Secured Term Loan and the proceeds of sale of the New Common Stock or the Exit Secured Term Loan, if the US Holder fails to provide a correct taxpayer identification number or certification of exempt status or, with respect to certain payments, if the US Holder fails to report in full all interest and dividend income and the IRS notifies the payor of the US Holder's under reporting.  Any amounts withheld under the backup withholding rules from a payment to a US Holder will generally be allowed as a refund or credit against the US Holder's federal income tax liability if the US Holder follows the required procedures.

******

## XIV.

## CONCLUSION

The Debtors believe the Plan is in the best interests of all creditors and equity holders and urge the holders of impaired Claims in Classes 1A-1F, 4A, 5, 6, 7, 8, and 9 to vote to accept the Plan and to evidence such acceptance by returning their Ballots.

Dated:  March 2, 2007

Respectfully submitted,

By:     /s/ Lawrence I. Wills
        Name: Lawrence I. Wills
        Title:   Chief Financial Officer