UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

                                   Case No. 06-12984 (ALG)

In re:                                       Chapter 11

GRANITE BROADCASTING CORP., et al.
----------------------------------------------------------------X

## MEMORANDUM OF OPINION

A P P E A R A N C E S :

AKIN GUMP STRAUSS HAUER & FELD LLP
Attorneys for the Debtors and Debtors in Possession
       By: Ira S. Dizengoff, Esq.
          Stephen M. Baldini, Esq.
          Phillip M. Abelson, Esq.
590 Madison Avenue
New York, New York 10022

MILBANK, TWEED, HADLEY & McCLOY LLP
Attorneys for Silver Point Capital Finance, LLC
       By:  Luc Despins, Esq.
          Andrew M. Leblanc. Esq.
          Brian Kinney, Esq
1 Chase Manhattan Plaza
New York, New York 10005

ROPES & GRAY LLP
Attorneys for Harbinger Capital Partners Master Fund I, Ltd., et al.
        By: Mark I. Bane, Esq.
          Robert S. Fischler, Esq.
          Anne H. Pak, Esq.
1211 Avenue of the Americas
New York, New York 10036

KELLEY DRYE & WARREN LLP
Attorneys for Stuart Beck, et al.
       By: Eric R. Wilson, Esq.
101 Park Avenue
New York, New York 10178

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Attorneys for Blackport Capital Fund Ltd., et al
      By:  J. Gregory St. Clair, Esq.
Four Times Square
New York, New York 10036

GIBSON, DUNN & CRUTCHER, LLP
Attorneys for Twentieth Television and Twentieth Century Fox Film Corporation
      By:  Jonathan M. Landers, Esq.
         Jessica I. Basil, Esq.
200 Park Avenue
New York, New York 10166

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

<u>Introduction</u>

Granite Broadcasting Corporation and five of its wholly-owned subsidiaries (collectively, the "Debtors") filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on December 11, 2006 (the "Petition Date").[1]  The Debtors have moved for confirmation of their Modified First Amended Joint Plan of Reorganization, dated April 13, 2007 (the "Plan").  Silver Point Capital Finance, LLC ("Silver Point"), which holds approximately 80% of the Debtors' 9.75% Senior Secured Notes due 2010 (the "Secured Notes"), and all of the debt under its $70 million Credit and Guarantee Agreement, dated as of July 5, 2006 (the "Silver Point Credit Facility"), supports confirmation of the Plan, which is the result of prepetition negotiations between Silver Point and the Debtors.  Confirmation is also supported by a group of institutions that hold approximately 15% of the Secured Notes.

Confirmation is opposed by Harbinger Capital Partners Master Fund I, Ltd., ("Harbinger"), Golden Tree Master Fund II, Ltd. ("Golden Tree"), and MFC Global Investment

---

[1] The subsidiaries which filed are KBWB, Inc., the San Francisco station, KBWB License, Inc., which holds the license for that station, WEEK-TV License, Inc., WXON, Inc., the Detroit station, and WXON License, Inc. which holds the license for that station. The other subsidiaries that own the Debtors' seven other stations or the licenses for those stations did not file.  The Debtors and the non-filed subsidiaries are hereafter called "Granite."

Management (U.S.), LLC (along with Harbinger and Golden Tree, the "Preferred Holders"),
holders of over 50% of the Debtors 12.75% Cumulative Exchangable Preferred Stock (the
"Preferred Equity").  The Preferred Holders object to confirmation of the Plan on two grounds:
(i) that the Plan is not proposed in good faith as required under § 1129(a)(3) of the Bankruptcy
Code; and (ii) that the Plan undervalues the Debtors and pays the Secured Creditors more than
the full amount of their claims, depriving the Preferred Equity of its appropriate recovery.  For
the following reasons, based on an extensive evidentiary record, the Court adopts the following
findings of fact and conclusions of law and confirms the Plan.

<div align="center">Facts</div>

### The Debtors' Business and Corporate Structure

W. Don Cornwell ("Cornwell") and Stuart Beck founded Granite in 1988.  Granite is a
television broadcasting company operating in nine small-to-mid-sized markets in the United
States, including Binghamton, NY, Fresno, CA, and Peoria, Ill., plus two large-market stations in
Detroit and San Francisco. [2]  Granite's network includes four NBC–affiliated stations, one ABC–
affiliated station, two CBS-affiliated stations, and one independent station.  The stations
generally operate autonomously, although Granite has attempted to capitalize on synergies
among stations in the same market or geographic region.  Granite's corporate headquarters is in
New York City.  As the parent, Granite Broadcasting Corp. is responsible for global matters such
as organizing sales programs and negotiating service contracts.  Granite has 786 employees in
total; 207 are employed by the Debtors.  Granite is also one of the largest minority–controlled
television broadcasting companies in the United States.

---

[2] In a costly exception to its business model, Granite purchased the two stations in large markets, namely San
Francisco and Detroit, in an effort to gain the benefits of a new WB network being developed.  The purchase of
these stations required a significant cash outlay, and they have been a cash drain.  These two stations and Granite's
unsuccessful attempts to sell them are further discussed below.

<u>The Debtors' Capital Structure</u>

The Debtors' capital structure is comprised of secured debt, a minimal amount of unsecured debt, and three classes of equity. On December 22, 2003, the Debtors completed an offering of $405 million of Secured Notes. The Secured Notes are secured by substantially all of the assets of the operating companies and by the stock of the license–owning companies. Interest on the Secured Notes is due biannually, on June 1 and December 1. The Indenture for the Secured Notes contained covenants that, among other things, restricted the Debtors' right to incur additional debt and triggered holders' rights on a "change of control" event, and it also provided for a large prepayment premium if the Notes were repaid early. Silver Point holds approximately 80% of the Secured Notes, and a group of other holders, the largest of which is Blackport Capital Fund Ltd., holds approximately 15%. As will be discussed below, it was largely the Debtors' inability to make the $19.4 million interest payment on the Secured Notes in June 2006 that led to its financial crisis.

For reasons which will also be discussed below, Granite is a signatory to the Silver Point Credit Facility, dated July 5, 2006. Pursuant to this agreement, Silver Point provided $70 million of financing to Granite in two tranches. The Silver Point Credit Facility is secured by the same liens, *pari passu*, as the Secured Notes, as well as by a first lien on the assets of a station in Binghamton, New York that was purchased with the proceeds of that loan.

The Debtors have virtually no unsecured debt. The only substantial unsecured debts are a claim of Fox Network for damages resulting from termination of a long-term programming contract with the San Francisco station and a $3 million claim from Beck, in respect of severance and related employment rights. The claims of Beck and Fox have been liquidated in the Plan and will be paid in accordance with the parties' respective agreements.

Granite's equity is comprised of three classes of stock. The Class A common stock is owned by Cornwell and has sole voting authority. The Class B common stock consists of 19.8 million publicly-traded shares; members of Granite's board of directors own roughly 25%. The Preferred Equity is the third class and is comprised of approximately 200,376 shares of 12.75% cumulative exchangeable preferred stock. The Preferred Equity accrues a dividend of roughly $6.3 million per quarter, which has not been paid since October 2002. A majority of the Preferred Equity is held by the three Preferred Holders who have objected to confirmation. The holders of preferred stock were entitled to and did appoint two members to Granite's Board upon Granite's failure to make certain dividend payments. Cornwell, as the sole holder of the voting common stock, appointed all the other members of Granite's Board of Director's (the "Board").

Granite has also guaranteed approximately $30 million of debt to the Malara Broadcast Group ("Malara"). Granite sold its wholly-owned subsidiary WPTA to Malara, at which time Malara also bought KDLH from New Vision Group. Granite then entered into a service contract with Malara, thus obtaining an important position in the Indiana and Minnesota markets. Malara funded its purchases with a credit facility, which Granite guaranteed by pledging roughly $30 million of U.S. bonds. Malara's financial statements are consolidated with Granite's for accounting purposes.

<u>The Declining Financial Situation</u>

Granite has sustained net operating losses for at least the past three years. It has attributed these losses in part to the two large-market stations in San Francisco and Detroit that were affiliated with the unsuccessful Warner Brothers Television Network (the "WB Network"), and also to several burdensome and expensive programming contracts. As early as 2003, Granite retained JPMorgan as its financial advisor to propose a restructuring of Granite's balance sheet

and develop a new business plan. Granite also attempted to improve its position by entering into an agreement in September 2005 to sell the San Francisco and Detroit stations for approximately $180 million. This sale was aborted when Warner Brothers announced a plan to merge with United Paramount and in effect terminated the WB Network. This apparently violated covenants in the pending sale agreement and the purchaser chose not to close.[3]

When JPMorgan's retention agreement expired, Granite formed a committee to interview candidates to act as a new financial advisor. The committee (headed by Cornwell) interviewed several parties, and on March 13, 2006, Granite retained Houlihan Lokey Howard & Zukin ("Houlihan") as its financial advisor. The retention of Houlihan was supported by Eugene Davis, one of the directors appointed by the Preferred Holders. Houlihan was retained to help raise needed capital as well as to formulate a global restructuring of Granite's balance sheet. It was known at that point that Granite had only a limited time to raise the cash for the June 1, 2006 interest payment on the Secured Notes (the "June Interest Payment") and if feasible also to close on a contract to purchase a station in Binghamton, New York, that fit in well with its business plan.

In April 2006 Granite also formed a restructuring committee (the "Restructuring Committee") to work with counsel and Houlihan on restructuring issues. The Restructuring Committee was comprised of Davis, three other directors, and Cornwell. Later, Granite's Board of Directors determined that it needed to be directly involved with the restructuring, and the Restructuring Committee unofficially disbanded and the Board assumed its role.

Still desiring to sell the San Francisco and Detroit stations, Granite announced in or around May 2006 a contract to sell them to subsidiaries of DS Audible, LLC, for $150 million.

---

[3] Granite subsequently brought an action against Warner Brothers, and a settlement was reached and approved during the Chapter 11 case.

The proceeds would have been more than sufficient to make the interest payment on the Secured Notes and fund the purchase of the Binghamton station. However, on June 7, 2006, one of the Preferred Holders, Harbinger, filed suit in the Delaware Chancery Court, seeking to block the sale as an alleged fraudulent transfer. The Preferred Holders also attempted to prevent the sale by asking the Federal Communications Commission (the "FCC") to disapprove of the assignment of the licenses for the stations and (it was later learned) by intervening with an industry contact. The Delaware suit was eventually dismissed but it delayed the closing of the DS Audible sale, and ultimately the transaction was aborted. In the meantime, Granite still needed to raise cash for the interest payment due on the Notes.

In the time available, Houlihan only was able to approach a few third party investors, none of whom proposed a viable financing.[4] As discussed in much greater detail below, the Debtors eventually negotiated with both Silver Point and the Preferred Holders to raise the cash to make the interest payment and fund the purchase of the Binghamton station. With Houlihan's advice the Board eventually entered into the Silver Point Credit Facility. The facts surrounding Granite's entry into the Silver Point Credit Facility and its rejection of the Preferred Holders' offer form the foundation for the latter's good faith objection to Plan confirmation.

Subsequent to the Silver Point Credit Facility, Houlihan continued to search for potential investors, approaching 18 institutional investors (including the Preferred Holders), without success. In any event, Granite was obligated to negotiate a comprehensive restructuring plan with Silver Point, and it eventually did so. The Debtors, Silver Point, and several other large

---

[4] On cross examination, Houlihan's principal, David Hilty, admitted that given more time, he would have liked to contact other potential investors, although he felt that the work Houlihan did was sufficient. There is no dispute that Houlihan did not approach any strategic buyers, and instead focused on institutional investors that had invested in the media industry in the past. Although the Preferred Holders contend that Houlihan should have approached strategic buyers, Houlihan testified as to several reasons for limiting its search, and its efforts appear reasonable under the circumstances.

holders of the Secured Notes entered into a restructuring support agreement (the "Restructuring

Agreement") on December 11, 2006, the day that Granite filed for bankruptcy.[5]

        The Restructuring Agreement and Plan

        In the Restructuring Agreement, the Debtors, Silver Point, and the other holders of

Secured Notes who signed it agreed to support the terms of the Plan, which the Debtors filed on

the Petition Date and which is now before the Court for confirmation in substantially the same

form.  The Debtors' Plan provides, *inter alia*, that the Secured Holders will receive $200 million

in new secured notes, with the balance of their debt to be converted into substantially all of

Granite's new equity.  Silver Point will also be able to appoint six of seven directors of the

reorganized Debtors, the remaining director being Cornwell.  Unsecured creditors will receive a

100% recovery subject to cap of $11 million on the total amount of all allowed unsecured claims.

The holders of Preferred Equity will receive approximately 2% of the new equity and warrants,

and the holders of Class B common stock will receive a pro rata share of 1% of the Debtors new

equity plus warrants.[6]  Subject to the requirements of the securities laws, preferred shareholders

have also been able to participate in a Rights Offering that commenced on March 18, 2007, and

expired on April 6, 2007, the last date to cast ballots on the Plan.  Houlihan expressed the

opinion that the entire package of consideration made available to the holders of Preferred Equity

eligible to participate in the rights offering constituted a 6.4% recovery on the preferred. (Apr.

18, 2007 p.m. Tr. at p. 48.)

        The Debtors' Plan also provides certain releases, exculpations, and indemnifications to

Granite's officers and directors with regard to any company claims against them.  Also a part of

the Debtors' Plan is an executive employment agreement, which provides for Cornwell's future

---

[5] But first Granite again missed making the $19.4 million interest payment on the Notes due December 1, 2006, and
also failed to repay the $70 million Silver Point Credit Facility that had become due.
[6] There is no distribution to Class A common stock, all of which is owned by Cornwell.

employment and the settlement of any claims he would have for termination of his employment contract or otherwise.  The consideration to Cornwell comprises: (1) forgiveness of a $3.3 million loan from Granite; (2) a bonus payment of up to $2.6 million to "gross up" his loan forgiveness and incentive award; (3) options to purchase 375,000 shares of common stock of reorganized Granite; (4) up to $400,000 of restricted shares of reorganized Granite's common stock; (5) a future salary and bonus for one year of employment; and (6) certain exculpations, indemnities, and releases.  This part of the Plan is addressed below.

The DIP Loan

Along with the Plan, the Debtors filed a motion on the Petition Date authorizing them to enter into a DIP loan agreement (the "DIP") with Silver Point as collateral and administrative agent.  Pursuant to the DIP, Silver Point provided the Debtors with a senior secured, superpriority revolving loan of up to $25 million.  The DIP also permitted the Debtors to use as cash collateral all of their cash and cash equivalents that were secured by the Secured Notes and the separate Silver Point Credit Facility, and it provided certain adequate protection rights to the holders of the prepetition Secured Debt.

At a final hearing on the DIP loan held January 3, 2007 (the "DIP Hearing"), the Preferred Holders strenuously objected to the terms of the DIP as well as to the fact that it required the Debtors to proceed to confirmation by May 2007.  However, the Preferred Holders did not propose to provide alternative financing to the Debtors, notwithstanding an invitation by the Court that they do so, and the Court granted the Debtor's motion for entry of the DIP at the conclusion of the DIP Hearing.  Although provisions in the DIP order required the chapter 11 case to proceed on a fast track, the Preferred Holders did not contend at the Confirmation

Hearing that the case has been proceeding so rapidly that they have been unable to present their case against confirmation or to make an alternative bid for the Debtors.

The DIP also provided for a waiver by the Debtors of any claims they might have against Silver Point, as well as an investigation period for an examination into such claims and an investigation termination date, after which Silver Point would no longer be subject to suit from the Debtors or any party asserting the rights of the Debtors with respect to its prepetition dealings with Granite.[7]  The U.S. Trustee was unable to appoint a creditor's committee because of lack of creditors' interest, but the Trustee moved for the appointment of an Examiner to perform the necessary examination into the prepetition conduct of Silver Point and the Debtors as well. The U.S. Trustee's motion was granted on consent of all parties, and Andrew C. Hruska of King & Spalding LLP was named Examiner. [8]

The Examiner's Report

The Examiner investigated (i) whether the Debtors, including their officers and directors, appropriately discharged their fiduciary duties during the period leading up to the Petition Date, and (ii) whether the Debtors have any potential claims against any third parties, including Silver Point.  The Examiner issued a report in which he found no evidence of a cause of action against Silver Point.  However, the Examiner concluded that "the Granite Directors are potentially liable for breaches of their duties of loyalty because they allowed Cornwell to direct the process of seeking financial alternatives for the company without properly overseeing, supervising and controlling his actions." (Examiner's Report at 65-6.) He found as well that the Board also might have breached its duties of good faith.

---

[7] This date has been carried numerous times and now runs through May 20, 2007.
[8] The Preferred Holders had previously moved for the appointment of an official equity committee after the U.S. Trustee had refused to appoint one, but they withdrew their motion (without prejudice) upon the Examiner's appointment.

The Examiner also found a possible claim against Cornwell.  As reported by the Examiner, Cornwell knew that he had a conflict of interest in negotiating a severance package for himself while simultaneously arranging financing for Granite, and he had been informed that he should remove himself from all deliberations involving Granite's restructuring options.  The Examiner found that Cornwell nevertheless chose to actively involve himself in the process, keeping abreast of the restructuring process through communications with Houlihan and Debtors' counsel and chairing the Restructuring Committee.  The Examiner concluded that Cornwell, in his capacity as controlling shareholder and as an officer of Granite, might have breached his fiduciary duties, although the Report also identifies facts that would support defenses for Cornwell and the other members of the Board and questions whether there were any damages.

The Debtors (as well as Silver Point) vehemently disagree with the conclusions in the Examiner's Report, and they submitted a response thereto on April 10, 2007.  The Court deals with the issues raised by the Examiner in its decision hereafter.

<u>The Confirmation Hearing</u>

The Plan came on for a contested confirmation hearing on April 16, 2007.  The Preferred Holders' objection to confirmation limited the contested issues to two: i) whether the Debtors have satisfied the good faith requirement of § 1129(a)(3) of the Bankruptcy Code, and ii) whether the Plan violates the "fair and equitable" rule  that no creditor can be paid more than its claim.[9]  The Court heard from six witnesses over five days of testimony, received approximately fifty exhibits, and admitted the deposition testimony of three additional witnesses.

_____

[9] The Preferred Holders withdrew an objection they had earlier raised that the Debtors' Plan makes an illegal "gift" to the holders of common stock. (*See* April 30, 2007 a.m. Tr. at 125.) The only other objection to confirmation was submitted by June Foster, a *pro se* plaintiff in a prepetition lawsuit against the Debtors.  Ms. Foster complains about the Debtors' treatment of her claim but does not provide any reason why the Plan should not be confirmed,

As to the good faith objection, the Court's findings of fact and conclusions of law are set forth below. As to the "fair and equitable" objection, the Court took testimony from three expert witnesses on the issue of valuation, and, in addition, based on the premise that an offer made by a willing buyer to a willing seller in an arms-length transaction is the best indication of value, gave the Preferred Holders an opportunity to submit an offer for the Debtors that would pay the debt in full and demonstrate that there is value for the equity. A date and time was set (April 25 at 5:00 pm) for the Preferred Holders to submit to the Debtors their best and final offer, and they did so. The Debtors rejected that offer. Silver Point also submitted a counter-offer, which the Preferred Holders ignored and implicitly rejected. The Court's findings of fact and conclusions of law on the issue of valuation are also set forth hereafter.

## Discussion

### Good Faith

The preferred holders assert that the Plan should not be confirmed because it has not been proposed in good faith. Section 1129(a)(3) of the Bankruptcy Code provides that a court may only confirm a plan if "the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Second Circuit has construed the standard as requiring a showing that "the plan [was] proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988); *see also In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) ("For purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."(citation omitted));

---

especially as the Plan proposes to pay general unsecured claims in full. The Plan does have a ceiling that would be exceeded by Ms. Foster's claim if it were liquidated in the amount she has sued for ($10 million), but as found by separate Court Order her claim should be estimated at $0.

*Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.),* 709 F.2d 762, 765 (1st Cir.

1983) (a plan "must bear some relation to the statutory objective of resuscitating a financially

troubled corporation"). Good faith has been found lacking where a plan is proposed for ulterior

purposes. *Koebl v. Glessing (In re Koebl)*, 751 F.2d 137, 139 (2d Cir. 1984) (quotations

omitted). The Preferred Holders do not assert that the Plan lacks "a basis for expecting that a

reorganization can be effected," one of the *Kane* standards. They argue that the Plan is not

proposed in good faith because the Debtors have not proceeded with "honesty and good

intentions" but for the "ulterior purposes" of enriching and protecting Cornwell and absolving

the other directors from their breaches of fiduciary duty.

Many of the Preferred Holders' contentions regarding good faith and "ulterior motives"

relate to the events of June 2006, the period of time that the Examiner's Report also analyzed at

length. The Court has had the benefit of an extensive testimonial and documentary record of the

events of that period, as well as the contentions of the parties and the conclusions of the

Examiner's report, based on documents and interviews.[10]   Based on the extensive record of the

confirmation hearing, the Court comes to the following conclusions regarding the decision of the

Granite Board in June 2006 to enter into a transaction with Silver Point rather than the Preferred

Holders.

The Events of June 2006

As discussed above, by March 2006 the Debtors had retained professionals and formed a

Restructuring Committee in an attempt to deal with their financial problems. There is no dispute

---

[10]  The Court recognizes, as the Debtors and Silver Point argue, that the Examiner's Report is not evidence, and that
the Examiner's conclusions are not based on a full factual record and are technically hearsay. *See In re Fibermark,
Inc.*, 339 B.R. 321, 327 (Bankr. D. Vt. 2006); *Rickel & Assocs. v. Smith (In re Rickel & Assocs.)*, 272 B.R. 74, 87-88
(Bankr. S.D.N.Y. 2002). In this case the Examiner's investigation was designed to assist the parties and the Court in
analyzing a factual situation, determining what further record is required and in narrowing and focusing the issues,
but many of its conclusions have been proved wrong by the evidence of record.

that in the spring of 2006 the Debtors knew they did not have enough cash to make the June

Interest Payment, and that they could not afford to close on the contract to purchase the station in

Binghamton. However, the Debtors had an apparently viable plan to raise the cash to make the

June Interest Payment on June 30 (the end of a 30-day grace period), as well as to purchase the

Binghamton station and to stop the cash drain caused by the Detroit and San Francisco stations

through the proposed sale of the stations to subsidiaries of D.S. Audible for $150 million. This

price was $30 million lower than the prior sale, but that transaction had fallen through when

Time Warner announced that it would be pulling the WB affiliations from both of the stations.

Notwithstanding the Debtors' cash needs, on June 7, 2006, shortly after it terminated its

confidentiality agreement with the Debtors, one of the Preferred Holders, Harbinger, brought suit

against the Debtors in Delaware Chancery Court, claiming that the sale of the two stations

constituted a fraudulent conveyance "only temporarily delaying Granite's inevitable bankruptcy

at the expense of the company's present and future creditors" (as the Delaware vice-chancellor

described the complaint). *Harbinger Capital Partners Master Fund I, Ltd. v. Granite

Broadcasting Corp.*, 906 A.2d 218, 222 (Del.Ch. 2006).[11] In short order the Delaware Court

concluded that Harbinger as a preferred stockholder did not have standing to file a fraudulent

conveyance complaint, and it dismissed the suit on standing grounds.[12] Nevertheless, the suit

had the effect that Harbinger apparently desired, making it highly unlikely that the transaction

---

[11] It bears noting that in the extensive record of the Confirmation Hearing, there was little if any evidence that the $150 million price was unfair. The expert witnesses on behalf of the Debtors and Silver Point testified credibly that the value of the two stations was less than $150 million, and that they had used the $150 million value in their reports because of the relatively recent contract to sell the stations to an independent third party for that amount. The Preferred Holders' expert valued these two stations at a midpoint of $171.7 million, but as further discussed below, he based his valuation work on untenable or unsupported assumptions.

[12] Harbinger claimed unsuccessfully that under generally accepted accounting principles, its issue of preferred stock was treated like debt and that it should have standing to bring a fraudulent conveyance suit. In addition to bringing suit in Delaware, Harbinger also filed a petition requesting that the FCC refuse its consent to the assignment of the licenses to the buyer. Further, discovery in the chapter 11 case revealed that a Harbinger officer used personal industry contacts to attempt to derail the transaction. (Ex. 161; Cleverdon Dep. Tr. at pp. 85:25-89:12).

would close in time and provide the Debtors with the required liquidity to make the $19.7

million interest payment coming due in three weeks.  This effectively left the Debtors in a crisis

mode with the following options:  try to make a deal with the holders of the Senior Notes; try to

make a deal with the Preferred  Holders; try to find another source of funding; or file a

bankruptcy petition immediately.

The Debtors went forward on all fronts.  They had already retained restructuring counsel

and were apparently prepared for a filing, but no one has contended that the Debtors would have

been well served by an immediate chapter 11 filing, with no prior agreement on use of cash

collateral and with the case having commenced "in free fall."  Nor is there any evidence that a

third party would have provided sufficient funding to the Debtors at the time.[13]   The Debtors

were thus left with the possibility of a transaction with the Secured Creditors or with the

Preferred Holders, and they investigated each of these options.

The Silver Point Proposal

In June Houlihan Lokey had several exploratory discussions with representatives of

Silver Point, the holder of a majority of the Debtors' Secured Notes, and Silver Point signed a

confidentiality agreement.  On June 20 representatives of the Debtors (including Cornwell), Hilty

of Houlihan Lokey, and counsel met with representatives of Silver Point and fashioned a

proposal that took the following form by June 28. The salient terms were a new secured loan to

the Debtors in the amount of $70 million (the "Silver Point Credit Facility"), sufficient to make

the interest payment on the Notes and to pay the purchase price on the Binghamton station.  The

Silver Point Credit Facility would be secured  *pari passu* with the Notes and in addition would

have a first security position on the Binghamton assets.  The Tranche B component of the Credit

---

[13]The record shows that the Debtors received an indication of interest from the Carlyle Group and Robert Johnson,
with whom they had signed a confidentiality agreement.  That transaction did not go forward because the offer made
for the Debtors was significantly lower than the amount of the Secured Debt.

Facility was convertible into 200,000 shares of preferred equity.  The Credit Facility violated a covenant of the Indenture of the Secured Notes prohibiting the issuance of new debt, but Silver Point was able to provide the necessary waiver by virtue of its Secured Note holdings.  A Supplemental Agreement was also entered into, requiring additional Indenture amendments that would restrict the Debtors' ability to issue additional capital stock and broaden the concept of a change of control event for the benefit of Silver Point and other "Qualified Holders" of the Notes.

Although Houlihan Lokey had included certain terms in the Debtors' proposals to Silver Point with respect to Cornwell's employment and benefits, the evidence is uncontradicted that Silver Point refused to discuss management issues in June and did not condition its proposal explicitly or implicitly on Cornwell's compensation or future employment benefits.[14]  The Debtors and Silver Point had also discussed the Debtors' need for a comprehensive restructuring of their balance sheet.  The evidence is that Silver Point was receptive to the Debtors' concepts, but the Silver Point Credit Facility provided no specifics with respect to the Debtors' recapitalization.  The only requirement was that the Debtors provide a draft restructuring plan by July 14 and agree with Silver Point on a "comprehensive restructuring plan" by August 15, 2006. (Ex. 136, § 5.17 at p. 72.)

The Preferred Holders' Proposal

The Preferred Holders were well-acquainted with the Debtors, Harbinger having agreed to (and then terminated) a confidentiality agreement and having two representatives on the

---

[14] The Silver Point proposal, however, did not require any change in the Board of Directors.

Debtors' Board of Directors.[15]    Their first proposal, made by Harbinger together with Golden

Tree, as holders of approximately 54% of the Preferred Equity, was made on June 20, 2006, the

day of the Debtors' meeting with Silver Point.   The proposal included a new preferred stock

investment of $20 million, which would just cover the $19.7 million interest payment due, and a

possible but uncommitted new debt/preferred investment of $45-50 million to purchase the

Binghamton station, secured by or with sole recourse to those assets.   The $20 million in

preferred stock would have a $40 million liquidation preference and bear interest at 15% (pay-in-

kind).   In return for this investment the holders of the new preferred issue would assume

immediate control of the Debtors through the appointment of interim directors "until vote on

permanent directors can be held under Company's bylaws." (Ex.  30.)  The Preferred Holders'

term sheet  contained provisions that not only removed the entire Board, but it terminated

Cornwell's employment agreement and specified his severance, temporary salary, and other

benefits.  The Preferred Holders had previously expressed the opinion that the Debtors needed an

overall reduction in debt and a more manageable capital structure, but their proposal stated only

that a subsequent recapitalization was to take place "as soon as practicable and in any event prior

to December 1, 2006," and be "subject to market conditions and stakeholder negotiations at such

time."

    The substance of the Debtors' initial response to the June 20 proposal has not been

challenged by the Preferred Holders.   The Debtors pointed out that the term sheet would likely

trigger the change of control provisions of the Secured Notes Indenture and permit the holders of

the Secured Notes to put them to the Debtors for 101% of par plus accrued interest (triggering a

---

[15] The two members of the Board appointed by the Preferred Holders in October 2005 were required to keep
company information confidential, but the record shows that the Debtors' counsel gave them authority, from time to
time, to provide status reports and other information directly to the Preferred Holders.  The record also shows that
the Preferred Holders agreed to receive confidential information at some points of time and refused it at other times,
a position that, according to the Debtors, made their dealings with the Preferred Holders more difficult.

bankruptcy).  The Debtors were also concerned about the liquidation preference and dividend rate, the lack of specificity regarding the additional funding, and the fact that much of the promised funding would be subject to the complete discretion of a new Board.  Moreover, since the Preferred Holders' term sheet provided for a change of control of the Debtors, it would require Cornwell's personal consent (as the sole voting shareholder), as well as his consent to the provisions relating to his severance, and benefits and the cancellation of his employment agreement.  Because of these elements, the Board determined that Cornwell would have to retain his own counsel and make arrangements with respect to his interests independently of Granite's acceptance or rejection of the Preferred Holders' plan.  It was also accepted that the Debtors would have to make a decision on the Preferred Holders' plan independently of Cornwell, taking into account only the interests of the Debtors and their stakeholders.

Cornwell's initial response to the Preferred Holders' proposal was neither appropriate nor reasonable.  He demanded large severance and incentive awards and in addition an option to buy the Debtors' CBS affiliate in Syracuse for approximately $13 million.  The Preferred Holders angrily rejected these demands (referring in correspondence to "outrage"), and no party claims that the demands were appropriate at the time.  In any event, Cornwell promptly withdrew them, and they did not prevent the Preferred Holders from making a revised proposal, which they did on June 28, 2006.

The Preferred Holders' revised proposal, described as a "nonbinding proposal for discussion purposes" (Ex. 54), responded to some of the Debtors' expressed concerns about the initial offer and improved some of the terms of the June 23 term sheet.  The interest rate was increased to 20% (pay-in-kind), but the liquidation preference was eliminated.  The Preferred Holders also indicated they would make available an additional $20 million preferred stock

investment to be escrowed for working capital purposes related to the Detroit and San Francisco

stations, as may be determined by the "reconstituted Board of Directors".  This reconstituted

Board would include two additional directors elected by the Preferred Shareholders, with the

four directors appointed by them designated as "Preferred Directors" and having the exclusive

right to approve draw-downs on the $20 million additional investment, the filing of a bankruptcy

petition or a reorganization plan, the purchase or sale of any substantial asset, and the initiation,

acceptance or implementation of "any refinancing or restructuring of the Company's capital

structure".  The proposal still turned over substantial control to the Preferred Holders, while

attempting to avoid the change of control provisions of the Indenture.  The proposal contained no

details regarding a possible recapitalization, but it did contain specific provisions regarding the

treatment of Cornwell, including amendments to his employment agreement and his appointment

as vice chairman of the Board and "Interim CEO."

### The Board's Decision

The Preferred Holders have insisted throughout these proceedings that their June 28

proposal was superior to the Silver Point proposal that was ultimately accepted, and much of

their case is based on that proposition.  Moreover, they argue that whatever the merits of the two

proposals, the procedures followed by the Board breached its fiduciary duty to the Debtors and

their stakeholders in that the Board permitted itself to be dominated or controlled by Cornwell

and to act in his interest rather than in the best interests of the Debtors.  The Examiner's Report

also found that the Board failed to take sufficient steps to remove Cornwell from the

consideration and negotiation of a restructuring transaction in general, and the Preferred Holders'

proposal in particular.  The Examiner's report concludes,

> Cornwell may potentially be liable for a breach of the fiduciary duty of loyalty based on
> the following allegations:  (1) if he used his rights and influence to control the process to

search for reacapitalization alternatives, thereby limiting strategic alternatives and forcing
Granite into an unfair deal with Silver Point (that benefited Cornwell personally) versus
other possible transactions that would have been more favorable to Granite as an
enterprise and to minority shareholders;  (2) knew the Silver Point deal was unfair based
on advice from Houlihan and the Harbinger offer, but the Harbinger offer (and other
possible alternatives) could have a negative impact on him personally;  and (3) engaged
in self-dealing and received improper benefits by virtue of these acts.  Any allegations
against Cornwell would require an entire fairness determination to determine whether
damages can be alleged.

(Examiner's Report at 64.)  The same Report states that "the Granite Directors are potentially

liable for breaches of their duties of loyalty because they allowed Cornwell to direct the process

of seeking financial alternatives for the company without properly overseeing, supervising and

controlling his actions." (*Id*. at 65-66.) These potential claims are also obviously relevant to the

issue of good faith, on which the Preferred Holders base one of their two Plan objections.  They

also raise as an issue the propriety of the provisions of the Plan that purport to settle all of the

Debtors' potential claims against Cornwell and the rest of the Board.  It is therefore necessary to

examine closely both the procedures that the Board followed leading up to its decision to accept

the Silver Point proposal and the decision itself.

There is no doubt that, as the Examiner concluded on the basis of his interviews and

document review, better procedures should have been instituted to put the Debtors' restructuring

decisions into the hands of wholly independent Board members.  The Debtors were advised to

have the restructuring under the control of an independent committee, and Davis, one of the

directors appointed by the Preferred Holders, constantly reminded his co-directors of their

responsibilities.  Nevertheless, Cornwell was made chairman of the restructuring committee

(while it was in existence), and he continued to play an active role in all aspects of the

restructuring efforts.  The Debtors' failure to follow appropriate procedures played into the

Preferred Holders hands and gave them one of the cards they have played well.

Nevertheless, based on five days of testimony, including the testimony of Cornwell himself, and hundreds of pages of deposition transcript, the Court is convinced not only of the basic good faith of the Debtors and their professionals but also of the lack of any damages as a result of the June 2006 transactions. The basis for this conclusion is as follows.

On June 28, 2006, with the default on the Notes only a few days away, the Debtors were well advised to accept the Silver Point proposal as the better proposal by far. Silver Point provided the liquidity necessary for the Debtors to accomplish their two immediate goals – pay the interest on the Notes and close the purchase of the Binghamton station. The new Silver Point Credit Facility was admittedly debt rather than equity, but there is no dispute that the Debtors were already over-leveraged. The additional $70 million could be dealt with during an overall restructuring, and the testimony is that during the June time period Silver Point was more forthcoming than the Preferred Holders about a commitment to an overall plan. In any event, Silver Point could provide certainty that the deal could close in time and that an immediate bankruptcy would not be required. Silver Point controlled the great majority of the outstanding Secured Debt and had the ability to grant necessary waivers and forbearance agreements on the eve of a default. Assuming it was reasonable for the Debtors to avoid a default on the Senior Notes at the time, and the Preferred Holders did not argue to the contrary at the Confirmation Hearing, Silver Point was the obvious party to deal with, particularly if the Debtors did not have an alternative plan from another party that was sufficiently clear and feasible so as to provide a clear path to the avoidance of a default and a long-term restructuring.

The Preferred Holders contend and the Examiner's Report assumes that the transactions entered into with Silver Point in June-July 2006 locked the Debtors into the Silver Point embrace and permitted Silver Point thereafter to dominate and control all subsequent restructuring efforts.

Several of the provisions of the transaction – the ability to convert part of the Credit Facility into preferred, and the additional change of control provisions added to the Indenture—gave Silver Point some additional leverage, but it was leverage Silver Point did not need or use. Silver Point already had more than enough leverage as the holder of most of an issue of $405 million of debt that was secured by all of the Debtors' assets. The new Silver Point Credit Facility required the Debtors to propose a recapitalization plan by August 14 and to agree with Silver Point on a restructuring by September 15. These were tight deadlines – although it is worth noting that the Debtors missed both of them, without incident. In any event, no one expected that the Debtors would be able to avoid a bankruptcy filing later in the year, when the December interest payment on the Secured Notes would come due. The Preferred Holders knew at the time that they could make a comprehensive counteroffer to acquire the Debtors in connection with the bankruptcy or, in their words, "have a fight in chp. 11."[16]

The Examiner's Report assumes that Houlihan Lokey believed in June 2006 that there was residual value in the Debtors for the preferred stockholders and that the negotiations with the parties proceeded on that basis. (Examiner's Report at 68.) Although this is a critical assumption, there is no source reference for it in the Report, and the evidence of record at the confirmation hearing does not support it. Hilty testified to the contrary (April 19, 2007 p.m. Tr. at pp. 29-30), and the Debtors received a third party offer during this period that was far below the secured debt. (*See* n. 13, *supra*). Moreover, the Examiner's conclusion that in June 2006 "Harbinger had proposed [a] restructuring transaction that would pay the debt in full and create potential value

---

[16] *See* Ex. 71, discussed at greater length below. It should be recalled that Harbinger told the Delaware Chancery Court at that time that closing the sale of the Detroit and San Francisco stations would only delay the Debtors' "inevitable bankruptcy."

for the existing preferred stock" (Report, p. 68) is flat wrong.[17]  As further discussed below, the

Preferred Holders have, to this day, steadfastly refused to pay the debt in full.

Indeed, in June 2006 the Debtors never had a clear and feasible plan from the Preferred

Holders that could have been effectuated during the time remaining before the Notes would

default.  The Preferred Holders' revised proposal, which reached the Board while its meeting

was in progress on June 28, was incomplete in several respects, such as the commitment to the

second $20 million tranche of funding and the interest rate on the loan to fund the Binghamton

purchase.  The Preferred Holders were entirely silent with respect to a comprehensive and

feasible restructuring for the Debtors – something they have never proposed, as further explained

hereafter.  More important, the proposal gave the Preferred Holders control over the enterprise,

even though it was structured in an attempt to avoid the change of control provisions of the

Indenture.

The Board was not required at that point in time to cede control of the Debtors to

Harbinger or the other Preferred Holders, and the demand of the Preferred Holders to acquire

control of the Debtors would have provided the Board with ample justification for rejecting the

offer.  As one of the independent directors testified, the Board received advice that its

responsibility was to the entire enterprise while it was in the zone of insolvency, not to turn over

control to one constituency. (Milton Brown Test. Aug. 17, 2007 p.m. Tr. at 153.) The advice

received by the Board was accurate.  When a company is in the vicinity of insolvency a board of

directors has a responsibility to manage its affairs in the interests of the corporation and all of its

constituencies. *See Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 787-88 (Del. Ch. 1992);

*Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 793 (Del. Ch. 2004); *In*

---

[17] At another point, the Examiner states only, "The terms of [the Preferred Holders'] proposal were, in some respects, arguably more beneficial to Granite than the terms of Silver Point's proposal." Report pp. 1-2.

*re Buckhead America Corp.*, 178 B.R. 956, 968 (D. Del. 1994) (Delaware law); *see also Official*

*Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343

B.R. 444, 471 (Bankr. S.D.N.Y. 2006). There is no duty to abdicate and turn control over to a

third party or, worse, to one of the constituencies.  It bears repeating that the Preferred Holders,

in return for effective control, committed to invest only $20 million, just enough to cover the

interest payment, and that they had refused to make any commitments with respect to the long-

term recapitalization that was needed.  It also bears noting that the crisis that the Board

confronted in late June 2006 had been instigated by the Preferred Holders themselves.  The

Preferred Holders condemn the Debtors for having given Silver Point too much control through

the Credit Facility and the Indenture Amendments.  Silver Point never had effective control over

the Debtors, and it did not demand control of the Board, as did the Preferred Holders.

The Preferred Holders contend that Cornwell turned down their proposal because of an

implicit deal with Silver Point, retaining him as chairman and providing him with the benefits

that are incorporated in the Plan.  The Preferred Holders similarly contend that the Board turned

down their offer because they were loyal to and dominated by Cornwell and failed to consider

the interests of the Debtors rather than Cornwell's personal interests.  Although the Board should

have taken more effective steps to manage the restructuring efforts more independently,

Cornwell left the meeting when a final decision was made on June 28 between the proposals

submitted by Silver Point and the Preferred Holders, and he abstained from the vote (a point the

Examiner missed when he filed his Report).  Cornwell also told the Board that if it accepted the

Harbinger proposal he would not stand in the way and would resign (as Harbinger did not want

him around).  In any event, although the Preferred Holders complain that the Debtors acted in

bad faith when they included provisions for Cornwell in the restructuring proposals that they

made to Silver Point, it was the Preferred Holders themselves who included provisions relating

to Cornwell's benefits in both of their term sheets.  The only party that divorced Cornwell's

treatment from the recapitalization and restructuring was Silver Point.  The uncontradicted

testimony is that it was not until the fall of 2006 that Silver Point began to discuss the retention

of senior  management under a restructuring, and it was not until December 2006 that a

definitive agreement was reached between Silver Point and Cornwell.  There is no evidence that

Cornwell and Silver Point at that time failed to conduct their negotiations separately from and

subsequent to the negotiations on the Debtors' overall restructuring.

       Moreover, there is no evidence that the compensation and benefits provided to Cornwell

in the Plan were unreasonable or excessive or that they breached any duty he owed to the

Debtors.  The only testimony of record is that it is common for plans of reorganization to include

provisions identifying a reorganized debtor's new senior management along with their "new

[compensation] package[s]" and severance arrangements. (Apr. 18, 2007 p.m. Tr. at 11, 14; Apr.

19, 2007 a.m. Tr. at 68.)  The Bankruptcy Code itself requires only disclosure of the identity of

any insider who will be employed or retained by the debtor and "the nature of any compensation

for such insider."  11 U.S.C. § 1129(a)(5)(B).[18]  The record is barren of any evidence that the

negotiation of the terms of the Chapter 11 Plan was dominated by Cornwell or that his interests

improperly affected the Debtors' judgment with respect to the provisions of the Plan.

       The evidence is also uncontradicted that after the Board's decision of June 28, the

Preferred Holders failed to engage with the Debtors in connection with the recapitalization, and

---

[18]Section 1129(a)(5)(B) requires only disclosure of the amount of compensation, not that the Court approve the
amount of remuneration. *In re Prudential Energy Co.*, 58 B.R. 857, 861 n.4 (Bankr. D.N.Y. 1986); *see also In re
Drexel Burnham Lambert Group*, 138 B.R. 723, 760 (Bankr. D.N.Y. 1992) (citing support for the proposition that
"§ 1129(a)(5)(B) is satisfied where plan fully disclosed that certain insiders will be employed by reorganized debtor
and the terms of employment of such insiders.") (emphasis added).

in effect disappeared from the scene, reappearing only after the bankruptcy filing.[19]  Their

decision not to compete with Silver Point in proposing an overall restructuring was apparently a

deliberate one.  The record contains an email dated July 27, 2006 from the Harbinger officer

responsible for its investment in the Debtors to his superior, describing the "current state of

play."  He acknowledged that the Debtors were discussing a recapitalization term sheet with

Silver Point, speculated on certain possibilities and concluded that "if everything goes our way

big in a chp. 11 valuation fight and there's no makewhole on the bonds, we might get 20% of the

company (mid 30s recovery) – but makewhole cuts this in half." (Ex. 71)[20]  The email further

states that he was "looking at floating a strawman competing proposal" and described what it

would be "assuming no makewhole on the bonds…."  But he apparently never made a proposal

at the time, as his boss wrote back, "I would have no interest in proposal 1.  I'd rather fight in

chp.11.  I'd rather have a battle." The Preferred Holders have had their battle and, as discussed

below, a further opportunity to acquire the Debtors.

<u>Conclusions of Law with Respect to Good Faith and Related Issues</u>

The Preferred Holders assert that the Debtors' failure to follow proper procedures in

connection with the June 2006 offers tainted the entire process of plan formulation and

confirmation and renders the instant Plan lacking in good faith and unconfirmable. They

contend:

> …the failure to establish a committee of independent directors, and instead to allow
> Cornwell to lead the Restructuring Committee and otherwise to involve himself in the
> restructuring process (including, for example, attending the June 20 meeting with Silver
> Point) was inexplicable, and tainted all that flowed from the process.  The taint extends to
> the July 2006 Silver Point Credit Facility, the restructuring agreement reached in

---

[19] They did file a derivative action in Delaware against the Board in August 2006, asserting that the Board had
violated its fiduciary duties in June.  This action was stayed by the chapter 11 filing.

[20] The "makewhole" on the bonds is the prepayment premium requiring the payment of an additional $39.5 million
if the bonds are prepaid at this time.  As will be seen, the effort to avoid paying this premium has dominated all of
the Preferred Holders' proposals to acquire the Debtors.

December 2006 pursuant thereto, and the Proposed Plan that embodies that restructuring
agreement.

Preferred Holders' Proposed Finding 78 at p. 23 (footnote omitted).  As set forth above, the

proceedings established by the Board were not as deficient as the Preferred Holders assert and

there were no damages, as Silver Point's proposal was decidedly superior and the Board's

decision to accept it justified.

In any event, irregular or improper procedures at some point in a debtor's past do not

necessarily cause a plan to fail the "good faith test." In *In re Madison Hotel Associates*, 749 F.2d

410 (7th Cir. 1984), the Seventh Circuit rejected just such an argument and said that the

"important point of inquiry is the plan itself and whether such plan will fairly achieve a result

consistent with the objectives and purposes of the Bankruptcy Code." 749 F.2d at 425. The Plan

before the Court for confirmation will achieve a result fully consistent with the objectives and

purposes of the Bankruptcy Code.  It pays all unsecured creditors in full, issues $200 million in

new debt to the secured creditors, and converts the balance of the secured debt to equity.  The

Plan leaves a small distribution for the preferred and common stockholders that, as also analyzed

below, constitute more than they would be entitled to under the absolute priority rule.  No party

has challenged the Plan's feasibility, or that the Plan leaves the Debtors with other than a

manageable debt and a reasonable capital structure.

Moreover, there is no nexus between the Debtors' failure to follow proper procedures in

June 2006 and the filing of the Plan in December and no evidence that there was any harm to any

party from any procedural shortcoming, especially as the Silver Point proposal was superior to

the proposal from the Preferred Holders.  As stated above, the record is devoid of evidence that

the plan of reorganization was not negotiated in the fall of 2006 independently of Cornwell's

interests, and the unrebutted testimony is that Silver Point and Cornwell agreed on the provisions

relating to Cornwell's employment after the material terms of the plan of reorganization had
been formulated.

The "good faith" cases on which the Preferred Holders rely are distinguishable.  In *In re
Coram Healthcare Corp.*, 271 B.R. 228 (D. Del. 2001), the debtor's CEO was secretly on the
payroll of one of the debtor's largest creditors, earning $80,000 per month plus expenses, and he
had directed the prepetition payment of over $6 million that benefited that creditor.  The Court
denied confirmation of a first plan on good faith grounds, finding that the arrangements had
never been disclosed until the eve of confirmation, and it later denied confirmation of a second
plan where the debtors had taken no steps to isolate the CEO from the plan formulation process
and where the Court refused to find that there had been no harm to the debtors.  These facts bear
no resemblance to the instant situation.

The Preferred Holders also rely on *In re Bush Industries*, 315 B.R. 292 (Bankr. W.D.N.Y.
2004), where the debtor's CEO and controlling shareholder had negotiated what the Court found
to be a "golden parachute," as it did not appear that he would play any role in the reorganized
company.  The Court concluded that the debtor's board had breached its fiduciary duty to
creditors by approving an employment agreement that had no discernable value to the estate.
However, the Court indicated that it would likely approve the plan if the benefits to the CEO
were excised, stating, "I foresee no insurmountable barrier to confirmation of an appropriately
revised plan.  The debtor may demonstrate its good faith in a variety of ways…."  315 B.R. at
308.  The Court thus implicitly rejected the proposition on which the Preferred Holders rely, that
a taint in the past irrevocably corrupts a party for all time.

The Court has carefully considered whether to take the same action indicated in the *Bush
Industries* Court and refuse to confirm the Plan unless the provisions relating to Cornwell's

compensation are excised.  The issue of compensation and benefits provided to executive

management in connection with Chapter 11 cases is a sensitive one that involves the interests of

creditors, stockholders and all other stakeholders, as well as the public interest.  Congressional

concern with executive compensation in chapter 11 cases is evidenced by § 503(c) of the

Bankruptcy Code, added by the 2005 Amendments, and by the very recent hearings on the issue.

*See, e.g.,* Hearings before the Subcommittee on Commercial and Administrative Law of the

House Judiciary Committee, 110th Cong., 1st Sess., Apr. 17, 2007.

Nevertheless, despite an extensive record, there is no evidence that the provisions of the

Plan relating to Cornwell's compensation and benefits were not negotiated separately, that Silver

Point did not make a reasonable business judgment to retain Cornwell or that Cornwell will not

play an important role in the Debtors' future management and/or in the transition to new

management.  There is no evidence that the Plan provisions relating to Cornwell's compensation

and benefits are unusual or unreasonable based on the market or other plans of reorganization.

Moreover, the record is clear that Cornwell had an employment contract and severance and other

rights that would entitle him to a claim as a Chapter 11 creditor, and the Plan provides for full

payment of creditors' allowed claims.  There is no evidence that Cornwell is receiving more

under the specific provisions of the Plan providing for his compensation and benefits than he

would receive if he were a creditor paid in full under a proof of claim.  Finally, the Plan,

including the provisions relating to Cornwell, was overwhelmingly approved by the Secured

Noteholders, who will hold the new equity.  In sum, there is no reason to disapprove the Plan

provisions relating to Cornwell's compensation and benefits.

The Plan also provides in § 11.11 for a release of claims of the Debtors and their

subsidiaries against Cornwell, the other former directors, the Debtors' officers, and Silver Point

and its representatives.  This release would effectively terminate the action commenced by

Harbinger (derivatively on behalf of the company) against Cornwell and other directors on

August 21, 2006, in Delaware Chancery Court, claiming that the Board breached  its fiduciary

duties by approving the Silver Point rather than the Preferred Holders' proposal.[21]  The release

does not affect contractual claims or claims for willful misconduct or gross negligence held by

the Debtors, and it does not affect claims held individually by creditors or shareholders and thus

does not raise any issue regarding the power of the bankruptcy court to approve a "third-party

release." *Compare Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re*

*Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005). Nevertheless, since the Plan

proposes the settlement of possible claims held by the Debtors, it must satisfy the provisions of

the Bankruptcy Code relating to the approval of settlements.  *See Protective Comm. for Indep.*

*Stockholders of TMT Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968).   In determining whether to

approve a settlement, a court must consider (1) the probability of success in the litigation;  (2) the

difficulties in collecting a judgment;  (3) the complexity of the litigation;  (4) the  expense,

inconvenience and delay caused by the litigation; and (5) the paramount interest of creditors and

a deference to their reasonable views.  *See* Preferred Holders' Proposed Finding of Fact 130 at p.

46, citing, *inter alia*, *In re Tower Automotive, Inc.*,  2006 WL 3751360 at *8 (S.D.N.Y. Dec. 16,

2006);  *In re Remsen Partners, Ltd.*, 294 B.R. 557, 565 (Bankr. S.D.N.Y. 2003).

Each of these factors, to the extent relevant, is satisfied in this case.  If  the Delaware suit

were permitted to go forward and the events of June 2006 were litigated all over again (and

assuming the Delaware action survived the pending motion to dismiss), the litigation would

likely be expensive, complex and distracting to new management (and thus injurious to the new

---

[21]  *Harbinger Capital Partners Master Fund I, Ltd. v. Cornwell, et al.*, No. 2360-N (Del. Ch. Sept. 11, 2006
Amended Complaint).  It should be noted that Harbinger claimed in this lawsuit that the Debtors were in the "zone
of insolvency" at the end of June, 2006.

shareholders).  More important, based on the findings set forth above, the litigation would have

little chance of success.  In order to approve a settlement under the Bankruptcy Code, a court is

not required to try the case, only to assess the reasonableness of the settlement. *Cosoff v. Rodman*

*(In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Purofied Down Prods.*, 150 B.R.

519, 522 (S.D.N.Y. 1998); *In re Texaco, Inc*. 84 B.R. 893, 900 (Bankr. S.D.N.Y. 1998).  The

settlement provided for in the Plan satisfies this standard based on the record of the Confirmation

Hearing.[22]

Finally, the Plan contains a provision that provides for exculpation of the Debtors and

Silver Point and their respective representatives for actions in connection, related to, or arising

out of the Reorganization Cases.  Plan, § 11.10.   The exculpation clause excludes gross

negligence and intentional misconduct and with one exception of which the Preferred Holders do

not complain, "generally follows the text that has become standard in this district [and] is

sufficiently narrow to  be unexceptionable." *In re Oneida Ltd*., 351 B.R. 79, 94, n. 22 (Bankr.

S.D.N.Y. 2006);  *see also  In re Enron Corp.*, 326 B.R. 497, 504 (S.D.N.Y. 2005);  *cf. In re PWS*

*Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000).  The Preferred Holders say only, "It is also

highly questionable whether the exculpation of Cornwell, set forth in the Proposed Plan, is at all

legitimate", arguing that controlling shareholders and officers are not entitled to exculpation

under Delaware law.  Proposed Finding 132 at 46-47, citing *In re Emerging Communications*

*Inc. Shareholders Litig.*, 2004 WL 1305745 at *38 (Del. Ch. June 4, 2004).  However, the Plan

provides exculpation only for acts or omissions in connection with the Plan and the bankruptcy

---

[22] The DIP financing order entered into at the outset of these cases provided for a period during which claims against
Silver Point could be investigated, and this was one of the principal tasks assigned to the Examiner.
Notwithstanding his finding of possible claims against Cornwell and the Board, the Examiner found no evidence of
any claims against Silver Point or any other party.  The "investigation period" has been extended several times with
Silver Point's consent and will lapse upon entry of the Confirmation Order.

cases.  It requires, in effect, that any claims in connection with the bankruptcy case be raised in

the case and not be saved for future litigation.  The courts have accepted this principle in other

contexts. *Cf. Browning  v. Levy (In re Browning)*, 283 F.3d 761, 772-73 (6th Cir. 2002) (holding

that a reorganized debtor's malpractice lawsuit against its prior counsel should have been

brought prior to the debtor's confirmation hearing and was thus barred by principles of *res

judicata*); *Iannochino v. Rodolakis (In re Iannochino)*, 242 F.3d 36 (1st Cir. 2001) (holding that a

debtor's malpractice lawsuit against its attorneys two years after they received a fee award from

the bankruptcy court was barred by principles of *res judicata*) .  Under the terms of the Plan,

exculpation does not extend back in time to the activities of the controlling shareholder in

connection with the events of 2006, and if there were any claims against him, the exculpation

clause would not cover them.  There is accordingly no reason to strike the exculpation provision

from the Plan.

<u>Valuation</u>

The second principal objection to Plan confirmation by the Preferred Holders raises the

issue of value.  There is no dispute that a class of creditors cannot receive more than full

consideration for its claims, and that excess value must be allocated to junior classes of debt or

equity, as the case may be.  *See, e.g., New England Coke & Coal Co. v. Rutland Co*., 143 F.2d

179, 186 (2d Cir. 1944) (Bankruptcy Act case) ("A plan may be feasible and yet not be fair and

equitable … if a reorganization plan … with assets worth $15,000,000 and debts of $11,500,000,

were to provide for the issuance of nothing but common stock having  an aggregate par value of

$10,000,000, all to be distributed to the old creditors, the plan would clearly be feasible … but it

would  be wanting  in fairness."); *In re Exide Technologies*, 303 B.R. 48, 61 (Bankr. D. Del.

2003) ("a corollary of the absolute priority rule is that a senior class cannot receive more than

full compensation for its claims."); *In re MCorp. Finance, Inc.*, 137 B.R. 219, 235 (Bankr. S.D.Tex. 1992) ("creditors must not be provided for more than in full"). The Disclosure Statement filed by the Debtors states that when the value of the new equity to be issued to the Secured Noteholders under the Plan is added to the face amount of the debt they are to receive, they will be paid approximately 85.5% of their allowed claims.[23] The Preferred Holders contend that the Debtors and Silver Point have undervalued the new common stock and that the Plan will provide Silver Point and the other Secured Noteholders with a recovery in excess of their allowed claims. It is therefore necessary to determine a reasonable value for the Debtors in order to determine whether the Secured Creditors are receiving more than full payment.

The valuation of a debtor in connection with confirmation of a Plan is at best a challenging undertaking. Where, as here, a valuation is required, the parties ordinarily rely on expert testimony to calculate value, and each of the principal parties in this case provided a valuation report and expert testimony. In addition, there is no question that in appropriate circumstances, "People who must back their beliefs with their purses are more likely to assess the value of the [asset] accurately than are people who simply seek to make an argument." *In re Central Ice Cream Co.*, 836 F.2d 1068, 1072, n. 3 (7th Cir. 1987); *In re Oneida Ltd.*, 351 B.R. at 93. There was no risk in this case that a market test would undervalue the Debtors, as the Preferred Holders had the information necessary to make an informed offer and the ready ability to pay the price, as well as an interest in acquiring the Debtors. Therefore, during the confirmation hearings the Preferred Holders were given ample opportunity to back their

---

[23] This percentage is based on the Houlihan Lokey valuation of the Debtors' common stock after reorganization and the payment to the Secured Creditors of principal and prepetition interest. *See* Ex. 108 at p. 35. It is important to note that if there is equity value in the Debtors (as the Preferred Holders contend), the Secured Creditors are oversecured and also entitled at a minimum to postpetition interest and :any reasonable fees, costs, or charges provided for in their loan documents. 11 U.S.C. § 506(b). We discuss hereafter whether they are also entitled to a prepayment premium or "makewhole."

arguments with their purses and submit a proposal that would establish that there is value in excess of the debt, that the instant Plan is accordingly not confirmable and that they should be able to acquire the Debtors, if they chose to do so.  The Preferred Holders made such a proposal. As will be discussed below, the expert valuations and the proposal made by the Preferred Holders confirm that there is no value beyond the debt and that the Plan should be confirmed.

Expert Reports

Each of the principal parties submitted an expert valuation of the Debtors.  All reports used three standard methods for valuing an enterprise in financial distress: a discounted cash flow analysis, which calculates the enterprise's future cash flow and discounts it back to present value;  a comparable company analysis, estimating a company's future value based on the market capitalization of comparable companies in the industry;  and a precedent transaction analysis that attempts to ascertain value based on the amounts paid for comparable companies in the same industry in recent transactions.  *See, generally, In re Oneida,* 351 B.R. at 88-91;  Peter V. Pantaleo and Barry W. Ridings, *Reorganization  Value*, 51 Bus. Law. 419 (1996).   Using these three methodologies, the report and testimony of Hilty of Houlihan Lokey on behalf of Debtors concluded that their value at confirmation is between $463 and $523 million, with a midpoint value of $493 million.  Similarly, the testimony and report of Jill Greenthal of the Blackstone Group, on behalf of Silver Point, calculated a valuation range of $450 to $525 million, with a midpoint of $487.5 million.  Both of these reports used the projections in the Debtors' current business plan to estimate its future cash flow and margins, although neither report reduced projected enterprise value as a consequence of the Debtors' failure to meet these projections in the recently-concluded first quarter of 2007.

The Preferred Holders submitted an expert report and testimony from Russell Belinsky of Chanin Capital Partners.  Belinsky estimated the Debtors' value at between $626.7 million and $707.9 million, with a mid-point of $667.3 million, using the same three methodologies as Hilty and Greenthal.  Most of the difference was accounted for by Belinsky's use of projections of future enterprise performance that were far higher than the Debtors' projections.  The projections were provided by a third party, J. Daniel Sullivan, an entrepreneur who has managed broadcast stations and who would apparently be installed by the Preferred Holders as the chief executive officer of the Debtors if they were able to gain control.

Although Belinsky testified that he had never before provided an expert opinion using an outsider's projections, and knew of no court opinion that validated the use of third-party projections for purposes of valuing an ongoing stand-alone company (Belinsky Test. Apr. 20, 2007 p.m. Tr. at 11:9-13), there is no reason in principle to reject a valuation based on third-party projections.  The problem with the analysis submitted on behalf of the Preferred Holders is that they provided no support for Sullivan's projections.   Excerpts from Sullivan's deposition were admitted into evidence, but he was not qualified as an expert, his work on the projections was never described in detail, and it was established that he knew very little about the Debtors.  It was also established that Sullivan's projections are driven by several unsupported assumptions, such as that corporate overhead can immediately be reduced by over 50% and that the Debtors will be able to earn 30 cents of cable retransmission revenue per subscriber for their four largest stations.  It was also established that the last broadcast company operated by Sullivan had poor operating results, was overleveraged and was frequently in default under its credit facility.  Belinsky failed to conduct any substantial due diligence on Sullivan's projections or any due

diligence whatsoever on Sullivan's qualifications to provide projections of the Debtors' future performance.

By contrast the record contains evidence in support of the Debtors' projections, and it is uncontested that Hilty of Houlihan Lokey performed extensive due diligence on the projections and the Debtors' business plan during the year he was retained on the Debtors' behalf.  The only specific attack that the Preferred Holders made on the Debtors' projections was that the Debtors' margins were below industry norms, and the Preferred Holders contended that if the Debtors' projected margins were increased to the levels reached by other companies in the industry, the values projected forward would be appreciably higher.  As Belinsky put it, "in the right hands, i.e. Mr. Sullivan and his team, the Company could get back to industry margins."  (April 20, 2007 p.m. Tr. at 119-13.)  The problem is that the evidence does not support the premise that the Debtors are underperforming the industry as a consequence of poor management practices that Sullivan could readily correct.   For example, Ms. Greenthal of Blackstone, who has spent her entire career as an analyst and deal-maker in the broadcast industry, carefully examined the margins of the Debtors' individual stations.  She concluded that the Debtors' Peoria and Fresno stations have "very significant margins" and that some of the other stations (*e.g.*, Syracuse, Buffalo, Fort Wayne and Duluth) operate below the 38.3% average of others in the industry because of the nature of the markets and the competitive situations that the stations face.   The San Francisco and Detroit stations, although in large markets, were badly hurt by fallout from the cancellation of the WB Network and also by the decision to operate Detroit as an affiliate of the new MyNetwork TV.  In a rebuttal report Ms. Greenthal also identified many other errors in the Belinsky presentation, such as a failure to take account of probable tax expenses and use of

2006/2007 multiples to the 2008/2009 projections in the precedent transaction and comparable
company analyses.

In sum, it must be concluded on this record that the Belinsky valuation is unsupported
and that there is no substantial evidence to counter the expert reports submitted by Hilty and
Greenthal.  Moreover, the Belinsky submission was seriously undermined by the fact that his
compensation from the Preferred Holders is contingent on the total consideration to be received
by the Preferred Holders under a confirmed plan.  Belinsky admitted that he did not understand
that it is highly unusual for an expert witness fee to be contingent on the results of his testimony,
and that a court is entitled to discredit anything said by an expert compensated by such an
arrangement.  *See In re Oneida Ltd.*, 351 B.R. at 92, citing *Person v Assoc. of Bar of City of N.Y.*,
554 F.2d 534, 538 (2d Cir. 1977), *cert denied*, 434 U.S. 924, 98 S. Ct. 403, 54 L. Ed. 2d 282
(U.S. 1977); *Cresswell v. Sullivan & Cromwell*, 704 F. Supp. 392, 401 (S.D.N.Y. 1989), *rev'd on
other grounds*, 922 F.2d 60 (2d Cir. 1990).

<u>Valuation Based on the Preferred Holders' Offer to Buy the Debtors</u>

As also noted above, there is no dispute that in many circumstances the best evidence of
value is what a third party is willing to pay in an arm's length transaction.  As Ms. Greenthal of
Blackstone testified, a third party offer "typically trumps all other[]" indications of value.  (April
19, 2007 a.m. Tr. at 24; *see also* April 20, 2007 p.m. Tr. at 80.)  In the instant case it was
conceded that the Preferred Holders had enough cash or credit to buy the Debtors, and that they
are informed and motivated purchasers.  The Court accordingly gave the Preferred Holders an
opportunity to make an offer to purchase the Debtors or fund an alternative plan of
reorganization that would establish value in the Debtors beyond the debt.  During the course of
the confirmation hearing, the Preferred Holders made and revised certain proposals to acquire the

Debtors, and the Debtors' Board of Directors considered them. Ultimately, it was agreed that the

Preferred Holders' last and final offer would be due by the end of business on April 25, 2007,

after the close of testimony on all other matters, and that the Court would thereafter take

testimony solely with respect to the offer and the response from the Debtors and Silver Point.

The Preferred Holders submitted their "best and final" offer by way of a term sheet (Ex. 148),

and the parties provided testimony and argument with respect thereto. Silver Point made a

counteroffer, which is also in the record (Ex. 162). For the reasons stated below, the Preferred

Holders' offer confirms that there is no value in the Debtors beyond the outstanding debt.

The Preferred Holders' offer contemplates a minimum investment of $200 million in the

Debtors behind $435 million of secured debt, provided certain events occur by a specified

deadline. The $200 million would be raised through (i) a $124 million rights offering for a new

class A common stock open to all preferred shareholders, which the Preferred Holders will

backstop; and (i) a $76 million equity infusion from the Preferred Holders in exchange for a new

class B common stock. The Preferred Holders would also provide an exit facility of at least $25

million in exchange for preferred equity. The parties dispute the "implied value" of the offer and

whether it would cover all of the debt as of December 2007, which is a reasonable projection of

the date the Preferred Holders would likely obtain FCC approval for the transfer of control and

the transaction could close.[24] In any event, whatever the "implied value" that may be placed on

an offer by an analyst or investment banker, the ultimate question before the Court is whether the

Preferred Holders have made a bona fide offer that establishes that there is value beyond the

debt, and that the debt is being paid more than it is due. For the reasons stated hereafter, the

---

[24] The Debtors and Silver Point calculate that in December 2007 the amount due on the Secured Debt, with interest but without the $39.5 million prepayment premium, would be approximately $556 million; there would be approximately $20 million of unsecured claims; and there would be about $30 million of debt associated with the Malara Guarantee. Hilty also stated that the "implied value" could not be considered a market value for the Debtors because of the conditionality of the proposal.

record is clear that the Preferred Holders' offer establishes that they are not willing to pay a price that would cover the debt in full.  While they are willing to pay off the Silver Point Credit Facility and to pay principal and interest on the Secured Notes, they absolutely refuse to pay the prepayment premium on the Secured Notes under any circumstances.

The Indenture for the Secured Notes provides that prepayment of the Notes after December 1, 2006 and up to the present requires payment of a prepayment premium or "makewhole" of an additional 9.75% or $39.5 million.  The law on prepayment premiums is complex.  As a general matter a lender can forfeit a reasonable prepayment premium by electing to accelerate the debt. *In re LHD Realty Corp.*, 726 F.2d 327, 330 (7th Cir. 1984). On the other hand, an intentional default by a borrower, with the intention of forcing an acceleration, may permit the lender to collect a reasonable premium. *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1053 (2d Cir. 1982), *cert denied*, 460 U.S. 1012 (1983); *Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assoc.*, 11 Misc. 3d 980, 816 N.Y.S. 2d 831, 836 (Sup. Ct. Nassau Co. 2006).  Prepayment provisions have been found to be valid and enforceable in bankruptcy cases. *See United Merchant and Manufacturers, Inc., v. Equitable Life Assur. Soc.*, 674 F.2d 134, 143-44 (2d Cir. 1982) (Chapter XI case); *In re Imperial Coronado Partners, Ltd.*, 96 B.R. 997, 999 (B.A.P. 9th Cir. 1989); *In re Calpine Corp.*, 2007 Bankr. LEXIS 645, *17 (Bankr. S.D.N.Y. 2007); *In re Planvest Equity Income Partners IV*, 94 B.R. 644 (Bankr. D. Ariz. 1988). On the other hand, while the automatic acceleration of debt occasioned by a bankruptcy filing may not result in a forfeiture, a motion for relief from the stay may have that effect. *See In re LHD Realty Corp.*, 726 F.2d at 332, where the Court said, <u>in dictum</u>, "if the Lender wishes to preserve its right to a premium, it must forbear from exercising its acceleration option and await the trustee's or the debtor's decision.  Should the trustee or the debtor then decide to repay the

loan, the Lender would presumably be able to enforce an otherwise valid prepayment premium."
(footnote omitted).

The Preferred Holders argue that in this case a right to the prepayment premium will not
arise because they will not compel the lender to accept early payment of the loan. They argue
further that their proposals to acquire the Debtors and satisfy the Secured Notes will avoid such
compulsion. Silver Point argues that the Preferred Holders' Term Sheet implicitly contains just
such compulsion. There is no need in this case to determine conclusively that a prepayment
premium would have to be paid to the holders of the Secured Notes. In any event, the Preferred
Holders refuse to pay the premium even if a court should disagree with their position, and their
proposed purchase is voided if a court should hold that they are required to pay the premium in
order to satisfy the Secured Notes in full.

It is evidently the Preferred Holders' insistence on attempting to avoid the prepayment
premium that explains why their April 25 term sheet is not only convoluted but patently
unconfirmable. The Term Sheet proposes two principal alternative provisions for the Secured
Notes. The first would reinstate the Notes, using a debtor's power under § 1124 of the
Bankruptcy Code to de-accelerate defaulted debt and to reinstate the terms of a loan. The second
possible treatment would provide the Noteholders with new Notes of a value that is the
"indubitable equivalent" of the existing Notes, aptly termed the "cram up" Notes from their basis
in the "cram down" alternative provided for in § 1129(b)(2)(A)(iii) of the Bankruptcy Code.[25] If
the Court rejected both of these alternatives, the Preferred Equity Holders would offer to
purchase collectively all of the Secured Notes claims at face value, financing the purchase by

---

[25] Section 1129(b)(2)(A) of the Bankruptcy Code permits a debtor to "cram down" a dissenting class of secured creditors by providing them with certain alternative treatments, one of which is to pay the class the "indubitable equivalent" of the value of the secured debt. The term "indubitable equivalent" comes from the Learned Hand opinion in *Metropolitan Life Ins. Co. v. Murel Holding Corp. (In re Murel Holding Corp.)*, 75 F.2d 941, 942 (2d Cir. 1935).

issuing approximately $350 million in new secured indebtedness and by using the $55 million

raised in the Proposed Preferred Rights Offering.[26]  The parties dispute whether the Notes can be

reinstated under § 1124 of the Bankruptcy Code or whether the provisions of the Indenture

concerning the change of control of the Board and the issuance of new voting stock would be

violated and create a default under the reinstated Notes within days of Plan confirmation.  They

also dispute whether cram up Notes can be designed that would truly be the "indubitable

equivalent" of the old Notes, and whether the interest rate on the $350 million in new debt would

be preclusive.  In any event, reinstatement of the debt and the cram up notes are intended to

avoid the prepayment premium.  The Preferred Holders state that if the Secured Noteholders

don't like those alternatives, they can ask for payment in full, but this is also designed to cause a

forfeiture of the prepayment premium.

Whatever the Preferred Holders' motivations, their Term Sheet proposes a plan with no

feasibility.  Under all three alternatives in the Term Sheet, the reorganized Debtors would be left

with a level of debt that they cannot afford and an unconfirmable plan of reorganization.  The

Preferred Holders themselves took the position, before making their April 25 offer, that the

Debtors had too much debt, and one of their arguments that their June 2006 proposal was

superior to Silver Point's is that it would not add additional debt to an already overleveraged

balance sheet.  The evidence is clear that the Preferred Holders' plan violates the feasibility

requirements of § 1129(a)(11) of the Bankruptcy Code.  It is also clear that the conditional nature

of their commitment leaves the enterprise at risk for an extended period. One of the principal

conditions to the Preferred Holders' plan is that they obtain FCC approval for their assumption

_____

[26] It appears that the Preferred Holders obtained non-binding expressions of interest from possible lenders to lend up
to $350 million to a reorganized Granite.

of control. [27]   The Preferred Holders admit that it will take months for them to obtain FCC

approval to assume control of the Debtors;  the evidence was that it could take until December

for the FCC to act. [28]   Yet the proposal requires confirmation by August 31, 2007, and any

extension is at the Preferred Holders' "exclusive direction." (Ex. 148 at 9.) Moreover, the

proposal can be withdrawn if FCC approval is not obtained.  If the Preferred Holders never

receive FCC approval, or if it does not come soon enough and they refuse to extend their

commitment, their proposed plan fails and the Debtors presumably are compelled to file another

bankruptcy case.  Hilty testified that the conditionality of the proposal makes it "more of an

option as opposed to an unconditional plan…."

        The Preferred Holders' answer to the conditionality of their proposal, as well as the

problem of feasibility, is that the "problem will be ours" and that no creditor or other preferred

equity holder will be at risk.   The Term Sheet contains not only the offer to pay off all debt in

connection with their plan (if the Court rejects their reinstatement and "cram up" alternatives),

but in addition a further offer to make <u>immediate</u> payment in  full to all creditors who opt for it

and to pay the minority preferred shareholders a 7% distribution.  "Thus, under the April 25

Term Sheet, creditors and preferred stockholders may opt for immediate payment, and thereby

avoid any risk that the plan of reorganization proposed under the April 25 Term Sheet ultimately

will fail."  Preferred Holders Finding 52 at p. 16. [29]

        It is no answer for the Preferred Holders in effect to assert that "we'll buy out all the

others and the problem will be ours."  The feasibility requirement of § 1129(a)(11) of the

---

[27] The proposal may also require approval under the Hart-Scott-Rodino Antitrust Act.

[28] In contrast, Silver Point had already applied for FCC approval to take over control of the Debtors and at the time
of the confirmation hearing it appeared that approval would be forthcoming.  Confirmation of the Plan is, not,
however, contingent on FCC approval.

[29] The Preferred Holders clarified in testimony that they would also pay the holders of Secured Debt interest at the
default rate and interest on interest if a court found that such amounts were required by applicable law.

Bankruptcy Code is not optional. *Kane v. Johns-Manville Corp.*, 843 F.2d at 649; *See generally In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir. 1985); 7 Lawrence P. King, *et al*., *Collier on Bankruptcy*, ¶ 1129.03 (15th ed. rev. 1999). The Debtors have moved for confirmation of a feasible plan that has received the overwhelming support of the creditors, that pays all unsecured creditors in full and that restores the enterprise to the marketplace with a credible balance sheet. The Preferred Holders would substitute a plan with no apparent feasibility whose confirmation is subject to several major contingencies. During this extended period, as the evidence showed, the Debtors' business would be subject to damage and erosion. Chapter 11 is designed not only for creditors and equity lenders. It also protects all those with a stake in the enterprise, such as the employees, customers and the public. *See United States of America v. Whiting Pools, Inc.*, 674 F.2d 144, 159 (2d Cir. 1982) (citation omitted). The Preferred Holders' plan would leave the Debtors' employees and customers in limbo for months, whereas the current Plan would restore the enterprise to the marketplace immediately.

Nor does the evidence show that the Preferred Holders would necessarily provide a material benefit to the Debtors' constituencies, as compared to the current Plan. The unsecured creditors are treated the same under both plans – they get paid in full.[30] The Preferred Holders' Term Sheet gives the minority holders of the Preferred Equity an opportunity to participate with the Preferred Holders in financing their proposal, or they can take an immediate payment of 7% of the face amount of their shares. However, there is evidence in the record that the consideration allotted to the preferred stockholders under the Debtors' Plan, inclusive of the rights offering, is worth approximately 6.4%. (Apr. 18, 2007 p.m. Tr. at p. 48.) This makes the Preferred Holders' proposal only a slight improvement in terms of benefit to the minority

[30] It is uncertain whether the Preferred Holders would make the same payment as the current Plan to Beck, who founded Granite with Cornwell and who has a multimillion-dollar claim.

preferred stockholders.  As for the Secured Creditors, the Preferred Holders assert that their offer

to pay 100% of principal and interest obviously exceeds the value of the Plan consideration,

which the Debtors and Silver Point peg at approximately 85%. (Ex. 108 at 35.) The Preferred

Holders contend that Silver Point cannot possibly believe in the value opined by its expert and

that Silver Point's refusal to take the Preferred Holders' offer constitutes an implicit admission

"that its goal here is not, as it often has argued, to be repaid in full with riskless cash, but rather

to capture the Debtors' existing equity value, which is far higher than Silver Point's debt."

Preferred Holders Finding 91 at p. 28.

     The issue is not, however, whether Silver Point believes there may be upside to its

investment in the Debtors.  The issue before the Court is whether the Plan gives the Secured

Creditors value that is more than 100% of their debt.  It bears noting that one calculates market

value by considering what a willing buyer is willing to pay a willing seller, *when neither is under

a compulsion to trade*. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537-38 (1994) ("…the

market value of . . . a piece of property is the price which it might be expected to bring if offered

for sale in a fair market; not the price which might be obtained on a sale at public auction or a

sale forced by the necessities of the owner, but such a price as would be fixed by negotiation and

mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but

not compelled) to sell and a purchaser who desires to buy but is not compelled to take the

particular . . . piece of property."(citations omitted)); *Grandison v. Nat'l Bank of Commerce,* 231

F. 800, 804-05 (2d Cir. 1916); *United States v. Boccagna*, 450 F.3d 107, 116 (2d Cir. 2006);

*FDIC v. Elder Care Servs.*, 82 F.3d 524, 528 (1st Cir. 1996); *see also In re Superintendent of

Banks*, 207 N.Y. 11, 16, 100 N.E. 428, 429 (1912). The Preferred Holders have made it clear

through their Term Sheet that their offer does not cover the additional cost of the prepayment

premium, which would be payable in a transaction between a willing buyer and willing seller

when neither is under any compulsion to act.  This renders their offer inadequate to prove there is

value beyond the debt and indicative of just the opposite.  The Plan should be confirmed.[31]

<div align="center">Conclusion</div>

For the above reasons, the Plan is confirmed.  An appropriate form of confirmation order

will be entered.

Dated: New York, New York
       May 18, 2007

                                          /s/ Allan L. Gropper
                                          UNITED STATES BANKRUPTCY JUDGE

---

[31] The Plan contains a provision that would deprive the preferred and common stockholders of any recovery if an appeal is taken from an order of confirmation.  The Preferred Holders have not separately attacked this provision, and it did not impact the vote of any shareholder because all of the equity classes were presumed to reject the Plan and did not vote.  The Court will reserve decision on the propriety of this provision in the Plan in the event that any party seeks to enforce it.